**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ERIC CLOPPER,<br><br>Plaintiff<br><br>v.<br><br>HARVARD UNIVERSITY; PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION); THE HARVARD CRIMSON; AND JOHN DOES 1-10<br><br>Defendants | Case No.: |

## COMPLAINT AND JURY DEMAND

1. The Defendants named in the Complaint caused and are liable for the harm suffered by the Plaintiff, Eric Clopper, as detailed below when Harvard University terminated his employment.

## PARTIES

2. The Plaintiff, Eric Clopper ("Clopper"), is a private individual who resided in Massachusetts from February 2015 to June 2019, and who now resides in Washington, D.C. He started working for Harvard University on May 23, 2011 on an intermittent basis, and he worked full-time for Harvard University's Language Resource Center ("LRC") from July 17, 2017 through July 12, 2018.

3. The Defendant, Harvard University ("Harvard"), is a university and a corporation incorporated by a Massachusetts Colony charter dated 1650, with a principal place of business in Cambridge, Massachusetts.

4. The Defendant, President and Fellows of Harvard College, also known as the "Harvard Corporation" ("Harvard Fellows"), is Harvard University's governing board.

5. The Defendant, The Harvard Crimson, Inc. (the "Crimson"), is a Massachusetts corporation and newspaper doing business in Massachusetts.

JURISDICTION AND VENUE

6. The court has jurisdiction over this Complaint for diversity as all Defendant parties have places of business or reside in the Commonwealth of Massachusetts (and all events complained of occurred within the Commonwealth), and the Plaintiff, Eric Clopper, is a resident of Washington, DC. In addition, there is federal question jurisdiction over the Plaintiff's First Amendment right to free speech.

THE FACTS

**CLOPPER'S BELIEFS ABOUT CIRCUMCISION AND THE GENESIS OF HIS PLAY TO SHARE HIS BELIEFS, EXPRESSED AS A PRIVATE INVIDIVIDUAL**

7. The Plaintiff, Eric Clopper (hereinafter "Plaintiff" or "Clopper"), is Jewish.

8. After studying the practice for years, Clopper became one of a large and increasing number of people, including Jews, adamantly opposed to non-consensual circumcision or genital cutting. It is Clopper's mission in life to help end what he considers to be a harmful and unlawful traditional practice that harms babies and mutilates their genitals for life.

9. Clopper was invited to give a lecture about circumcision at Cornell University in October of 2017; he titled his lecture "Circumcision in the US: Identifying Truths & Trends in Genital-Cutting Cultures." Clopper's lecture contained graphic depictions of both circumcised and intact penises and frank discussions of how circumcision damages the penis for both masturbatory and sexual purposes.

10. Clopper paid to have his Cornell lecture videotaped and then showed his videotaped lecture to Harvard's Professor Michael Bronski of Harvard's Women, Gender, and Sexuality Department. Bronski was impressed and agreed to help Clopper deliver a lecture on the same topic with bigger scale at Harvard.

11. After some brainstorming, Clopper and Bronski decided the lecture should be turned into a play by incorporating more theatrical components. They named the play "Sex & Circumcision: An American Love Story" (the "Play").

**CLOPPER RELIED ON SUPPORT, ENCOURAGEMENT, AND HELP FROM HIS MANAGER AND HARVARD TO DELIVER HIS EDUCATIONAL, ADULT-ONLY, EXPLICIT PLAY ABOUT CIRCUMCISED PENISES**

12. Clopper's manager was Thomas Hammond ("Hammond"), the Director of Harvard's Language Resource Center. Hammond was also impressed with Clopper's Cornell lecture and decided to help him produce the Play at Harvard. Hammond approved everything Clopper did in connection with the Play. He gave Clopper permission to work on the Play occasionally at Harvard; he approved the advertising; he approved every word and action in the Play. Indeed, Hammond assisted in conceiving and producing the entirety of the Play's content and served as stage manager when Clopper performed the Play.

13. On March 1, 2018, Clopper reserved Harvard's Sanders Theatre, a large and historic venue, for his Play for May 1, 2018. The contract specified that Clopper and a charitable organization are licensees and the contract price was $4,020.00, which Clopper personally paid to Harvard as consideration to perform at Sanders Theatre. The contract made no mention of prohibition of nudity, nor was Clopper made aware of any restriction on nudity, and had Harvard informed him of any such prohibition, Clopper would have chosen another venue for the Play.

14. Harvard's Box Office Manager Tina Smith began promoting Clopper's Play on March 16, 2018 on Harvard's Office of the Arts website. The title of Clopper's Play, "Sex & Circumcision: An American Love Story," made clear that the Play would include "sex," "circumcision," and a "love story." There were also "EXPLICIT CONTENT" warnings on every advertisement Harvard hosted online and on the printed ads Harvard placed in the Sanders Theatre complex itself. The ticketing site also included the disclaimer that the play was "Not Appropriate for Children." The pictures Harvard used to advertise the Play showed a nude Clopper pointing to his genitals, which were obscured by a thin censor bar (Exhibit 1).

15. Clopper advertised the Play by placing posters around campus as is customary for university presentations and events. These posters were variations of the nude picture of Clopper that Harvard was using to advertise they play; they showed Clopper naked with his genitals obscured by a censor bar and "EXPLICIT CONTENT" warnings on them, thus communicating to potential playgoers that there would be nudity. Clopper further communicated there would be graphic depictions of penises in his play about circumcision by hiring actors to wear seven-foot inflatable penis costumes in Harvard Yard and hold picket signs of these same posters. On April 28, Professor Bronski informed Clopper that "all of my students who say [sic] the parade of men thought it was great." Online videos show Clopper taking group portraits with dozens of citizens

around Cambridge smiling and laughing with his group of actors and appreciating what Bronski described as "innocent, sexual material" in an April 29 email.

16. Clopper believes that if Harvard had an issue with the content of his Play, Harvard should have informed him that his "explicit" play about "sex" and "circumcised [penises]" was unacceptable on campus, before he invested his life savings to advertise it and perform it at Harvard. Instead of taking issue with the content of Clopper's Play, Harvard advertised Clopper's explicit, adult-only Play and collected money from its ticket sales without complaint. Furthermore, Harvard made many express and implied promises to Clopper – verbally and in writing – that he would be free to express himself in his explicit Play without retaliation because of protection of free expression described by Professor Bronski, Clopper's manager Hammond, Harvard's outgoing president Drew Faust, Harvard's incoming president Lawrence Bacow, and Harvard's Free Speech Policy.

17. Clopper invested his life's savings, went into debt, and solicited charitable contributions from opponents of circumcision to create, advertise, stage, and perform the Play. The Play cost Clopper and his donors approximately $40,000. Clopper relied on the promises of Harvard officials and Harvard's Free Speech Policy that his free speech rights were comprehensive and that they would be respected when he delivered his anti-circumcision Play as a private individual to a willing adult audience. Clopper's manager Hammond even urged Clopper to take full advantage of his protected speech by including a nude dance and an educational slideshow relating to masturbation.

18. Three days before his Play on April 28, 2018, Harvard informed Clopper by email that his Play "may well not include nudity." Clopper believed that he had the right to include nudity in

the Play: nudity was an essential part of the message about circumcision, which involves exposing boys' and men's sex organs and amputating part of them; the Play was about "sex" and "circumcised [penises]; a Harvard professor and Clopper's boss helped Clopper create the Play with nudity in it and approved it; Harvard's policies encourage and protect free speech and Clopper was told he could rely upon them; Harvard condones and even encourages nudity and sexual art in other situations; Harvard disseminated advertisements disclosing nudity and sexual content; and the written contract for Sanders Theatre did not prohibit nudity. Again, if it had, Clopper would have chosen a different venue. Clopper also believed including nudity in the Play helped present his messages more powerfully. The inflatable penises and advertisements alerted theatregoers that there would be nudity and penises in the Play. In addition, Clopper had invested his life savings and donor's money in the Play and it was far too late to change the Play, the schedule, or the venue. Harvard's essentially last minute command to avoid nudity would infringe upon his contractual rights and his constitutionally protected right to free speech that Harvard promised to protect and had supported since the inception of the Play. *Cabaret Enterprise v. Alcoholic Beverages Control Commission*, 468 N.E.2d 612, 614-615 (Mass. 1984) (holding that nude dancing is a protected form of speech under Article 16 of the Massachusetts Constitution). Based on this, Clopper responded that the Play would be "within the bounds of propriety".

## CLOPPER DELIVERED HIS PLAY ON MAY 1, 2018 TO MULTIPLE STANDING OVATIONS

19. Clopper's May 1, 2018 Play was 140 minutes long. The first 135 minutes largely followed a lecture format and went smoothly. In the first 130 minutes, Clopper explained how circumcision can be considered a form of genital mutilation. Clopper showed how circumcision was a social

phenomenon limited to the Jewish people, but through the consistent efforts of a dedicated

minority, the practice had expanded to all of America. The audience of hundreds of individuals

from the Harvard community and beyond gave Clopper a standing ovation.

20. From approximately the 130- to 135-minute mark, Clopper performed a nude dance to

Britney Spears' *Toxic* music video with an inflatable love doll named "Britney." "Britney" was

the big reveal of the "love story" Clopper had hinted at throughout the Play. Clopper's nude

dance provided much-needed comic relief after the heavy message Clopper had just delivered to

the audience. The audience laughed and clapped in unison to the song; some gave Clopper a

standing ovation after the dance.

21. Immediately following the nude dance, Harvard's "Production Assistant/Venue

Representative" Maureen Lane sprinted towards Clopper, arms raised, screaming at him for his

nude dance. The lights flashed on and off, which many members of the audience interpreted as

the end to the Play, so many people started filing out of the theatre. However, Clopper's Play

was not over.

22. From the 135 to 140-minute mark, Clopper intended to get dressed and share a final message

about the irreconcilable doctrines of circumcision, which he considers to be genital mutilation,

and modern-day human rights. As Clopper shared this message, an explicit "love scene" between

him and "Britney" was supposed to play, thus highlighting the irrational status quo in

contemporary culture that acts of genital mutilation against infants are tolerated, but harmless

sexual acts such as masturbation or procreative sex that actually create the infant are vilified in

America. This final "love scene" concluded with the message that "[circumcision] is the most

obvious and evil lie in human history," and that Clopper "imagine[s] that some powerful interests may not appreciate [his] Play."

23. Clopper indicated multiple times throughout his Play that he was speaking only for himself and not for Harvard. Clopper believes that anyone who had seen the Play's advertisements would be adequately prepared for an adult-only Play that contained frank and explicit scenes about sex, circumcised penises, and a satirical love story.

**THE HARVARD CRIMSON**

24. The following day, on May 2, 2018, Harvard's student newspaper named The Harvard Crimson ran an article titled "Harvard 'Reviewing' Employee's Nude, Anti-Semitic Rant in Sanders Theatre", written by Michael Xie and Lucy Wang.

25. Clopper was shocked at what he perceived to be a gross and malicious misrepresentation of the Play. Clopper spoke with one of the student reporters, Michael Xie, the following day. During their consensually recorded conversation, Xie had admitted that neither he nor Ms. Wang had seen his Play, but that:

> Our cover[age] is mostly around the Harvard angle. Where Harvard is standing regarding your performance. So, I guess it may seem a little more one-sided just due to the fact that Harvard is kind of taking a one-sided stance on this, as opposed to looking at the entire thing broadly.

Clopper did not know that "Harvard" took positions on the content of presentations shared within the university's walls. He also did not know that Harvard had editorial influence over the student newspaper, The Crimson. Speaking for The Crimson, Xie admitted that Harvard drove one-sided coverage of Clopper's Play.

26. The Harvard Crimson, presumably still under the influence of Harvard, went on to publish two more direct attack articles against Clopper: "Employee Planned Show Containing Anti-Semitism, Nudity in Harvard Workplace During Work Hours" (May 4, 2018); and "Against 'Sex and Circumcision: An American  Love Story'" (May 9, 2018). The Harvard Crimson also published two more articles mentioning Clopper, 1as an example of anti-Semitism: "Harvard 'Investigating' After Swastika Found at School of Public Health" [gratuitously referring and linking to a story about Clopper's performance] (May 12, 2018); and "Expanding the Diversity Conversation" (May 24, 2018).

**HARVARD'S RETALIATION FOR CLOPPER'S SPEECH AS A PRIVATE INDIVIDUAL**

27. Clopper had scheduled and took vacation time from April 23, 2018 through May 4, 2018. On May 4, Clopper's Dean Robert Doyle informed Clopper that he would be placed on paid administrative leave because Harvard, "need[s] to conduct a careful review of the events leading up to and including the show that took place at Sanders Theatre on Tuesday evening, May 1."

28. Harvard did not inform Clopper why it had suspended his employment or for what he was being investigated, and the scope of the investigation continued to expand with time.

29. The first and only meeting Clopper had with Harvard during the 69-day "investigation" of him was on May 9, 2018. Dean Doyle and HR representative Ann Marie Acker questioned Clopper to discern whether he violated work policy by impermissible use of Harvard's time or resources for his Play, as claimed in the May 4, 2018 Crimson article. Clopper's manager Hammond informed Dean Doyle via email that Clopper's behavior was in line with the department's policies for the last fourteen years, and that "[i]n fact, the truth of the situation runs

in the opposite direction: Eric did some work for the Center while he was technically on vacation [because Clopper] would rather spend the vacation time to be sure he was not abusing Harvard's time."

30. Harvard, unable to establish a pretextual work policy violation by Clopper, on the following day, May 10, expanded the scope of its "investigation." Harvard's Director of HR Consulting Gary Cormier emailed all staff and students of the LRC to "offer an opportunity to speak me [sic] confidentially in FAS HR if you would like to discuss any continued concerns related to the event that took place in Sanders Theatre on May 1st by an FAS colleague (Eric Clopper) or any of the activities related to that event." Harvard thereby solicited members of the community who had not previously complained for material to use against Clopper.

**CLOPPER FILED COMPLAINT WITH HARVARD'S OLER**

31. Fearing that the integrity of Harvard's administration had been compromised by the "powerful interests" Clopper had mentioned in his Play, Clopper filed a formal complaint with Paul Curran, a Harvard-employed lawyer and the director of Harvard's Office of Labor and Employee Relations ("OLER"). In this official complaint, Clopper alleged, *inter alia*:

a. Harvard violated its own free speech policy, as well as Clopper's free speech protections afforded to him by the US and MA state constitutions; and

b. Harvard conspired with Baystate [the events production company Clopper hired on Harvard's recommendation] ("Baystate") to steal an unauthorized recording of his copyrighted Play in order to conduct a pretextual investigation and  to retaliate for his anti-circumcision beliefs.

32. In the official complaint to OLER, Clopper explained with great specificity his grievances with how this "investigation" was being carried out, including, but not limited to, how Harvard had stolen a recording of the Play. Without Clopper's permission, Baystate, the events management company for the Play, took a digital screen capture of his copyright protected presentation slides from his laptop, and provided it to Harvard to supply further ammunition against Clopper in its disciplinary review. The OLER complaint stated:

> "There are many ethical problems with this, but there are also actionable legal ones as well. Baystate was contracted by me, not by Harvard. But, they are unquestionably motivated to toady to Harvard because they want to continue as a preferred events vendor for Harvard's premier venue(s). This is yet another example of Harvard's bullying behavior, in my view. Baystate, and now Harvard, are sharing likely illegally obtained explicit videos of me with my friends and colleagues, without my consent, under the guise of some vague "review." I am deeply distressed emotionally and otherwise by this behavior, which seems almost criminal to me. How is this different from the distribution of "revenge porn"?"

33. OLER's Curran responded approximately three weeks later on June 5, 2018 that there "has not been any action taken with respect to [Clopper's] employment" while Clopper remained under suspension and "investigation," and "therefore it would be premature at this point to conduct an investigation of your May 17 complaint."

34. In an email on July 3, 2018, Clopper implored Curran to begin OLER's investigation without further delay, "because of grave concerns about the integrity of the FAS administrators assigned to carry out this review. I fear that they will continue to engage in unethical, perhaps even illegal,

activities in their zeal to terminate my employment." Curran ignored Clopper's last plea to settle things amicably before Harvard terminated his employment.

**CLOPPER'S TERMINATION FOR HIS PROTECTED SPEECH**

35. During Harvard's protracted 69-day "investigation," its focus continued to shift for want of any violation that would withstand scrutiny. On the 69-day mark, on July 12, 2018, Harvard called Clopper into a meeting where Dean Doyle read Clopper's termination letter in a barely audible voice. Clopper's termination letter cited three reasons for Harvard's decision to terminate him:

> a. Clopper's nude dance;

> b. The sexual content in Clopper's Play; and

> c. The amorphous allegation that Clopper had engaged in "excessive, disruptive, and distressing" behavior in the LRC workspace prior to his show.

36. Clopper was surprised to see the content of his show cited as reasons for his termination, especially since he performed the Play in his individual capacity; his Harvard-employed boss approved everything in the Play and even directed portions of it; and Harvard's Free Speech policy promised Clopper that Harvard will allow him to express his personal beliefs "consistent with First Amendment standards."

37. Clopper was surprised to see the allegation of "disruptive" behavior in the LRC workspace by individuals who had never met him or seen him work there. Clopper's work reviews were uniformly positive with no mention of disruptive behavior. As stated, Clopper's boss approved his work on the Play. The allegation of disruptive behavior is pretextual. Hammond informed

Clopper that Dean Doyle told him that *the dean of the college at the time, Michael Smith, had decided to terminate Clopper, whatever the cost*.

38. Dean Leslie Kirwan had decided to hire Clopper for his full-time role on July 11, 2017. She emailed Dean Doyle and Hammond later that day that she, "had sensed a wisdom in Eric beyond his years."

39. One week before his Play on April 24, 2018, Den Doyle, Dean Kirwan's subordinate and Hammond's boss, Dean Doyle gave Clopper a money bonus for excellent work since his hiring, and stated, "I truly wish that there was a bigger fund, so that I could provide a bonus to match your performance."

40. On June 4, 2018, Dean Kirwan hosted her annual picnic for all of the departments she oversees. One of Clopper's colleagues who still works at Harvard wrote "ERIC" on his nametag to express his support for Clopper. Others began to join him, similarly affixing "ERIC" nametags to their chests.

41. *Six weeks after the Play*, on June 14, 2018, Thomas Hammond gave Clopper his annual performance review. Hammond called Clopper a "leading performer in every respect" and the "de facto associate director" of the department. Two Harvard faculty members and a technical colleague gave Clopper very positive feedback as well.

42. During this 69-day "investigation," Harvard had solicited complaints about Clopper directly from Harvard students after Harvard drove negative coverage about him in their student newspaper The Crimson. Some students complained because of what they read in The Crimson. So, it is possible Harvard is referring to these solicited student complaints in their allegations of

misbehavior. Harvard did not give Clopper the opportunity to respond to or defend himself against any such student complaints.

**HARVARD'S SUBSEQUENT RETALIATION AGAINST HAMMOND**

43. Shortly after terminating Clopper on July 12, 2018, Harvard management focused its energies on Hammond, who, as stated, was Clopper's stage manager for the Play and supported Clopper's right to perform the Play. Harvard began trying to collect "evidence" of alleged mistakes and/or malfeasance by Hammond, such as requiring medical documentation relating to his absences for his hospitalizations, which it had never done before.

44. Furthermore, at the end of 2017, Harvard had decided to build a new Language Resource Center ("LRC") because of Clopper's recent hiring. The goal was to make a "flagship center" to bring language learning into the 21st century. Hammond and Clopper were the only two full-time employees of the LRC, and accordingly Harvard management consulted with them extensively during the planning and design stages. Hammond and Clopper were invited to all the design meetings from late 2017 until the Play. Following the May 1, 2018 Play and while Clopper's employment was suspended, Harvard stopped inviting Hammond to some critical management meetings concerning his center's future, even though Hammond had been the director of the LRC for the previous fourteen years.

45. Harvard then hired PhD sociologist Adonica Lui in mid-August to "help" Hammond run his department. Dean Doyle informed Hammond of this new hire on July 24, 2018. According to Hammond's text messages to Clopper on that day, it was "entirely clear" to Hammond that Harvard hired someone who "duplicates [his] skill set" and that Harvard had "basically replaced

me." Harvard then required Hammond to submit a detailed list of his job duties to Harvard and train Lui how to do them.

46. Hammond suspected that Harvard excluded him from meetings about his center's future as retaliation for having refused to terminate Clopper, and for having filed a complaint to his office's Title IX representative Sandy Stergiou on June 25, 2018 alleging that Harvard had created a hostile workplace environment because Harvard had compelled him to view stolen, sexually explicit materials of Clopper. Hammond's Title IX complaint went unacknowledged. Hammond emailed Clopper on September 8, 2018 that it was clear to him that Harvard was retaliating against him for "having the temerity to complain."

47. Prior to the Play, in March 2018, Hammond took time off from work for surgery. After getting the surgical results, Hammond had informed Clopper that he had cancer, possibly terminal. After the Play, Hammond informed Dean Doyle that he had potentially cancerous masses growing in his lungs. Clopper had no money, had increasing debts, and no job following his suspension and investigation. Clopper's apartment lease ended in September 2018, so Clopper accepted Hammond's offer to live in the additional room in his Harvard-owned apartment until Clopper could get back on his feet.

48. During September 2018, Harvard's retaliatory efforts against Hammond continued to increase despite Hammond's loyal service to the institution for over 20 years and his failing health. Hammond began to unravel as he grew increasingly frantic that he would be terminated, evicted from his Harvard-owned apartment, and left without health insurance or palliative care if his cancer proved terminal. On September 17, 2018, Harvard sent Hammond – a Harvard graduate, a 20-year member of the Harvard community, and the director of the LRC for the

previous 14 years – a "Final Written Warning" for his "involvement in events leading up to Eric Clopper's Sanders Theater performance." Hammond believed this letter foreshadowed his impending termination.

49. The following week on September 24, 2018, Hammond committed suicide using an asphyxiating breathing hood fed and filled by helium gas.

50. Clopper found his friend and mentor Hammond deceased in his apartment bedroom. With instructions from the 911 operator, Clopper performed CPR on Hammond's corpse until the medics arrived to pronounce him dead. When the Harvard University police arrived, they informed Clopper that he was banned from Harvard's campus and must leave the apartment, carrying what of his possessions he could.

**HARVARD'S OLER INVESTIGATION, WHICH TOOK 267 DAYS TO COMPLETE, IGNORED CLOPPER'S CLAIMS**

51. On January 7, 2019, Clopper emailed Brian Magner, a Harvard-employed lawyer and an Associate Director of OLER, asking OLER to conclude its investigation of his complaint dated May 17, 2018 within one month because his complaint had gone unresolved by Harvard for over seven months. On February 7, 2019, Magner sent Clopper the results of OLER's "investigation." OLER's review failed to address or even acknowledge Clopper's two allegations that:

   a. Harvard had violated its own free speech policy, as well as Clopper's free speech protections afforded to him by the US and MA state constitutions; and

   b. Harvard conspired with Baystate to steal an unauthorized recording of his copyrighted Play in order to conduct a pretextual investigation to censor his anti-circumcision beliefs.

**BLACKBALLED FROM GRADUATE SCHOOL AT HARVARD**

52. A primary reason relied on by Clopper to take the full-time, managerial position at Harvard was its Tuition Assistance Program (TAP). Through TAP, employees receive a 90% tuition discount, including for Harvard's Graduate School of Engineering and Applied Sciences (SEAS).

53. Clopper applied to SEAS Data Science Program for the Fall of 2018. Clopper had outstanding qualifications. He was a leading physics graduate from Colgate University; he scored in the 99th percentile of his GRE standardized tests; and, he had compelling recommendations and professional employment reviews. Clopper and Hammond anticipated that he would be accepted into Harvard's program.

54. At a February 25, 2018 meeting, a professor on the admissions committee at SEAS informed Clopper that he was a very, very strong candidate and that he had made it to the final round, but that a fellow faculty member of the Jewish faith had blackballed [rejected a possible candidate] Clopper, presumably for his prior anti-circumcision advocacy. Feeling sympathy for Clopper, this professor invited Clopper to attend his Introduction to Data Science class in Fall of 2018 and to reapply to the program the following year.

55. Despite Clopper's termination on July 12, 2018, this professor honored his promise to Clopper and allowed him to attend his Introductory to Data Science class in the Fall of 2018; an opportunity that Clopper took very seriously in anticipation of reapplying to the Fall 2019 program. Following Hammond's suicide, Clopper heeded Harvard University Police Department's orders to not return to campus. Thus, Clopper was forced to withdraw from the Introduction to Data Science class. Clopper knew that his ban from Harvard campus, combined

with his withdrawal from this introductory class, meant that he would not be admitted to the graduate program. Clopper could no longer participate in the course that he had been taking to improve his chances of being accepted into that program for the Fall of 2019, and he instead applied to law school where he is currently a student.

## CLAIMS FOR RELIEF

### COUNT I

### Violation of United States Constitution, Amendment 1

### Harvard

56. Plaintiff re-alleges each and every allegation in paragraphs 1 through 55 above as if fully set forth herein.

57. Under the First Amendment, a government, including a municipal government vested with state authority, has no power to restrict expression because of its message, its ideas, its subject matter, or its content. U.S.C.A. Const.Amend. 1; *Reed v. Town of Gilbert, Ariz.* 576 U.S. 155, 162 (2015).

58. Content-based laws which target speech based on its communicative content are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. *Reed v. Town of Gilbert, Ariz.* 576 U.S. 155, 162 (2015).

59. Regarding nudity, the Supreme Judicial Court of Massachusetts held in *Cabaret Enterprise v. Alcoholic Beverages Control Commission*, 468 N.E.2d 612, 614-615 (1984), that nude dancing is

a form of free speech. Therefore, the Commonwealth of Massachusetts has ruled that nude performances are not a compelling state interest warranting restriction or prohibition.

60. Harvard represented to Clopper a few days before his production that the terms and conditions of its entertainment license with the City of Cambridge prohibit nudity at the Sanders Theater, and that Clopper would be prohibited from exhibiting nudity during his play. This prohibition is void under the First Amendment and is an unconstitutional restriction of the right to free speech for those who lease the Sanders Theatre for their productions, including Clopper.

61. Moreover, Harvard relied on its representation to Clopper that the terms of its entertainment license with the City of Cambridge prohibit nudity, and used this reasoning as justification for interrupting Clopper's play, causing defamatory remarks to be published about him in the Harvard Crimson, terminating his employment at Harvard, and denying him entry into graduate school at Harvard.

62. In doing so, Harvard violated Clopper's First Amendment right to free speech, in addition to committing several other independent tortious acts against Clopper.

63. As a result, Clopper has suffered damages.

## COUNT II

### Mass. Gen. L. Ch. 12, §§ 11I

### Massachusetts Civil Rights Act

### All Defendants

64. Plaintiff re-alleges each and every allegation in paragraphs 1 through 63 above as if fully set forth herein.

65. The Massachusetts Civil Rights Act (MRCA), Massachusetts General Laws, Chapter 12, §§ 11H, 11I, authorizes a private plaintiff to seek compensatory damages and injunctive relief against anyone who interferes with the plaintiff's exercise of constitutional rights. The statute provides a cause of action:

> [w]henever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth.

*Id.* To establish a claim under the act, "a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." *Currier v. Nat'l Bd. of Med. Exam'rs*, 965 N.E.2d 829, 837-38 (Mass. 2012). Unlike its federal counterpart, 42 U.S.C. § 1983, the Massachusetts Civil Rights Act does not require a party to show that a government actor deprived the plaintiff of a constitutional right. *Sena v. Commonwealth*, 629 N.E.2d 986, 993 (Mass. 1994).

66. Regarding element (1), every person in the Commonwealth including Clopper has the constitutional right of free speech, and a statutory right to free speech under The Massachusetts Civil Rights Act. Regarding nudity, the Supreme Judicial Court of Massachusetts held in *Cabaret Enterprise v. Alcoholic Beverages Control Commission*, 468 N.E.2d 612, 614-615 (1984), that nude dancing is a form of free speech.

67. Regarding elements (2) and (3), the defendants named below interfered with or attempted to interfere with Clopper's constitutional and statutory rights to free speech, privacy, and other rights by threats, intimidation, or coercion by, without limitation, the conduct described below.

a. The defendant Harvard (i) by telling Clopper shortly before he performed the Play that he could not perform nude in it; (ii) by telling Clopper one day before his Play that he could no longer put up posters advertising his Play despite positive feedback and encouragement from his boss Hammond, senior faculty member Professor Bronski, and other faculty; (iii) telling Baystate to stop the performance of the Play, if it did so; (iv) by Harvard theatre manager Maureen Lane physically and threateningly blocking him from returning to the Play to turn off the projector and to make concluding remarks; (v) by Harvard administrators publishing defamatory and intimidating remarks about Clopper in The Crimson; (vi) by Harvard encouraging Crimson reporters to publish defamatory remarks about Clopper and the Play; (vii) by threatening to terminate Clopper for working on the Play at Harvard, even though his boss Hammond approved all such work; (viii) by not telling Clopper what he was accused of so that he could defend himself, by continuously expanding the investigation, and by not conducting the investigation expeditiously; (ix) by threatening to terminate Clopper's employment for expressing his sincerely held opinions; (x) by threatening to phase out his department before terminating him; (xi) by invading Clopper's right to privacy by stealing sensitive videos of Clopper and disseminating them to his friends and colleagues; (xii) by terminating his employment based in part on the words and nudity in the Play, even though he performed the Play as a private individual with his boss's approval; (xiii) by banning him from the campus because of his speech, thereby preventing him from going to graduate school at Harvard; and (xiv) by

acquiescing to pressure from third parties to violate Clopper's rights by engaging in, without limitation, all the aforementioned conduct.

b. The Harvard Crimson interfered with Clopper's right to free speech by (i) falsely claiming that he did not have the right to say what he said during the Play; (ii) by falsely claiming that he did not have the right to express himself by dancing nude in the Play; (iii) by not allowing him to publish a rebuttal in The Crimson when he asked to do so; (iv) by not allowing him to publish a rebuttal in The Crimson when his attorney asked The Crimson to let him do so; (v) by failing to adhere to the demands in Clopper's attorney's May 13, 2018 Cease & Desist letter; (vi) by infringing on Clopper's right to privacy and his right to be free from defamation; and (vii) by acquiescing to pressure from third parties to violate Clopper's rights.

c. Clopper perceived the foregoing conduct by each of the defendants to constitute threats, intimidation, and coercion.

68. For a valid MRCA claim, Clopper need not prove that the defendants interfered with his rights by "threats, intimidation, or coercion" if the defendants acquiesced to pressure from third parties who did wish to interfere with such rights. *See Redgrave v. Boston Symphony Orchestra, Inc.*, 502 N.E.2d 1375, 1379–1380 (Mass. 1978). Furthermore, if the defendants are found liable under the MRCA for acquiescence to third-party pressure, it is not a defense for the defendants to show that its actions were motivated by additional concerns, such as threat of economic loss, for example loss of donations from special interest groups. *Id.*

69. In *Redgrave*, performance artist and plaintiff Vanessa Redgrave signed a contract with defendant Boston Symphony Orchestra ("BSO") to perform in their theatre. *Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888 (1st Cir. 1988), *petition for cert. filed*, 1988 WL

1093370 (U.S. Nov. 29, 1988) (No. 88-912), pages 5–8 . Shortly after signing the contract, BSO board member Irving Rabb called BSO General Manager Thomas Morris to see if "BSO could get out of [the contract]" because Redgrave was "very anti-Israel" and believed that the Palestinian people should have a homeland of their own. *Id.* Rabb, a trustee and board member of Hebrew College, Hebrew SeniorLife, and the Temple Israel of Boston took it upon himself to speak for this Jewish community, saying to Morris "there's a great deal of anger about this in the Jewish community . . . I think you will offend a tremendous number of Jews in the community if she performs." *Id.* Morris complied with the demands of his Jewish boss; he removed Redgrave from the performance. *Id.* Later that day, Morris wrote a memorandum to the chairman of the BSO trustees that, "The sentiments of the Jewish [sic] are without question stronger than we had anticipated." *Id.* Morris removing Redgrave from the performance was not without opposition; the BSO stage director Peter Sellars refused to proceed without Redgrave, and thus BSO cancelled the entire production. *Id.*

70. The facts in this complaint are similar to the facts in *Redgrave* which led the Massachusetts Supreme Court to hold that acquiescing to pressure from third parties satisfied the "threats, intimidation, or coercion" element of an MRCA claim. Like in *Redgrave*, Clopper is a performance artist who signed a contract to perform at a high-end theatre with the defendants. Like the plaintiff in *Redgrave*, Clopper holds views supporting the human rights of children (and Palestinians) in opposition to certain, vocal, and organized interest groups. While Clopper was expressing his sincerely held beliefs in his Play, defendants Harvard and Baystate stopped the performance after the nude dance, thus breaching the contracts he had with Harvard and Baystate regarding the performance. This breach was similar to BSO's breach in *Redgrave*, except

Harvard's breach was mid-performance instead of prior to performance, and thus arguably leading to greater damages.

71. The pressure applied from outside parties to Harvard after the Play was far greater than before or during the performance, due, in-part, to the Crimson's defamatory coverage immediately following Clopper's performance. Upon information and belief, there was substantial outside pressure from Jewish individuals and groups in Boston and beyond to retaliate against Clopper for expressing his sincerely held anti-circumcision beliefs . If Harvard acquiesced to such pressure by, without limitation, breaching Clopper's employment contract, his Sanders Theatre contract, its own policies and all the conduct complained herein, then Clopper would have a valid and actionable claim against Harvard under the MRCA. Furthermore, it is immaterial whether Harvard was motivated by additional concerns for investigating, retaliating, and terminating him, such as the "reasons" their "investigation" cited, or by the concern that Harvard may suffer "economic loss" by loss of money from Jewish donors; the mere act of acquiescing to third party pressure is sufficient to uphold an actionable MRCA claim. *See Redgrave*, 502 N.E.2d at 1379–1380.

72. If the Crimson violated Clopper's right to be free from defamation or any other of his rights from the conduct described herein, and these violations were a result of pressure exerted on them by Harvard or any other third party, Clopper has a valid and actionable MCRA claim against the Crimson even in the absence of other behavior that would satisfy the "threats, intimidation, or coercion" element. *Id.*

73. Furthermore, "threatening, intimidating, and coercive actions directed at third parties should be included in considering any conduct that forms the basis of a claim under the MRCA." *Haufler v. Zotos*, 845 N.E.2d 322, 334 (Mass. 2006) Economic pressure can rise to meet the

statutory definition of "coercion" if such pressure compels individuals to forgo rights otherwise

meant to be protected by the MRCA. *See Buster v. George W. Moore, Inc.,* 783 N.E.2d 399, 411

(Mass. 2003). The standard for determining whether conduct constitutes threats, intimidation or

coercion is an objective, reasonable person standard. *Currier*, 965 N.E.2d at 838.

74. Hammond emailed the LRC's Title IX representative Sandy Stergiou on June 25, 2018

alleging Harvard had created a hostile workplace by forcing him to view stolen, sexually explicit

materials of Clopper while Dean Doyle and HR Representative Gary Cormier oversaw the

process under implicit, if not explicit, threat of discipline up to and including termination.

Harvard had the responsibility to "adopt . . . grievance procedures providing for prompt and

equitable resolution of . . . employee complaints alleging any action [in violation of Title IX]."

34 C.F.R. § 106.8(b). Harvard did not do so. In fact, Harvard had failed to acknowledge

Hammond's Title IX complaint, and, instead, proceeded to retaliate against him as Hammond

had indicated to Clopper in his September 8, 2018 email. Also, based on information and belief,

Hammond had indicated to Dean Doyle multiple times in person and via email that he perceived

Harvard's actions to be unfair and retaliatory for him having the temerity to complain about what

he perceived to be Harvard violating his rights.

75. Harvard, and especially Dean Doyle, knew of Hammond's chronic health problems.

Hammond had taken significant time off in the past for major heart surgery among other

ailments. Shortly after the May 1, 2018 Play, Hammond informed Dean Doyle of masses

growing in his lungs. Via Harvard's actions -- including but not limited to (i) excluding

Hammond from management meetings regarding his center; (ii) compelling him to view stolen,

sexually explicit video footage of his subordinate Clopper; (iii) refusing to address or even

acknowledge his Title IX complaint; (iv) requesting medical and other receipts in a fishing

expedition to "catch" him in wrongdoing; and (v) sending him a "final warning" letter -- Harvard was retaliating against Hammond for trying to assert his constitutionally and statutorily protected rights that the MRCA is designed to protect. Hammond would have lost his job, his healthcare in a time of increasing need, his home (since he lived in Harvard-owned apartments), his community, and all other necessities for life had Harvard completed its retaliation by terminating Hammond. A reasonable person would construe Harvard's action as qualifying as economic coercion under the MRCA statute, and thus Harvard violated Hammond's rights meant to be protected under the MRCA statute.

76. Harvard's actions towards Hammond constitute the kind of "threatening, intimidating and coercive actions" directed at a third party which should be included when considering the conduct forming the basis of a claim under MRCA, and Clopper suffered damages as a result.

## COUNT III

## Breach of Contract for Sanders Theatre

## Harvard

77. Plaintiff re-alleges each and every allegation in paragraphs 1 through 69 above as if fully set forth herein.

78. Harvard's contract with Clopper as licensee which both parties signed (the "Contract") and Clopper paid for, states that the use of the space is subject to laws and policies, including but not limited to the Sanders Theatre Policy Book. This policy book states that the entertainment license from the City of Cambridge does not encompass nudity.  However, Harvard recommended and reserved Harvard's Sanders Theatre for the Play for May 1, 2018 knowing that the Play would be about circumcision, a controversial topic of which some degree of nude depiction might be expected, and impliedly promised to allow a frank discussion of it. Harvard

knew that given the Play's subject matter, it would likely contain nudity as Clopper had

advertised it as such (Exhibit 1), and Harvard subsequently hosted these ads promoting a  show

likely to contain nudity on their website, benefitting from the ticket receipts without complaint.

A Harvard professor and Clopper's boss approved of the contents of the Play and the

advertisements, including how Clopper advertised the Play with actors wearing inflatable penis

costumes. By its words, omissions, actions, and policies, Harvard, if not expressly, then

impliedly promised that Clopper could discuss the controversial topic of circumcision frankly;

that portions of the Play would contain nudity; and that it would not ask for, obtain, and use a

copy of Clopper's creative material without his permission.

79. Harvard breached the express and implied contract between Harvard and Clopper for Sanders

Theatre by: (i) telling Clopper shortly before the Play that it could not contain nudity; (ii) by

telling Baystate to stop the Play, if it did so; (iii) by obtaining a digital copy of Clopper's Play

and other materials without his permission; and (iv) by terminating Clopper based upon

Clopper's words and actions in the Play; and (v) by banning him from campus and thereby from

being accepted into graduate school at Harvard at a deeply discounted price.

## COUNT IV

### Breach of Employment Agreement and Free Speech Policy

### Harvard

80. Plaintiff re-alleges each and every allegation in paragraphs 1 through 79 above as if fully set

forth herein.

81. Harvard also employed Clopper and thus had an express and implied employment agreement

or contract with him.

82. Clopper made clear in the Play that he was performing it in his individual capacity, not as an employee at Harvard, and that the Play expressed his own views and not those of Harvard. Thus, the Play had nothing to do with Clopper's employment at Harvard.

83. Harvard Professor Bronski told Clopper he had a right to free speech, and to deliver a rousing performance in the Play, and that Harvard would not retaliate against him for the Play, and Professor Bronski approved the advertising. Clopper's manager Hammond told him that he could work on the Play at Harvard; that he had a right to free speech in the Play; Hammond approved every word and action in the Play and its advertising, so everything Clopper did was approved by his boss Hammond at Harvard. Harvard's written free speech policy promises to protect members of the community who engage in free speech from retaliation, and to take violations of free speech policies seriously. Harvard's outgoing and incoming presidents also underscored their promise to protect free speech in speeches shortly before and after the Play. Harvard thereby expressly and impliedly promised in its employment agreement with Clopper to allow him to say what he said in the Play as a private individual and to perform nude in it.

84. Harvard breached the express and implied employment agreement between Harvard and Clopper, without limitation, by: (i) accusing Clopper of having acted improperly and threatening to fire him for having worked on the Play occasionally at Harvard; (ii) telling Clopper shortly before the Play that it could not contain nudity; (iii) Harvard's Maureen Lane preventing Clopper from returning to the stage to make his final remarks and conclude the Play; on information and belief, by telling Baystate to turn on the light and stop the Play; (iv) by obtaining and disseminating a digital copy of Clopper's Play and other materials without his permission; and (v) by falsely accusing Clopper of improprieties, in and through The Crimson, including working working on the Play during work hours; being anti-Semitic; and performing nude; (vi) by

retaliating against Clopper and terminating him based upon Clopper's words and actions in the Play; and (vii) by banning him from campus and thereby from being accepted into graduate school at Harvard at a deeply discounted price.

85. As a result, Clopper suffered damages.

## COUNT V

### Breach of the Covenant of Good Faith and Fair Dealing

### Harvard

86. Plaintiff re-alleges each and every allegation in paragraphs 1 through 78 above as if fully set forth herein.

87. There is in every contract in Massachusetts including at will employment contracts an implied covenant of good faith and fair dealing.

88. By the conduct complained of this Complaint, Harvard breached the implied covenant of good faith and fair dealing in the contracts between Harvard and Clopper for both Clopper's employment and relating to Sanders Theatre.

89.  In addition, in Massachusetts, the covenant of good faith and fair dealing protects employees for asserting legally guaranteed rights, for doing what the law requires, and for refusing to do what the law forbids. Clopper had a legally protected right to perform the Play; the Play promoted compliance with the law (parents and physicians must leave their son's healthy bodies intact); and it argued against violating the law (or that circumcising healthy boys should be a violation of law).

90. By the conduct complained of this Complaint, Harvard breached the implied covenant of good faith and fair dealing in the employment contract between Harvard and Clopper, and Clopper suffered damages as a result.

## COUNT VI

### Promissory Estoppel

### Harvard

91. Plaintiff re-alleges each and every allegation in paragraphs 1 through 90 above as if fully set forth herein.

92. Under the concept of promissory estoppel, when one party has substantially and reasonably relied upon a promise of another to his detriment, and it would be unfair not to enforce the agreement, the promisee is entitled to a remedy for breach of the agreement as justice requires. Restatement (Second) of Contracts § 90 (1981).

93. Clopper reasonably relied to his detriment upon the many express and implied promises made to him expressly and impliedly, orally and in writing – including by Professor Bronski, Hammond, Harvard's free speech policy, and the speeches of the outgoing and incoming Harvard presidents – that he could express his personal views regarding the contentious issue of circumcision and perform in the Play, nude and otherwise, and that Harvard would not retaliate against him and his employment at Harvard for doing so.

94. It would be unfair to Clopper and unjust not to enforce the express and implied promises on which Clopper reasonably relied.

95. Clopper is entitled to a remedy under the doctrine of promissory estoppel.

## COUNT VII

### Defamation and Libel – The Crimson; and Harvard

96. Plaintiff re-alleges each and every allegation in paragraphs 1 through 86 above as if fully set forth herein.

97. Clopper was born Jewish and is a Jewish man. He has no animus towards Jewish people. His opposition is to circumcision and to those who practice it for religious reasons.

98. Under Massachusetts law, a plaintiff alleging libel must ordinarily establish six elements: that the defendant (1) published a written statement; (2) of and concerning the plaintiff; that was both (3) false; and (4) defamatory; and that (5) the defendant was at fault amounting to at least negligence on its part; and (6) this publication caused economic loss, or is actionable without proof of economic loss.

99. Regarding elements (1) and (2), defendants The Crimson and its reporters including but not limited to: Xie, Wang, and the nameless "Crimson Editorial Board," published five (5) articles about and concerning Clopper: "Harvard Reviewing Employee's Nude, Anti-Semitic Rant in Sanders Theatre" (May 2, 2018); "Employee Planned Show Containing Anti-Semitism, Nudity in Harvard Workplace During Work Hours" (May 4, 2018);  "Against 'Sex and Circumcision: An American Love Story'" (May 9, 2018); "Harvard 'Investigating' After Swastika Found at School of Public Health" [gratuitously referring and linking to a story about Clopper's performance] (May 12, 2018); and "Expanding the Diversity Conversation" (May 24, 2018).

100. Upon information, belief, and based on the May 3, 2018 voice recording of Xie, one or more Harvard senior administrators encouraged the Crimson to publish these negative articles about Clopper. Upon information and belief, The Crimson operated as an agent of Harvard and

as such, responsibility for their publication can be partly ascribed to Harvard, thus any elements the Crimson satisfies, so too does Harvard satisfy. Furthermore, Harvard senior administrators, including but not limited to Harvard spokeswoman Rachel Dane, is quoted in multiple articles accusing Clopper of being anti-Semitic and having improperly brought nudity to Sanders Theatre.

101. Regarding element (3) towards the falsity of the articles, there are major falsities throughout the five articles. The falsities can be categorized, without limitation, into three major buckets that are systemic throughout all five publications: (i) that Clopper, a Jewish man, is anti-Semitic; (ii) that Clopper improperly brought nudity to Sanders Theatre; and (iii) that Clopper had engaged in a "nude, anti-Semitic rant" in Sanders Theatre.

a. Clopper is a Jewish man. He is anti-circumcision; not anti-Semitic. Clopper has many Jewish friends and Jewish allies on the anti-circumcision front. Whether Clopper was Jewish or not, he would still have the right to freely express his critical opinions of the Jewish religious ritual of circumcision. As evidenced by the standing ovation from hundreds of progressive Harvard audience members, and a 97% "like" rating online from many thousands of YouTube viewers, the "anti-Semitic" label the Crimson has doggedly tried to brand Clopper with cannot be true, *unless* the great majority of Harvard's population and YouTube's viewer base (as evidenced by the significant sample size in the feedback from both these groups) is also "anti-Semitic." The Crimson has created this anti-Semitic narrative by taking nonrepresentative and incomplete quotes from Clopper's two-plus-hour Play. The Crimson's *prima facie* defamatory allegations of anti-Semitism against Clopper are a red herring to distract from Clopper's "very cogent--and important--presentation on circumcision," as Philip Guarino mentioned in his email complaining of Harvard's retaliation against Clopper to Dean Claudine Gay on August 27. 2018.

32

b. Clopper has the right to free speech and freedom of expression as protected by the US and Massachusetts constitutions, and he had Harvard's many explicit and implicit promises to protect that right.

c. Describing Clopper's play as a "nude, anti-semitic rant", as The Crimson did in its May 1, 2018 article, is a patent falsehood. There is no conceivably accurate description of the event that could categorize Clopper's Play as a "*nude* anti-Semitic rant" (emphasis added). Clopper has the entire event professionally filmed from four angles. He said no words during his brief nude dance, let alone was he "ranting." As Professor Bronski explains in a May 3, 2018 email to Clopper, "the title implies you are nude though [sic] the entire show, which is not true - - and gives the casual reader a TOTALLY inappropriate and inflammatory  description of the event." The Crimson's coverage of Clopper's Play, especially the most widely read part of their coverage – the title – is objectively false.

102. Regarding element (4), as to whether The Crimson's articles were defamatory, the articles are *prima facie* defamatory in their headlines, contents, and insinuations. "Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn, or ridicule, or tend to impair his standing in the community." *See Eyal v. Helen Broadcasting Corp.*, 583 N.E.2d 228, 232 (Mass. 1991); *see also Poland v. Post Pub. Co.*, 116 N.E.2d 860, 861 (Mass. 1953). "A defendant in an action for libel is liable for what is insinuated as well as for what is explicitly stated." *Poland*, 116 N.E.2d at 861.

103. After the Crimson's articles about Clopper were published on May 2, 2018, complaints that Harvard had hired Clopper flooded into Harvard's administration by, upon information and belief, primarily Jewish alumni, donors, and individuals. Dean Kirwan had mentioned in an irritated manner to a colleague shortly after the Play that she "had been up all night taking phone

calls [in connection with the Crimson's articles regarding Clopper's Play];" presumably by those triggered by the Crimson's defamatory allegations against Clopper. A Jewish student who had worked in the LRC during the time of the Play and previously had no animus towards Clopper emailed Harvard management saying she could no longer work alongside Clopper after reading the Crimson's articles. Despite the overwhelming critical comments of the Crimson's coverage on their public messaging boards, a reader would have to scroll all the way down the page to see how people who actually attended the play perceived the Crimson's coverage to be intentionally false and misleading in an effort defame Clopper. Thus, it was the false and defamatory headlines that did the bulk of the communication to the Harvard community, which held Clopper up to contempt, hatred, and worse within the Harvard community and beyond.

104. Regarding element (5), the Crimson displayed actual malice in their actions towards Clopper.  Multiple times in the May 2, 2018 "Nude, Anti-Semitic Rant" article, Xie and Wang make reference to "videos obtained by The Crimson." If the Crimson had such videos (recorded on a cellphone or other handheld device), it would have clearly shown that Clopper did not engage in a "nude, anti-Semitic rant" as Clopper's professionally filmed video footage from every angle throughout the event demonstrates. If it is true that the Crimson had such videos, and they still decided to publish such a false and defamatory headline (and other statements throughout the articles), then they would be publishing this material "with knowledge it was false," and thus satisfy the bar for actual malice, and thus element (5) for defamation.

105. Furthermore, upon information and belief, one or more Harvard senior administrators told The Crimson what to say in many of their defamatory articles, including the Crimson's May 4, 2018 article, "Employee Planned Show Containing Anti-Semitism, Nudity in Harvard Workplace During Work Hours" article. In that article, the defendants The Crimson through its

two student reporters Xie and Wang, and Harvard falsely accused Clopper of wrongdoing by (a)
working on the Play occasionally at work; (b) by performing nude in it; and (c) of being anti-
Semitic. Upon information and belief, Harvard caused that article to be published with intent to
terminate him on those grounds. Harvard suspended Clopper's employment on May 4, 2019 and
for 69 days thereafter without explanation. If such collaboration existed between Harvard and the
Crimson to defame Clopper on specific, pretextual grounds to use for his predetermined
termination, the "actual malice" demonstrated by the defendants would exceed comparable
analogs in Massachusetts case law.

106. Regarding element (6), the Crimson's false and defamatory coverage caused Clopper
economic loss, and even if it did not, it is still actionable because of the type of defamation.
Establishing the causal link between The Crimson's defamatory articles and Clopper's resulting
economic harm need only be plausible, not even probable, at the pleading stage. *Ashcroft v.
Iqbal*, 129 S.Ct. 1937, 1949 (U.S. 2009) (citing *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955,
1974 (U.S. 2007)). It is plausible that The Crimson's defamatory coverage of Clopper's Play
caused Jewish donors and other stakeholders to exert pressure on Harvard via harsh letters,
communications, and other *quid pro quo* arrangements to retaliate against Clopper, which
resulted in the loss of Clopper's profession and other damages. This is an especially plausible
claim considering the history of Jewish interest groups exerting pressure on a third party to break
their contracts with a conscientious objector to their agenda. *See Redgrave*, 399 Mass 95, 98. The
Crimson is also liable for other damages from their defamatory articles because of the type of
defamation they engaged in. As the Massachusetts Supreme Court in *Ravnikar* explains:

> Four types of statements are actionable without proof of economic loss: statements that
>
> constitute libel, see *Shafir v. Steele,* 431 Mass. 365, 373, 727 N.E.2d 1140 (2000);

statements that charge the plaintiff with a crime; statements that allege that the plaintiff

has certain diseases; and statements that may prejudice the plaintiff's profession or

business, see *Lynch v. Lyons,* 303 Mass. 116, 118–119, 20 N.E.2d 953 (1939). If the

statement comes within one of these four exceptions, a plaintiff may recover

noneconomic losses, including emotional injury and damage to reputation. See *Shafir v.*

*Steele, supra;* Restatement (Second) of Torts, *supra* at § 622 comment b, § 623 comment

a.

*Ravnikar*, 782 N.E.2d 630. The Crimson's coverage constitutes libel, as pled above, and thus no

economic harm is necessary for element (6) to be met. *Id.* Also, The Crimson's comments

prejudiced Clopper in his profession, especially considering many of his colleagues and bosses,

including Harvard's president, are Jewish, and thus the Crimson falsely accusing Clopper of anti-

Semitism prejudices his ability to work at and advance within the Harvard hierarchy. The

dispositive evidence that The Crimson's defamatory coverage prejudiced Clopper in his

profession is that he no longer has his profession because he was terminated, very likely because

of the fallout from The Crimson's defamation. Because two of the four conditions for recovering

on a defamation action without economic loss are present in the Crimson's defamation – namely

libelous statements and professional prejudice – element (6) of the defamation claim is met

independent of a showing of economic loss.

107. As a result of the Crimson, Harvard, Xie, Wang, and others defaming and libeling Clopper,

he thereby suffered economic, professional, reputational, emotional, and other losses. These

include, without limitation, loss of his job with its wages, benefits, and prestige, and the

opportunity to go to graduate school at Harvard at 10% of the usual cost and the significant

economic benefits such a Harvard degree would confer on Clopper for the rest of his life.

108.  In addition, Harvard defamed Clopper by: (a) accusing him in the Crimson of having done something improper by performing having performed in the nude when Harvard advertised that there would be nudity in the Play; (b) Harvard Faculty Arts and Sciences spokesperson Rachel Dane was quoted in the Crimson as saying that the Play included anti-Semitic content; (c) accusing him in the Crimson of having improperly used Harvard time and resources to work on the Play, when all such work was approved by Hammond.

## COUNT VIII

### Tortious Conversion – Harvard

109. Plaintiff re-alleges each and every allegation in paragraphs 1 through 108 above as if fully set forth herein.

110. Clopper wrote the Play with assistance from Hammond. The Play was Clopper's original creative material. Clopper had an automatic copyright of the entirety of the Play and legal ownership of it.

111. Upon information and belief, Harvard asked Baystate to provide Harvard with a copy of Clopper's Play.

112. Upon information and belief, Baystate made a perfect digital copy of the Play and other materials by taking a "screen capture" of the material on Clopper's laptop, without Clopper's consent. This wrongful act was inconsistent with Clopper's ownership of these materials. Harvard referred to these materials during its investigation of Clopper as the "Baystate video".

113. Harvard is liable to Clopper for tortious conversion of his property, the Play, and other materials, which led to Harvard terminating Clopper's employment.

114. Harvard is liable to Clopper for the damages caused by his termination and exclusion from Harvard's graduate school.

## COUNT IX

### Tortious Interference with Employment Contract

### The Crimson and John Does 1-10

115. Plaintiff re-alleges each and every allegation in paragraphs 1 through 108 above as if fully set forth herein.

116. The Crimson, which claims to be independent of Harvard, interfered with Clopper's employment contract with Harvard, by making false accusations against Clopper with the improper motive of assisting Harvard, which resulted in Clopper's termination and harm to Clopper.

117. Upon information and belief, complaints (primarily from Jewish donors and alumni, John Does 1-10) about Clopper flooded into Harvard's administration after the Crimson published the May 2, 2018 articles about him, and influenced Harvard to take action in terminating Clopper. Dean Kirwan stated that she had been up all night taking phone calls after the Crimson published their articles.

118. The Crimson and these unknown complainants, now called John Does 1-10, tortuously interfered with Clopper's contract with Harvard.

## COUNT X

### Violation of Mass. Gen. L., Ch. 274, Section 7

### Conspiracy to Steal the Play || Conspiracy to Defame Clopper

### Harvard, The Crimson, President and Fellows of Harvard College

119. Plaintiff re-alleges each and every allegation in paragraphs 1 through 118 above as if fully set forth herein.

120. Upon information and belief, Harvard and Baystate conspired to steal the contents of Clopper's Play and other materials before he performed it. Their acts constitute a conspiracy in violation of M.G.L. c. 274, sec. 7. Due to their conspiracy, Clopper suffered damages.

121. Upon information and belief Harvard, the Crimson, Xie, Wang, and other still unnamed individuals conspired to hold Clopper up to contempt, hatred, scorn, and ridicule, and to impair his standing in the Harvard community and beyond by defaming and libeling him in the Crimson by publishing intentionally false and malicious coverage of his Play and the events before and after it. Their acts constitute a conspiracy in violation of M.G.L. c. 274, sec. 7. Due to their conspiracy, Clopper suffered damages.

123. The statute provides for civil and criminal penalties.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff prays that this Court enter judgment in his favor:

(a) For compensatory damages in an amount to be determined at trial;

(b) For Harvard's profits on Clopper's past work pursuant to the doctrine expressed in *Gram v. Liberty Mutual*.

(b) For costs and reasonable attorneys' fees pursuant to M.G.L. c. 12 § 11I, and if the defendants mount a defense that is wholly insubstantial, frivolous, and not advanced in good faith, pursuant to M.G.C. c. 231 § 6F.

(c) And for such other and further relief as this Honorable Court shall deem just and proper.

THE PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS.

Respectfully submitted,
The Plaintiff, Eric Clopper,
By his Attorney,

 /s/ Michael Vigorito
_____          Dated: July 20, 2020
Michael Vigorito, Esq. (BBO#: 696328)
VIGORITO WOOLF PC
100 State Street, Floor 9
Boston, MA 02109
(617) 410-6750
mvigorito@vigoritowoolf.com