**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| ERIC CLOPPER, | |
| *Plaintiff*, | |
| v. | No. 20-cv-11363-RGS |
| HARVARD UNIVERSITY; PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION); THE HARVARD CRIMSON; and JOHN DOES 1-10, | LEAVE TO FILE EXCESS PAGES GRANTED 9/29/2020 [D.E. 27] |
| *Defendant*. | |

**MEMORANDUM IN SUPPORT OF
DEFENDANT PRESIDENT AND FELLOWS OF HARVARD COLLEGE'S
<u>MOTION TO DISMISS</u>**

William W. Fick (BBO# 650562)
Daniel N. Marx (BBO# 674523)
Amy Barsky (BBO# 601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

Dated: September 29, 2020

# Table of Contents

Table of Contents ................................................................................................................ i

Introduction ...................................................................................................................... 1

Background ....................................................................................................................... 2

Argument .......................................................................................................................... 9

I.       Legal Standard ..................................................................................................... 9

II.      The Complaint fails to allege that Harvard violated Clopper's First Amendment rights
         (Count I). ............................................................................................................... 9

         A.       Harvard did not act "under the color of state law." ............................................. 10

         B.       Clopper's live sex show with an inflatable doll before a public audience was not
                  protected activity under the First Amendment. ..................................................... 11

         C.       The Cambridge prohibition on public nudity at the Sanders Theatre, with which
                  Harvard complied, is a valid, content-neutral regulation. ..................................... 13

III.     The Complaint fails to allege that Harvard violated Clopper's civil rights by threat,
         coercion, or intimidation, either directly or through any third-party (Count II). .............. 14

         A.       Clopper had no right to present a live sex show to a public audience in the Sanders
                  Theatre, and he suffered no damages. .................................................................. 14

         B.       Harvard did not engage in "threats, intimidate, or coercion." ............................. 14

         C.       Harvard did not improperly acquiesce to third-party pressure. ........................... 15

IV.      The Complaint fails to allege that Harvard breached a contract with Clopper for his use of
         the Sanders Theatre (Count III), an employment agreement with Clopper (Count IV), or
         the implied covenant of good faith and fair dealing that is inherent in any such
         Massachusetts contracts (Count V). ..................................................................... 16

         A.       The contract for use of the Sanders Theatre prohibited nude performances. ....... 16

         B.       Clopper was an at-will employee of Harvard, and his termination did not breach
                  any employment agreement. .................................................................................. 18

         C.       Harvard did not breach the implied covenant of good faith and fair dealing in any
                  of the alleged contracts. ....................................................................................... 18

V.       The Complaint fails to allege Harvard made any enforceable promise that Clopper could
         perform nude at the Sanders Theatre (Count VI). ................................................ 19

VI.     The Complaint fails to allege that Harvard defamed Clopper (Count VII). ..................... 20

    A.     The Complaint does not allege that Harvard made any defamatory statements... 21

    B.     Clopper is a "limited-purpose public figure," and Harvard did not act with "actual malice" toward him............................................................................................. 22

VII.    The Complaint fails to allege that Harvard tortiously converted Clopper's tangible property (Count VIII). ................................................................................................................ 24

VIII.   The Complaint fails to allege that Harvard conspired with The Crimson or any other party to commit any tort against Clopper (Count X). ................................................................ 25

    A.     Clopper erroneously asserts a criminal conspiracy claim..................................... 25

    B.     The civil conspiracy analogue would not apply, because there was neither an underlying tort against Clopper nor a conspiracy with *The Crimson*. .................. 25

Conclusion .................................................................................................................................. 26

Certificate of Service .................................................................................................................. 27

**Introduction**

On May 1, 2018, before a public audience in Harvard University's historic Sanders Theatre, Plaintiff Eric Clopper delivered a 130-minute presentation condemning male circumcision. As an encore, Clopper appeared nude on stage and engaged in simulated sex acts with an inflatable doll. Clopper also played a stop-motion video in which he repeatedly inserted his erect penis into the doll's mouth and ejaculated on its face. At the time, Clopper worked for Defendant President and Fellows of Harvard College ("Harvard" or the "University"), but after receiving numerous complaints and conducting an extensive review, Harvard terminated Clopper.

Now, Clopper brings this action against Harvard (and *The Harvard Crimson*, an independent student newspaper), alleging that Harvard interrupted his performance and then retaliated against him by terminating his at-will employment and frustrating his plans to attend Harvard's School of Engineering and Applied Sciences.

The Complaint fails to state constitutional, statutory, contractual, or tort claims against Harvard. Clopper's contention that he had a "right" to engage in live, naked, simulated intercourse with an inflatable doll on Harvard property, and display a still more explicit pornographic video, has no support in the law. These activities are not "free speech" protected by the First Amendment or any employment contract with the University. Moreover, as the Complaint concedes, both Cambridge's entertainment license and the Sanders Theatre's policy prohibit nudity, and Harvard told Clopper in advance of the event that his performance could not include nudity.

Clopper's lawsuit should be dismissed for failure to state any cognizable legal claim.[1]

---

[1] Clopper posted a truncated video recording of his Sanders Theatre presentation (minus the encore proceedings) on YouTube. *See Sex & Circumcision: An American Love Story by Eric Clopper*, *available at* https://www.youtube.com/watch?v=FCuy163srRc (posted July 19, 2018; visited Sept. 28, 2020) ("YouTube Video"). To ensure this Court has a complete, accurate record of what Clopper said and did on May 1, 2018, Harvard submits under seal three additional video footage

## Background[2]

Plaintiff Eric Clopper is an outspoken opponent of neonatal male circumcision, Cplt. ¶ 8, which he describes as a "Satanic ritual" promoted by Jews, whom he calls a "genital mutilation cult" governed by an "evil ideology." YouTube Video at 1:56, 2:02, & 2:06. Clopper's self-proclaimed "mission in life" is to stop circumcisions for baby boys. *Id.* ¶ 8.

On July 17, 2017, Clopper started a full-time position as an at-will employee in Harvard's Language Resource Center ("LRC"). *Id.* ¶ 2. A few months later, in October 2017, Clopper delivered a lecture at Cornell University in which he spoke against circumcision. *Id.* ¶ 9. The Complaint does not allege that the lecture included any public nudity, much less a live sex show.

After Clopper returned to the Harvard campus, he showed a video recording of his Cornell lecture to Michael Bronski, a professor in Harvard's Women, Gender, and Sexuality Department. *Id.* ¶ 10. Bronski encouraged Clopper to turn his lecture into a play, titled "Sex & Circumcision: An American Love Story," with "more theatrical components." *Id.* ¶ 11.

Clopper discussed the idea with his boss, Thomas Hammond, the LRC's director, and Hammond decided to help Clopper. *Id.* ¶ 12. Hammond is now deceased, *id.* ¶ 49, but the Complaint alleges that he "approved" the play and served as its "stage manager." *Id.* It further alleges that Hammond "urged" Clopper to include a "nude dance" and "educational slideshow relating to masturbation." *Id.* ¶ 17.

---

exhibits depicting the event. Exhibit A is the video that Clopper played during the "encore" (including the "stop motion" pornography). Exhibits B and C document Clopper's nude dance and simulated sex with the inflatable doll. Citations to the recordings refer to the timestamp by hour and minute ("H:MM").

[2] The following facts are taken from the Complaint, which are assumed to be true for the purpose of this Motion only, as well as documents attached to or incorporated by reference in the Complaint. *See O'Brien v. Deutsche Bank Nat'l Tr. Co.*, 948 F.3d 31, 35 (1st Cir. 2020).

On March 1, 2018, Clopper and Foregen, a non-profit organization that researches "regenerative medical therapies for circumcised men," entered into an agreement with Harvard to reserve the Sanders Theatre for May 1, 2018. *Id.* ¶ 13; *see* https://www.foregen.org. The contract, which the Complaint incorporates by reference, licensed Clopper and Foregen to use the Sanders Theatre on the specified date and time. Ex. D.

In the "Rules and Policies" section, the contract stated that use of the theater is subject to the licensee's compliance with all federal, state, and local laws as well as Harvard's regulations and the Sanders Theatre Policy Book. *Cplt.* ¶ 18. Both Cambridge's entertainment license and the Sanders Theatre's Policy Book prohibited public nudity. *Id.* ¶ 78; *see also* Sanders Theatre Producer's Handbook at 3 ("Our Entertainment License from the City of Cambridge does not encompass nudity").[3]

On March 14, 2018, Tina Smith, the Sanders Theatre's Box Office Manager, began advertising Clopper's play. *Cplt.* ¶ 10. An online notice appeared on the website for Harvard's Office of the Arts, and "print ads" were placed "in the Sanders Theatre complex." *Id.* The promotional materials indicated that Clopper's play was "adult only" and would include "explicit content." *Id.*

With respect to that explicit content, the Complaint vaguely alleges:

> Harvard made many express and implied promises to Clopper—verbally and in writing—that he would be free to express himself in his explicit Play without retaliation because of protection of free expression described by Professor Bronksi, Clopper's manager Hammond, Harvard's outgoing president Drew Faust, Harvard's incoming president Lawrence Bacow, and Harvard's Free Speech Policy.

*Id.* ¶ 16.

---

[3] *Available at*
https://sites.fas.harvard.edu/~memhall/PDF/SandersTheatreProducerHandbookNA.pdf.

Clopper publicized his play by placing posters around Harvard's campus. *Id.* ¶ 15. The posters featured Clopper, naked, with his genitals obscured by a "thin censor bar." *Id*. He also hired actors to appear in Harvard Yard in inflatable penis costumes, hold signs, and take pictures with passers-by. *Id.* Clopper "believe[d]" that the explicit nature of his play was obvious from these promotional efforts and that, if Harvard "had an issue," it should have alerted him. *Id.* ¶ 16.

Yet, the Complaint acknowledges that on April 28, 2018, Harvard did just that. *Id*. ¶ 18. By email, Ruth Polleys, the Manager for the Office for the Arts, told Clopper:

> Due to the nature of the posters advertising the event, I've been asked to let you know that *zoning laws and our Entertainment License with the City of Cambridge do not permit nudity as part of any event*. The May 1 event may well not include nudity, but we want to be sure—and want to be sure the Entertainment License for Sanders remains in compliance.

Ex. E (emphasis added). By email, Clopper responded:

> I understand your concerns about the posters. My publicist has been very aggressive with them. Apparently, this is what is known in the publicity business as "implied nude"—slightly embarrassing to walk around campus and have the tourists pointing at me and then at the posters! It's an edgy show, but *we'll stay within the bounds of propriety*, no worries.

*Id*. (emphasis added).

Despite Harvard's warning that nudity was prohibited and Clopper's assurance that his play would not include nudity, the Complaint asserts that Clopper believed that he had a "right to include nudity in the Play." Cplt. *¶* 18*; see also id.* (acknowledging "Harvard's essentially last-minute command to avoid nudity"). In short, Clopper admits that he disregarded Sanders Theatre's policy and Harvard's instruction, because Clopper felt that he had invested too much time and money in his pet project, decided it was "too late to change the Play," and believed he had a "right"

to stage a live simulated sex show and pornographic video before an unwitting public audience. *Id.*

Although the Complaint refers to a "play," its allegations describe a lengthy performance that proceeded in two distinct parts. During the first part, which ran for more than two hours, Clopper delivered a lecture, with a PowerPoint presentation, in which he equated circumcision with "torture" and attacked Judaism as "an evil ideology." *Id.* ¶ 22; YouTube Video at 1:35, 1:56. At the end, Clopper bowed and exited the stage. During the second part, Clopper returned to the stage, totally naked and holding a life-size inflatable sex doll. Cplt. ¶ 22; Sealed Exs. B & C. For the next five to ten minutes, he cavorted with the doll, simulating sex acts, and then projected a self-made pornographic video on the screen behind the stage. *See* Sealed Exs. A at 0:7-0:10; B & C.

While the music video for Britney Spears' *Toxic* played on the screen behind the stage, Clopper "performed a nude dance" with the doll, which he called "Britney." Sealed Ex. B. That dance involved Clopper having or simulating vaginal sex with the doll and exposing his genitals to the audience. *Id.* Then, on the screen, Clopper presented a stop-action video in which he repeatedly inserted his erect penis in the doll's mouth, masturbated, and ejaculated on the doll's face. Sealed Ex. A at 0:7-0:10. The Complaint characterizes this aspect of the performance as a "love story," adding that it "provided much-needed comic relief." Cplt. ¶ 20.

Immediately after Clopper appeared naked on stage, engaged in simulated sex acts with the doll, and displayed his pornographic video, Maureen Lane, Harvard's production assistant and venue representative, "rushed toward Clopper" and "scream[ed] at him for his nude dance." *Id.* ¶ 21. The theatre lights flashed on and off, indicating the show was over, and the audience began to

leave. *Id.* The Complaint alleges that, as a result, Clopper was unable to get dressed, return to the stage, and deliver "his final message." *Id.*

Not surprisingly, and as intended by Clopper, his performance drew significant attention. On May 2, 2018, *The Harvard Crimson* published an article by two student reporters, titled "Harvard 'Reviewing' Employee's Nude, Anti-Semitic Rant in Sanders Theatre." Cmplt. ¶ 24. The article quoted an email from Rachael Dane, Director of Media Relations for Harvard's Faculty of Arts and Sciences ("FAS"), who said only that Harvard was "'reviewing' reports" about Clopper's anti-Semitic comments and nude performance. *Id.* ¶ 26.[4] On May 4, 2018, *The Crimson* published another article, "Employee Planned Show Containing Anti-Semitism, Nudity in Harvard Workplace During Work Hours," which repeated Dane's statements about Harvard's ongoing "review."[5] A few days later, on May 9, 2018, the Editorial Board published an opinion piece that, again, quoted Dane, *id.*, and went on to "castigate" Clopper for "us[ing] his position to deliver a tirade prominently featuring nudity and anti-Semitism to an audience that was given no fair warning to expect either."[6]

---

[4] *Available at* https://www.thecrimson.com/article/2018/5/3/eric-clopper-production/ ("We take seriously a report of this nature, as it appears to violate the terms of Sanders Theatre's entertainment license with the City of Cambridge," Dane wrote in an e-mail to *The Crimson*. "We are currently engaged in a review of these reports to determine whether Harvard was provided with an accurate account of the content of Clopper's show, prior to its production.").

[5] *Available at* https://www.thecrimson.com/article/2018/5/4/clopper-used-university-space/ ("Spokesperson Rachael Dane later announced Wednesday the Faculty of Arts and Sciences is 'reviewing' the nudity and 'anti-Semitic content' included in the show, titled 'Sex & Circumcision: An American Love Story.'").

[6] *Available at* https://www.thecrimson.com/article/2018/5/9/editorial-against-sex-and-circumcision/.

Later, *The Crimson* published two other pieces, one article and one editorial, that mentioned Clopper's show, *id.*, but did not feature any statements from Harvard about Clopper, his anti-Semitic comments, or his nude performance.

From April 23, 2018, through May 4, 2018, including the night of his event, Clopper was on paid time-off from his job at the LRC. *Id.* ¶ 27. When Clopper returned to work, he was placed on administrative leave and told by Dean Robert Doyle that Harvard was conducting "a careful review" about whether Clopper had misrepresented his plans, violated rules against public nudity, and delivered an anti-Semitic diatribe followed by an obscene performance. *Id.*

Over the next few months, Harvard conducted an extensive investigation. *Id.* ¶ 29. Dean Doyle and Ann Marie Acker, an administrator in Harvard's HR Department, met with Clopper, and Gary Cormier, Director of Harvard's HR Consulting, solicited input from LRC employees and the FAS community. *Id.* ¶¶ 29-30.

As the investigation proceeded, Clopper "fear[ed]" that "powerful interests"—the Jews— had "compromised" "the integrity of Harvard's administration." *Id.* ¶ 31. As a result, on May 17, 2018, he filed a complaint with Harvard's Office of Labor and Employee Relations ("OLER"). OLER considered an employment investigation to be "premature," because at that time, Harvard had not yet taken any adverse employment action against Clopper. *Id.*

On July 12, 2018, at the conclusion of its lengthy investigation, Harvard terminated Clopper from his at-will employment in the LRC. *Id.* ¶ 35. The termination letter cited several reasons, including Clopper's sexually explicit display in the Sanders Theatre as well as his "misrepresentations and misleading statements to Harvard LRC colleagues and to Sanders Theatre staff members regarding the content of the Show." *Id.*; *see* Ex. F. The letter said nothing about

Clopper's statements about Judaism or circumcision. The Complaint alleges that Clopper was "surprised" by Harvard's decision because he had been the LRC's star employee. Cplt. ¶¶ 37-41.

The Complaint alleges that, after Harvard terminated his employment, it "focused its energies on Hammond." *Id.* ¶ 43. Clopper contends that Harvard retaliated against Hammond for assisting Clopper (before the show) and refusing to terminate Clopper (afterwards). On September 17, 2018, Harvard sent Hammond a "Final Written Warning" concerning his involvement in Clopper's play. *Id.* ¶ 48. Around the same time, Clopper, who had no money and no job but "increasing debts," moved into Hammond's apartment, which Hammond rented from Harvard. *Id.* ¶ 47.

On February 7, 2019, Brian Magner, OLER's Associate Director, sent Clopper the "final results" of the investigation concerning the play. *Id.* ¶ 51. Clopper contends that the decision "failed to address" two of his allegations against Harvard. *Id.*

Before his live sex show at Sanders Theatre on May 1, 2018, Clopper had plans to attend Harvard's School of Engineering and Applied Sciences ("SEAS"). *Id.* ¶¶ 52-53. Clopper claims he initially pursued a job at Harvard to take advantage of its tuition assistance program, *Id.* ¶ 52, and based on what Clopper describes as his "outstanding qualifications," he "anticipated that he would be accepted into Harvard's [SEAS] program" in the fall of 2018. *Id.* ¶ 53.

The Complaint alleges that, on February 25, 2018, more than two months before Clopper put on his performance, an unnamed professor on the SEAS admissions committee told Clopper that "a fellow faculty member of the Jewish faith had blackballed … Clopper presumably for his prior anti-circumcision advocacy." *Id.* ¶ 54. This professor invited Clopper to audit his course, Introduction to Data Science, and to reapply for the following year. *Id.* But due to HUPD's campus ban, Clopper was unable to attend the class. *Id.*

According to Clopper, this confluence of events—his termination from the LRC, ban from campus, and withdrawal from data class—"meant that he would not be admitted" to Harvard's graduate program. *Id.* ¶ 55. Instead, Clopper enrolled in law school and sued Harvard. *Id.*

## Argument

### I.     Legal Standard

To survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In making that assessment, this Court may look to the facts alleged in the pleadings, the documents attached as exhibits or incorporated by reference, and matters of which judicial notice can be taken. *See Nollet v. Justices of the Trial Ct. of Mass.*, 83 F. Supp. 2d. 204, 208 (D. Mass. 2000), *aff'd*, 248 F.3d 1127 (1st Cir. 2000).

Although all factual allegations in a complaint must be accepted as true, that doctrine is not applicable to legal conclusions. *See Aldabe v. Cornell Univ.*, 296 F. Supp. 3d 367, 371 (D. Mass. 2017) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Threadbare recitals of the legal elements which are supported by mere conclusory statements do not suffice to state a cause of action." *Id.*; *see Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) (quoting *Iqbal*, 556 U.S. at 668) (holding that court "need not accept as true legal conclusions from the complaint or 'naked assertion[s]' devoid of 'further factual enhancement'").

### II.    The Complaint fails to allege that Harvard violated Clopper's First Amendment rights (Count I).

To state a First Amendment claim, a complaint must allege that, "acting under the color of state law," the defendant "deprived the [the plaintiff] 'of rights, privileges, or immunities secured by the Constitution or laws of the United States" and, also, that such conduct "was committed by a person acting under color of state law.'" *Martinez-Velez v. Simonet*, 919 F.2d 808, 810 (1st Cir.

1990) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). Here, Clopper asserts Harvard violated his "right to free speech" by enforcing the terms of its entertainment license with Cambridge, which prohibited nude performances in the Sanders Theatre, and by "us[ing] this reasoning as justification for interrupting Clopper's play." Cplt. ¶ 61. But the Complaint fails to allege that Harvard's conduct was "state action" or that Clopper's live sex show, including simulated intercourse with an inflatable doll and display of a pornographic video, was "protected activity." It also fails to establish that the applicable rules against public nudity, with which Harvard simply sought to comply, were improper content-based restrictions on Clopper's speech about circumcision.

### A.      Harvard did not act "under the color of state law."

The First Circuit has clearly and repeatedly held that for purposes of constitutional claims, Harvard is not a state actor. *See Rice v. Pres. & Fellows of Harvard Coll.*, 663 F.2d 336, 337 (1st Cir. 1981) (affirming dismissal of equal protection claims) (following *Krohn v. Harvard Law School*, 552 F.2d 21, 23 (1st Cir. 1977)) (explaining that Harvard is neither "a public institution" nor "sufficiently intertwined with the Commonwealth of Massachusetts so as to meet the 'state action' requirement"); *Doe v. Harvard Univ.*, No. 93-2051, 1994 U.S. App. LEXIS 28320, at *2-3 (1st Cir. Oct. 12, 1994) (affirming dismissal of disability discrimination claims).

Ignoring this case law, Clopper alleges that Harvard, a private, non-profit, educational institution, violated his free speech rights endeavoring to obey the terms of its "entertainment license with the City of Cambridge." Cplt. ¶¶ 60-61. Clopper concedes the license "prohibit[ed] nudity" in the Sanders Theatre, but he contends it is "void under the First Amendment." *Id.* Clopper's bald assertion that Cambridge's regulation of public nudity is unconstitutional does not make it so. The Complaint fails to cite the relevant terms of the "entertainment license," much less explain what protected speech was unlawfully proscribed. Moreover, steps taken by Harvard to

ensure its own compliance with an entertainment license do not transform the private college into a state actor. *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974) ("The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State."). That erroneous contention would turn every restaurant with a liquor license into state actors subject to constitutional claims.

**B.    Clopper's live sex show with an inflatable doll before a public audience was not protected activity under the First Amendment.**

"Given the absence of state action, the court need not reach the second element of a § 1983 claim, deprivation of a federally protected right." *Maloney v. Bd. of Trs. of Clapp Mem. Library*, No. 14-cv-30054-KAR, 2016 U.S. Dist. LEXIS 38664, at *27 (D. Mass. Mar. 24, 2016). Nevertheless, the Complaint fails to allege that Clopper's sex show was protected activity.

The First Amendment does not protect obscenity. *See Miller v. California*, 413 U.S. 15, 24-25 (1973). Without question, a public performance that includes simulated sex acts by a naked man with an inflatable doll, accompanied by a video in which the man exposes his erect penis, penetrates the doll's mouth, and ejaculates on the doll's face, contains obscenity. Clopper's shocking display "appeal[ed] to the prurient interest," was "patently offensive in light of community standards," and "lacked serious literary, artistic, political, or scientific value." *United States v. Obscene Printed Matter*, 668 F. Supp. 50, 53 (D. Mass. 1987). It included "ultimate sexual acts, normal or perverted, actual or simulated," as well as "masturbation" and "lewd exhibition of the genitals," all of which the Supreme Court has identified as "plain examples" of obscenity, which the First Amendment does not protect. *Miller*, 413 U.S. at 25-26 (holding "live sex and nudity" cannot be "exhibited … without limit" in "public places"). Moreover, the "encore" added

nothing to speech that Clopper had already delivered about circumcision,[7] and those political views, which Clopper expressed at length, did not give him carte blanche to engage in obscene activity, especially before a public audience. *Close v. Lederle*, 424 F.2d 988, 990 (1st Cir. 1970); *cf. Ginzburg v. United States*, 383 U.S. 463, 470-71 (1966) (noting as factor in pre-*Miller* obscenity test, whether material "would tend to force public confrontation with the potentially offensive aspects of the work").

Nor do *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000), and *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991), change the constitutional analysis. Those cases grudgingly recognized that "erotic dancing" may constitute expressive conduct protected at the margins of the First Amendment, but they provide no cover for Clopper.

> Any argument that one has a right to view live sex acts is belied by *Barnes* … and *Pap's A.M.* … both of which held that local authorities may, consistent with the First Amendment, ban totally nude dancing. Indeed, *these cases support the view that live performance of hardcore sexual activity such as sexual intercourse or oral sex is not even within the coverage of the First Amendment.* If nude dancing "is expressive conduct within the outer perimeters of the First Amendment, though … only marginally so," *Barnes*, 501 U.S. at 566 (plurality opinion), or activity "only within the outer ambit" of the First Amendment, *Pap's A.M.*, 529 U.S. at 289 (plurality opinion), then it is certain that hardcore sexual activity unalloyed with some constitutionally recognized form of expression such as dance falls well outside of the First Amendment's ambit.

James Weinstein, "Democracy, Sex and the First Amendment," 31 N.Y.U. REV. OF L. & SOCIAL CHANGE 865, 870 n.19 (2007) (emphasis added). To the extent that nude dancing marks "the outer perimeters of the First Amendment," *Barnes*, 501 U.S. at 566, Clopper's nude display of simulated sex acts accompanied by a video in which he inserted his erect penis into an inflatable doll before a public audience was well beyond the constitutional pale.

---

[7] It is noteworthy that Clopper chose not to include this material in the rendition of his performance that he posted on YouTube, free from any control by Harvard.

Although Clopper relies on *Cabaret Entertainments, Inc. v. Alcoholic Beverages Control Commission*, 393 Mass. 13 (1985), he misconstrues Massachusetts law on the regulation of public nudity. *See* Cplt. ¶ 59. In *Cabaret*, the SJC recognized public nudity (specifically, nude dancing) may be "regulated" in venues that "are licensed to sell alcoholic beverages without violating the U.S. Constitution." *Id.* at 16. But it did not hold that a person has a constitutional right to expose himself in public. Indeed, lewd public displays are illegal in Massachusetts, *see Commonwealth v. Maguire*, 476 Mass. 156, 158 (2017) (discussing M.G.L. c. 272, § 16, which prohibits "open and gross lewdness and lascivious behavior"), and the First Amendment permits governments to regulate public nudity "to protect morals and public order," *Barnes*, 501 U.S. at 569.

### C.   The Cambridge prohibition on public nudity at the Sanders Theatre, with which Harvard complied, is a valid, content-neutral regulation.

The First Amendment permits broad bans on public nudity, even when accompanied by expressive activity, when such prohibitions do not "target" particular viewpoints. *See Pap*, 529 U.S. at 290 (upholding ordinance that "ban[ned] all public nudity, regardless of whether that nudity is accompanied by expressive activity" and did not "target" nudity with any particular message).

To the extent that Harvard merely sought to comply with Cambridge's prohibition on public nudity, in the Sanders Theatre and elsewhere, that local law is a reasonable, content-neutral restriction and, thus, constitutional. *See Taub v. City & Cty. of San Francisco*, No. 15-16415, 696 Fed. Appx. 181, 182-83 (9th Cir. 2017) (citing *United States v. O'Brien*, 391 U.S. 367 (1968)). Here, it made no difference that Clopper is vehemently opposed to circumcision. His performance would have run afoul of local law, even if it had been a celebration of circumcision, because he not only appeared without clothes, but also engaged in graphic, simulated sex acts on stage. Even if the law were ultimately ruled unconstitutional (Cambridge is not a defendant in this litigation), Harvard cannot violate the First Amendment by taking action to comply. Nor does the Constitution

13

require Harvard to maintain an employment or student relationship with a person who has conducted himself in this manner. The actions taken by Harvard—termination from employment and, allegedly, withholding of admission to a graduate program—do not violate the First Amendment.

### III.    The Complaint fails to allege that Harvard violated Clopper's civil rights by threat, coercion, or intimidation, either directly or through any third-party (Count II).

To plead a violation of the Massachusetts Civil Rights Act ("MCRA"), a plaintiff must allege that, by threats, coercion, or intimidation, the defendant interfered with the plaintiff's exercise of a constitutional or statutory right. *See Currier v. Nat'l Bd. of Med. Exam'rs*, 462 Mass. 1, 12 (2012). A MCRA claim mirrors a § 1983 claim, except the Massachusetts law does not require state action. *See Bell v. Mazza*, 394 Mass. 176, 181 (1985). Here, the allegation that Harvard unlawfully "interfered" with Clopper's "right" to perform nude at the Sanders Theatre does not state a MRCA claim. Clopper was not engaged in "protected activity," and Harvard did not engage in "threats, coercion, or intimidation." Nor did Harvard improperly "acquiesce" to alleged "outside pressure" from "Jewish individuals and groups." Cplt. ¶¶ 68-71.

### A.    Clopper had no right to present a live sex show to a public audience in the Sanders Theatre, and he suffered no damages.

For the reasons stated above, *see* Part II.B. *supra*, Clopper had no "right" to perform an explicit, public show, including live simulated sex acts with an inflatable doll and display of a pornographic video. Put simply, an individual has no constitutional or statutory right to expose oneself in an obscene public display, even if he aims to make some political or artistic point.

### B.    Harvard did not engage in "threats, intimidate, or coercion."

The MCRA "explicitly limit[s]" its reach to "situations where the derogation of secured rights occurs by threats, intimidation, or coercion." *Buster v. George W. Moore, Inc.*, 438 Mass. 635, 645 (2003) (quoting *Bally v. Northeastern Univ.*, 403 Mass. 713, 718 (1989)). In interpreting

the MCRA, "the Supreme Judicial Court has suggested that a showing of an 'actual or potential physical confrontation accompanied by a threat of harm' is a required element of a claim." *Carvalho v. Town of Westport*, 140 F. Supp. 2d 95, 101 (D. Mass. 2001) (citing *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994)). Here, however, the Complaint does not allege any "actual or potential physical confrontation" between Harvard and Clopper or any threat of "physical harm."

### C.     Harvard did not improperly acquiesce to third-party pressure.

In an effort to overcome the lack of any physical confrontation in this case, Clopper contends that Harvard violated the MCRA by bowing to outside pressure from the Jewish community to fire Clopper after his play. Cplt. ¶ 71 (citing *Redgrave v. Boston Symphony Orchestra*, 399 Mass. 93 (1987)). That gambit fails.

As a legal matter, "the validity of the contract exception" to the MCRA's physical-confrontation requirement is "questionable." *Carvalho*, 140 F. Supp. 2d at 101. The SJC has characterized *Redgrave* as involving "not a contract dispute, but rather a physical confrontation accompanied by threats of harm." *Id.* (citing *Blake*, 417 Mass. at 473 n.8). Clopper's misreading of *Redgrave,* which could transform countless mine-run contract cases into civil rights actions, ignores the SJC's guidance that the MCRA "was not intended to create, nor may it be construed to establish, a 'vast constitutional tort.'" *Buster*, 438 Mass. at 645 (quoting *Bell*, 394 Mass. at 182).

Regardless, such a claim would fail in this case. Unlike Vanessa Redgrave, who had a contract with the BSO to perform for a fee, Clopper had no "contractual right" to put on a live sex show at the Sanders Theatre or, following his performance, to continue his at-will employment in the LRC. *See infra* Section IV. Because Clopper was "employed 'at-will,'" he had "no contract right to [his] position[]" and cannot rely on *Redgrave* to maintain a MCRA claim. *Webster v. Motorola, Inc.*, 418 Mass. 425, 430 (1994) (affirming dismissal of MCRA claim where

15

"defendants allegedly attempted to interfere with the plaintiffs' rights by threatening the loss of their 'at-will' positions," because such "interference" is "not actionable conduct").

IV.     **The Complaint fails to allege that Harvard breached a contract with Clopper for his use of the Sanders Theatre (Count III), an employment agreement with Clopper (Count IV), or the implied covenant of good faith and fair dealing that is inherent in any such Massachusetts contracts (Count V).**

A contract claim requires the breach of a valid, binding agreement. *See Brooks v. AIG Sunamerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007). Here, however, the Complaint fails to plead Harvard agreed that Clopper could perform a live sex show at the Sanders Theatre or that he could continue to work in the LRC in its aftermath. *See Hannigan v. Bank of Am., N.A.*, 48 F. Supp. 3d 135, 140 (D. Mass. 2014) (allowing motion to dismiss contract claim).

A.     **The contract for use of the Sanders Theatre prohibited nude performances.**

Clopper and Foregen entered a contract with Harvard's Office for the Arts for use of the Sanders Theatre. Cplt. ¶ 13. That contract, which the Complaint incorporates by reference, set forth the following "rule and policies":

> Licensee and Licensee's use of the Space [i.e., the Sanders Theatre] shall be subject to Licensee's compliance with all federal, state, and local laws and any policies, rules, and regulations that the Memorial Hall/Lowell Hall Complex or Harvard may promulgate from time to time, including those stated in … the Sanders Theatre Policy Book … [and] any correspondence from the Memorial Hall/Lowell Hall Complex Program Manager.

Ex. D. The Sanders Theatre Policy Book included a "[s]pecial note regarding nudity" that states: "Sanders Theatre serves primarily as a lecture and concert facility. *Our Entertainment License from the City of Cambridge does not encompass nudity*." *Supra* n.3 (emphasis added). Clopper acknowledges that Harvard's license and the Theatre's policy prohibited public nudity. Cplt. ¶ 8. That critical concession precludes his contract claim. Put simply, there was no agreement with

Harvard for Clopper to perform nude at Sanders Theatre, much less to simulate sex acts with an inflatable doll on stage and screen a pornographic stop-motion video.

If anyone violated the contract for use of the Sanders Theatre, it was Clopper, who not only broke the rules against nudity but also misled Harvard about his event. The Complaint summarizes discussions, via email, in which Harvard told Clopper that nudity was prohibited. *Id*. ¶ 18. Ruth Polleys, Program Manager in Harvard's Office of the Arts, advised Clopper:  "Due to the nature of the posters advertising the event, I've been asked to let you know that zoning laws and our Entertainment License with the City of Cambridge do not permit nudity as part of any event." Ex. E. In response, Clopper falsely assured Polleys that his performance would *not* involve nudity:

> *I understand your concerns about the posters.* My publicist has been very aggressive with them. Apparently, this is what is known in the publicity business as "implied nude" – slightly embarrassing to walk around campus and have the tourists pointing at me and then at the posters! It's an edgy show, but *we'll stay within the bounds of propriety*, no worries.

*Id*. (emphasis added)

To the extent that Clopper contends other people made "implied promises" about his show, Cplt. ¶¶ 16-17, the Complaint fails to state a contract claim against Harvard. As a matter of law, an oral representation cannot override the clear terms of the written contract. *See Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1124 (1st Cir. 1995). Regardless, alleged comments by Bronski and Hammond, who supposedly encouraged and assisted Clopper, Cplt. ¶¶ 67, 78, 83, could not bind Harvard, because those individuals had no authority. *See Hudson v. Mass. Prop. Ins. Underwriting Assn*., 386 Mass. 450, 457 (1982) ("Apparent or ostensible authority results from conduct by the principal which causes a third person reasonably to believe that a particular person … has authority to enter into negotiations or to make representations as his agent."); *see also Normandin v. Eastland Partners, Inc.*, 68 Mass. App. Ct. 377, 385 (2007). The Complaint

does not allege—nor could it—that Harvard engaged in conduct that would have caused a reasonable person to believe that, on Harvard's behalf, a FAS professor or LRC employee could sanction live nudity and pornographic content in the Sanders Theatre, despite an express contractual provision and Harvard's policies (and Cambridge's laws) against public nudity.

### B.   Clopper was an at-will employee of Harvard, and his termination did not breach any employment agreement.

Under Massachusetts law, "an employment at-will contract can be terminated at any time for any reason or for no reason at all." *Folmsbee v. Tech Tool Grinding & Supply, Inc.,* 417 Mass. 388, 394 (1994); *see Pearson v. John Hancock Mut. Life Ins. Co.*, 979 F.2d 254, 258 (1st Cir. 1998) (holding "at-will employment" can be "scrap[ped]" by either party "at any time, without notice or cause"). For that reason, "subject to limited exceptions for violations of public policy or to prevent unjust enrichment to an employer … an at-will employee cannot succeed on a breach of contract claim arising from a change in the terms and conditions of her employment," including termination. *Merricks v. Savers, Inc.*, No. 11-cv-10956-DJC, 2012 U.S. Dist. LEXIS 1568, at *15 (D. Mass. Jan. 6, 2012) (citing, *e.g.*, *Bergeson v. Franchi*, 783 F. Supp. 713, 717-18 (D. Mass. 1992) (dismissing at-will employee's contract claim)). Because Clopper was an at-will employee, Harvard could terminate him at any time and for any reason. Thus, even if Harvard fired Clopper for staging his obscene and offensive play, as Clopper alleges, *see* Cplt. ¶ 84, his claim for breach of his employment agreement would fail.

### C.   Harvard did not breach the implied covenant of good faith and fair dealing in any of the alleged contracts.

Every contract in Massachusetts is subject to an implied covenant of good faith and fair dealing, and a breach of that implied convent occurs when one party violates the reasonable expectations of the other. *See Chokel v. Genzyme Corp.*, 449 Mass. 272, 275-76 (2007).

The covenant, however, does not supply terms that the parties were free to negotiate, but did not, *see id.*, nor does it "'create rights and duties not otherwise provided' for in the contract," *id.* (quoting *Ayash v. Dana-Farber Cancer Ctr.*, 443 Mass. 367, 385 (2005)). Thus, Clopper's "allegation" that, under Massachusetts law, the implied covenant broadly "protects employees for asserting legally guaranteed rights," such as free speech rights, *see* Cplt. ¶ 89, is incorrect.

Here, Clopper's tag-along implied covenant claim adds nothing to his case. The Complaint does not allege any fact that would independently establish a breach of the implied covenant separate from any contract. Instead, it generically asserts, "[b]y the conduct complained of [in] this Complaint," meaning the entire pleading, "Harvard breached the implied covenant of good faith and fair dealing in the contracts between Harvard and Clopper." *Id.* ¶ 88. That conclusory legal allegation without any "further factual enhancement" is insufficient, *Maldonado*, 568 F.3d at 268: the Complaint does not specify what "conduct" or how it "violat[ed]" the implied covenant.

## V.    The Complaint fails to allege Harvard made any enforceable promise that Clopper could perform nude at the Sanders Theatre (Count VI).

Promissory estoppel is an equitable doctrine that provides for enforcement of a promise that a defendant made with the intent to induce reliance by a plaintiff, where the plaintiff relied on that promise to his detriment. *See Nardone v. LVI Servs., Inc.*, 94 Mass. App. Ct. 326, 330 (2018).

To be enforceable, a promise must be "definite and certain." *Santoni v. Fed. Dep. Ins. Co.*, 677 F.2d 174, 179 (1st Cir. 1981). A plaintiff's alleged reliance on a "vague representation" is insufficient, because such reliance is "certainly not reasonable." *Michelson v. Dig. Fin. Servs.*, 167 F.3d 715, 725-26 (1st Cir. 1999). Here, the Complaint fails to allege Harvard made any "definite and certain" promise that Clopper could perform "nude and otherwise" and that it would not "retaliate against him … for doing so." Cplt. ¶ 93. Vague references to "many express and implied promises made to [Clopper] expressly and impliedly, orally and in writing," by Bronski,

19

Hammond, "Harvard's free speech policy," and "the speeches of the outgoing and incoming Harvard presidents" are insufficient. Absent factual allegations about who said what, when, and how such statements could be imputed to the University, there can be no valid claim that Clopper relied on any specific "promise."

Further, the fact that Clopper signed a written agreement with Harvard precludes his promissory estoppel claim, for two reasons. First, "an oral statement made in the face of a written contract" does not constitute "a 'promise' or 'commitment' for promissory estoppel purposes," because "the existence of a written contract demonstrates the parties' intention that it [will] govern[.]" *Trent Partners & Assoc. v. Dig. Equip. Corp*., 120 F. Supp. 2d 84, 104-05 (D. Mass. 1999) (quoting *Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 850 (1995)). Second, to invoke promissory estoppel, a plaintiff "must have *reasonably* relied on the alleged promise to his detriment." *Coll*, 50 F.3d at 1124 (emphasis in original) (quoting *Hall v. Horizon House Microwave*, 24 Mass. App. Ct. 84, 93 (1987)). When an oral representation "conflicts with" a written document, such as a contract, "reliance on the oral representation is generally held to be unreasonable." *Id.* (citing *Trifiro v. N.Y. Life Ins. Co.*, 845 F.2d 30, 33-34 (1st Cir. 1988)). As noted above, Clopper concedes that his written agreement to use the Sanders Theatre, which incorporated the Policy Book, expressly prohibited public nudity. He could not, therefore, have reasonably relied on an alleged promise to the contrary.

## VI.     The Complaint fails to allege that Harvard defamed Clopper (Count VII).

To state a claim for defamation, a plaintiff must allege the defendant "published a false statement about him to a third-party that either caused him economic loss or was the type that is actionable without proof of economic loss." *Phelan v. May Dep't Stores Co.*, 443 Mass. 52, 55-56 (2004). The plaintiff must also allege the defendant acted with the requisite intent, from negligence

(for a private person) to actual malice (for a public figure). *See Ravnikar v. Bogojavlensky*, 438 Mass. 627, 630 (2003) (discussing varying "levels of fault required" for defamation).

A.     **The Complaint does not allege that Harvard made any defamatory statements.**

Clopper complains about several critical articles in *The Harvard Crimson* concerning his performance. Cplt. ¶¶ 24-26, 99. The Complaint does not allege, however, that *Harvard* published these articles. To the extent the articles quote statements from Rachael Dane, FAS's Director of Media Relations, the Complaint fails to allege that her statements were false or defamatory. To the contrary, the Complaint concedes that *The Crimson* reported—*accurately*—that Harvard was "reviewing" what transpired at the Sanders Theatre on May 1, 2018. *See id.* ¶ 99; *see also id.* at ¶¶ 28-30.

Nevertheless, the Complaint alleges that Harvard is somehow responsible for three statements published in five articles by *The Crimson*:   (1) Clopper performed "nude," (2) his performance was a "rant," and (3) it included anti-Semitic remarks. *See* Cplt. ¶¶ 99-101. These statements were neither false nor defamatory.

First, there was no falsity. It is undisputed that Clopper appeared fully nude, with his genitals exposed, on the stage before a public audience in the Sanders Theatre at the end of his performance. *Id*. ¶ 20 ("Clopper performed a nude dance[.]"); *see* Sealed Exs. B & C. Indeed, the core of this case is Clopper's erroneous assertion that he had constitutional and contractual rights to perform nude. It is also undisputed that Clopper "rant[ed]" about circumcision. He characterized himself as "sputtering with rage" and his performance as his "official declaration of war on [the Jewish] covenant." YouTube Video at 2:03-2:05.

In addition, the assertion that Clopper or his performance was "anti-Semitic" expresses an opinion, which is not actionable. *See Egiazaryan v. Zalmayez*, 880 F. Supp. 2d 494, 512 (S.D.N.Y. 2012) (dismissing defamation claims and holding "accusations" of anti-Semitism are "expressions

21

of opinion"); *cf. Nat'l Assoc. of Gov't Emps. v. Cent. Broad. Corp.*, 379 Mass. 220, 229 (1979) (holding "communist" was "too vague to be cognizable as the subject of a defamation action"). "Under the First Amendment, opinions based on disclosed facts are absolutely privileged, …. even when an opinion is extremely derogatory, like calling another person's statements 'anti-Semitic.'" *McCafferty v. Newsweek Media Grp.*, 955 F.3d 352, 357 (3d Cir. 2020). Here, the relevant facts were fully disclosed, by *The Crimson* in its articles and by Clopper on stage.

Clopper's public statements, which were accurately reported, speak for themselves. For example, during his performance, Clopper called Judaism "an evil ideology" that is "hideous and duplicitous enough to fool an entire nation" to perpetrate the "unspeakable evil" of circumcision, which Clopper called "a Satanic ritual." YouTube Video at 2:02-2:03. He repeatedly insisted that Jews have "too strong a grip" and wield "a demonstrably evil influence on this country." *Id.* at 2:03. He also claimed, "the Jews … raped me" and exhorted his audience "not [to] allow them to rape the next generation of children." *Id.* at 2:05. Invoking the most traditional of anti-Semitic tropes, Clopper threw cash from the stage and shouted the Jews "can keep their money." *Id.* at 1:58.

### B.    Clopper is a "limited-purpose public figure," and Harvard did not act with "actual malice" toward him.

In defamation cases, "the requirement of actual malice" has been extended "to an otherwise private figure who 'voluntarily injects himself or is drawn into a particular public controversy,' thus becoming a limited-purpose public figure[.]" *Lemelson v. Bloomberg, L.P.*, 903 F.3d 19, 23 (1st Cir. 2018) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)).

"The First Circuit uses a two-pronged test to determine whether a defamation plaintiff fits the limited purpose public figure category." *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 13 (1st Cir. 2011). First, would "a reasonable person … have expected persons beyond the immediate

participants in [a] dispute to feel the impact of its resolution"? *Id.* at 13. Second, did they "attempt[]

to 'influence the resolution' of that controversy"? *Id.*; *see Alharbi v. Beck*, 62 F. Supp. 3d 202, 209

(D. Mass. 2014) (holding people are "limited purpose public figures" if they "affirmatively sought

out press coverage in order to influence public perception of their respective controversies").

      In the debate over circumcision, Clopper is—and wants to be—a limited-purpose public

figure. *See* https://www.clopper.com (touting Clopper's anti-circumcision activism and soliciting

donations to fund litigation against Harvard). The controversy certainly impacts persons beyond

Clopper and his audience, and he has aggressively tried to influence its resolution. Indeed, that

was the *raison d'etre* for his appearance in the Sanders Theatre, and Clopper has sought public

attention both before and after his performance.

      "Because of the First Amendment interests implicated by a claim of defamation by a public

figure, the standard for pleading actual malice 'is a daunting one.'" *Howard v. Antilla*, 294 F.3d

244, 252 (1st Cir. 2002). "Even where a plaintiff establishes an extreme departure from

professional norms, the standard for actual malice is not met unless the plaintiff can establish that

the defendant actually entertained serious doubts about the truth of the publication at issue." *Id.*

      To survive a Rule 12(b)(6) motion to dismiss to dismiss, a limited-purpose public figure

must "la[y] out enough facts from which malice might reasonably be inferred." *Lemelson*, 903

F.3d at 24 (citing *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012));

*see, e.g.*, *Frachini v. Bangor Publ'g Co.*, No. 1:18-cv-00015-GZS, 2020 U.S. Dist. LEXIS 66200,

at *8 (D. Me. Apr. 15, 2020) (dismissing defamation claim for failure to plead actual malice). In

this case, however, the Complaint fails to allege that Harvard acted with actual malice in making

any defamatory statements about Clopper or his performance.

**VII.    The Complaint fails to allege that Harvard tortiously converted Clopper's tangible property (Count VIII).**

To plead tortious conversion, a plaintiff must allege the defendant intentionally or wrongfully exercised dominion or control over the plaintiff's personal property, thereby substantially interfering with the plaintiff's use of his property. *See Kelley v. Laforce*, 288 F.3d 1, 11-12 (1st Cir. 2002) (citing *Third Nat'l Bank v. Cont. Ins. Co.*, 388 Mass. 240, 383 (1983)).

Conversion applies only to tangible property, not intellectual property. *See Blake v. Prof'l Coin Grading Serv.*, 898 F. Supp. 2d 365, 386 (D. Mass. 2012) (collecting cases). But here, the Complaint fails to allege Harvard converted any "chattel" of Clopper. Rather, under the erroneous guise of tortious conversion (a *tangible* property claim), the Complaint improperly asserts copyright infringement (an *intangible* property claim). *See* Cplt. ¶ 110 ("Clopper had an automatic copyright of the entirety of the Play . . ."). Even assuming Clopper owned a copyright, he "[held] no ordinary chattel" with respect to his nude show, *Dowling v. United States*, 473 U.S. 207, 215 (1985), and thus, there was nothing for Harvard to convert.

Further, Harvard did not substantially interfere with Clopper's ability to use the "property" he claims Harvard converted, *i.e.*, the performance.[8] The Complaint states only that Baystate, a separate entity which is not named as a defendant, "made a perfect digital copy of the Play and other materials by taken a 'screen' capture of the material on Clopper's laptop," and it characterizes Baystate's conduct as "inconsistent with Clopper's ownership of these materials." Cplt. ¶¶ 111-12. The Complaint fails to allege, however, that Harvard did anything (other than "ask" Baystate for "a copy of Clopper's Play"); to specify what "other materials" were supposedly taken from "Clopper's laptop"; or to explain how making an after-the-fact copy of the recording substantially

---

[8] Indeed, as noted above, Clopper subsequently posted a video of his Sanders Theatre performance on YouTube and he retained sufficient control over the "property" that he was able to omit his nude dance with the sex doll and the pornographic video he presented as an "encore."

interfered with Clopper's ability to present the performance at any other venue or to distribute his own copies.

## VIII. The Complaint fails to allege that Harvard conspired with The Crimson or any other party to commit any tort against Clopper (Count X).

### A. Clopper erroneously asserts a criminal conspiracy claim.

Invoking G.L. c. 274, § 7, the Complaint alleges that Harvard conspired with Baystate to "steal the play" and with *The Crimson* to defame Clopper. *See* Cplt. ¶¶ 39, 119-123. Notwithstanding the Complaint's ambiguous and erroneous legal assertion that "[t]he statute provides for civil and criminal penalties," *id.* ¶ 123, section 7 provides for "punishments," including imprisonment, for "[a]ny person who commits the crime of conspiracy," and Clopper cannot sue Harvard pursuant to that penal law.

### B. The civil conspiracy analogue would not apply, because there was neither an underlying tort against Clopper nor a conspiracy with *The Crimson*.

To the extent Clopper intended to plead a *civil* conspiracy, that claim would fail. Massachusetts has never explicitly recognized the tort of civil conspiracy, *see Kurker v. Hill*, 44 Mass. App. Ct. 184, 189 (1988), and at a minimum, the Complaint would have to allege "'a common plan to commit a tortious act.'" *Id.* (quoting *Stock v. Fife*, 13 Mass. App. Ct. 75, 82 n.10 (1982)). Here, because there was no tort (violation of the First Amendment, defamation, or conversion), there could be no civil conspiracy. Further, the Complaint fails to allege any "common plan." For example, allegations that Harvard emailed a statement to *The Crimson*, which then reported on Clopper's performance and Harvard's "review" of it, does not establish concerted tortious action. If a claim for conspiracy could be stretched to that extreme, every person quoted in a critical news article could be sued for conspiring to defame.

## Conclusion

For the foregoing reasons, Defendant President and Fellows of Harvard College respectfully requests that the Court dismiss this civil action for failure to state a claim.

Respectfully submitted,

**PRESIDENT AND FELLOWS**
**OF HARVARD COLLEGE**

By its attorneys,

*/s/ William W. Fick*
William W. Fick (BBO# 650562)
Daniel N. Marx (BBO# 674523)
Amy Barsky (BBO# 601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

Dated: September 29, 2020

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 29, 2020.

*/s/ William Fick*