UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ERIC CLOPPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 1:20-CV-11363-RGS |
| v. | ) | |
| | ) | |
| HARVARD UNIVERSITY, PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), THE HARVARD CRIMSON, AND JOHN DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF
MOTION OF THE HARVARD CRIMSON, INC.,
TO DISMISS COMPLAINT FOR FAILURE TO STATE A CLAIM**

PRELIMINARY STATEMENT

On May 1, 2018, Plaintiff Eric Clopper presented a 2-hour and 20-minute one-person performance in Harvard University's Sanders Theater. His intention was to convey what he himself describes as a "heavy message" (Cmplt., ¶ 20): that the widespread practice of circumcision, a form of "genital mutilation" that was originally a "social phenomenon limited to the Jewish people" (Cmplt., ¶ 19), "is the most obvious and evil lie in human history" (Cmplt., ¶ 22).

Plaintiff Clopper alleges that Harvard University (the "University") shut down the performance shortly before its conclusion, following his performance of a nude dance. By the next day, the University had commenced an investigation of his behavior, which ultimately led to the termination of Clopper's employment with the University. In this action, Plaintiff sues the University for wrongful termination in violation of his contractual and First Amendment rights.

1

Not content to sue only his former employer, Plaintiff has also brought claims against *The Harvard Crimson*, a student newspaper published by The Harvard Crimson, Inc., a Massachusetts corporation owned and operated independent of the University. He alleges that by reporting on criticism that his performance was "anti-Semitic" and a "rant," *The Crimson* published false information that defamed him, interfered with his free speech rights, caused the University to fire him, and conspired with the University to defame him.

Plaintiff's Complaint fails to state any viable claims against *The Crimson*, and therefore must be dismissed for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6).

## FACTUAL BACKGROUND[1]

The Harvard Crimson, Inc. is a Massachusetts nonprofit corporation whose officers and directors are all Harvard College students. *See* 2019 Annual Report (G.L. c. 180), located at Secretary of the Commonwealth, Corporations Division, ID No. 042426396, at https://corp.sec.state.ma.us/CorpWeb/CorpSearch/CorpSearchViewPDF.aspx . It publishes thecrimson.com and, until the recent pandemic,[2] a print newspaper distributed free of charge to Harvard students (daily during the academic year) (collectively, "*The Crimson*").

This action arises out of Plaintiff's May 1, 2018, presentation at Harvard University's Sanders Theatre, titled "Sex & Circumcision: An American Love Story." Plaintiff published a video recording of his presentation on YouTube. *See Sex & Circumcision: An American Love*

---

[1] Solely for the purposes of this motion, *The Crimson* accepts as true the well-pleaded factual allegations of the Complaint, but only to the extent not contradicted by the Complaint's attachments or by matters the Complaint incorporates by reference.

[2] While the print publication has been suspended since the start of the pandemic in March 2020, *The Crimson* continues in full operation on its website.

*Story by Eric Clopper, available at* https://www.youtube.com/watch?v=FCuy163srRc (posted July 19, 2018; visited Oct. 5, 2020).[3]

*The Crimson* published three articles focusing on Plaintiff's performance and the University's response to it. True copies of those articles are attached to the Affidavit of Robert A. Bertsche ("Bertsche Aff.") as exhibits 1-3, respectively. They are as follows:[4]

1. *Harvard 'Reviewing' Employee's Nude, Anti-Semitic Rant in Sanders Theatre,* May 3, 2018, by Lucy Wang and Michael E. Xie, Crimson Staff Writers. (Bertsche Aff., Ex. 1.) The article quotes a University spokesperson as saying Harvard is "reviewing" reports that Clopper "made anti-Semitic comments and stripped to the nude" during his performance. It cites "[v]ideos obtained by The Crimson" in which Clopper was "offering denunciations of circumcision that at times morphed into attacks against Judaism more generally." The article provides further details from the performance, and also quotes Clopper, interviewed by *The Crimson*, describing his performance as including a "two-hour lecture"; defending what he referred to as "the anti-semitic comments" contained within it; and acknowledging that the performance ended with him dancing onstage, fully nude.

---

[3] A rough transcript of the play, automatically generated from YouTube, is attached to the accompanying Affidavit of Robert A. Bertsche ("Bertsche Aff.") as Exhibit 6. Counsel has not edited or attempted to remove transcription errors from this automatically generated transcript, and submits it simply for the Court's convenience, to help provide a rough textual guide to the lengthy YouTube video at https://www.youtube.com/watch?v=FCuy163srRc .

[4] Two other articles, also referenced in the Complaint, made brief allusions to the Clopper controversy: *Harvard 'Investigating' After Swastika Found at School of Public Health,* May 12, 2018, by Luke W. Vrotsos, Crimson Staff Writer (Bertsche Aff., Ex. 4) (noting in final paragraph that a "Harvard employee gave a performance in Sanders Theatre May 2 in which he stripped to the nude and made anti-Semitic comments," and that "Harvard is currently 'reviewing' that performance."); and *Editorials: Expanding the Diversity Conversation: In the wake of the Presidential Task Force on Inclusion and Belonging, as well as incidents this past year, administrators must consider the diversity of Harvard's diversity initiatives,* May 24, 2018, by The Crimson Editorial Board (Bertsche Aff., Ex. 5) (noting in ninth paragraph that "Harvard employee Eric Clopper provoked outrage in his one-man show at Sanders Theatre, 'Sex and Circumcision: An American Love Story,' by making anti-Semitic claims, such as that of the perceived 'demonstrably evil influence' of Judaism in the United States. Clopper defended his freedom of expression and the ideal of ideological diversity, while detractors accused him of bigotry.").

2. *[Employee Planned Show Containing Anti-Semitism, Nudity in Harvard Workplace During Work Hours](#)*, May 4, 2018, by Lucy Wang and Michael E. Xie, Crimson Staff Writers. (Bertsche Aff., Ex. 2.) The article reports that Clopper (as he acknowledges in the Complaint, at ¶ 37) "planned and filmed promotional videos" for his performance in his workplace, during work hours. It quotes the University spokesperson saying Harvard, in her words, was "reviewing" the nudity and the "anti-Semitic content." It notes that in the performance, Clopper referred to Judaism as an "unmasked genital mutilation cult." It also quotes from an interview in which Clopper acknowledges to *The Crimson* that he had done some of the work in his University workplace, and describes his show as "more of a political and ideological speech, in like, where does religion have the right to carve their religion into your body, essentially."

3. *[Editorial: Against 'Sex and Circumcision: An American Love Story': Clopper should not have brought nudity and anti-Semitism to Sanders Theatre](#)*, May 9, 2018, by The Crimson Editorial Board. (Bertsche Aff., Ex. 3.) This editorial, described as representing "the majority view of The Crimson Editorial Board," describes why those editors believe Clopper had falsely promoted his performance and had expressed "bigotry" and "anti-Semitism," and also inquired whether or not the University had known that Clopper intended to "strip naked"—adding that if the University did know, "it should have taken action to prevent him from doing so."

ARGUMENT

**I. Count VII Fails to State a Claim for Defamation.**

Under Massachusetts law, "[d]efamation is the publication … of a statement concerning the plaintiff which is false and causes damage to the plaintiff." *Yohe v.* Nugent, 321 F.3d 35, 39-40 (1st Cir. 2003), quoted in *Ayyadurai v. Floor64, Inc.,* 270 F. Supp. 3d 343, 355 (D. Mass. 2017). Because the tort "requires a false statement at its core," *Piccone v. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015), "defamatory statements are not punishable unless they are capable of being true or false," *Pan Am Sys., Inc. v. Atlantic Northeast Rails & Ports, Inc.* 804 F.3d 59, 65 (1st Cir. 2015). If they are true, or incapable of being proved true or false, the statements are not actionable. *Id.* It is plaintiff's burden to show that statements are materially false, *id.*: "To survive a motion to dismiss, a complaint challenging statements about a matter of public concern[5] must not only allege that the statements are false, but also provide 'factual underpinning(s) to support that claim.'" *Ayyadurai*, 270 F. Supp. 3d at 358.

**A. *The Crimson* Did Not Make Any False, Defamatory Statements of Fact.**

To survive a motion to dismiss, a complaint for defamation must give evidence of a specific statement made by a defendant that could be considered defamatory. *See Canney v. City of Chelsea*, 925 F. Supp. 58, 70 (D. Mass. 1996) (granting motion to dismiss because complaint failed to provide evidence of specific defamatory statement). A defamation plaintiff is limited to its complaint in defining the scope of the alleged defamation, because a defamation defendant is

---

[5] "To qualify as a matter of public concern, the speech … must touch on issues in which the public (even a small slice of the public) might be interested, as distinct, say, from purely personal squabbles." *Pan Am*, 804 F.3d at 66. Issues of public concern can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.,* 127 F.3d 122, 132 (1st Cir. 1997). Clearly the question of the medical, ethical, sexual, and religious propriety of circumcision—including Clopper's view that it is "a form of genital mutilation" (Cmplt. ¶¶ 19, 101), are such a matter of public concern. *See also* Wikipedia,"Circumcision controversies," at https://en.wikipedia.org/wiki/Circumcision_controversies (noting that circumcision "has often been, and remains, the subject of controversy on a number of grounds").

entitled to knowledge of the precise language challenged. *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 n.6 (1st Cir. 1992) (declining to consider statements not identified in the complaint). Put simply, a court is not required to "comb through" a plaintiff's complaint to identify defamatory statements, *Flanders v. Mass Resistance*, No. 1:12-CV-00262-JAW, 2013 WL 2237848, at *2 (D. Me. May 21, 2013), much less comb through a defendant's news articles to do so.

Plaintiff's Complaint fails to meet this fundamental standard. Count VII, alleging defamation, gets no more specific than to identify three "buckets" of allegedly false and defamatory statements: "(i) that Clopper, a Jewish man, is anti-Semitic;[6] (ii) that Clopper improperly brought nudity to Sanders Theatre;[7] and (iii) that Clopper had engaged in a 'nude, anti-Semitic rant' in Sanders Theatre." (Cmplt. ¶ 101.) When one examines the three allegedly objectionable statements in turn, it is apparent that none of the allegedly defamatory statements rise to the level of an actionable tort.

### 1. "Nude"

Plaintiff acknowledges in his complaint that toward the end of his presentation, he "performed a nude dance to Britney Spears' *Toxic* music video with an inflatable love doll named 'Britney.'" (Cmplt. ¶ 20.) As he points out, the nudity should have come as no surprise to his audience, because he had publicized the event in advance using posters that "showed Clopper naked with his genitals obscured by a censor bar and 'EXPLICIT CONTENT' warnings on

---

[6] Plaintiff misrepresents the content of *The Crimson's* articles. Nowhere do any of the articles say Clopper himself is "anti-Semitic"; rather, they characterize many of his statements during the public performance as being anti-Semitic—an utterly reasonable and supportable characterization. (*See* Ex. 6 (transcript).)

[7] Again, nowhere did *The Crimson* explicitly write that Clopper acted "improperly"; rather, it noted that Harvard was investigating whether the nudity was in violation of contractual and municipal standards (Exs. 1, 2), and, in an editorial, expressed the *Crimson* editors' *opinion* that Clopper "*should not* have brought nudity … to Sanders Theatre" (Ex. 3 (emphasis added)).

them, thus communicating to potential playgoers that there would be nudity." (Cmplt. ¶ 15.) As advance publicity, he had also hired actors "to wear seven-foot inflatable penis costumes in Harvard Yard." (*Id.*) Indeed, it was the nudity in plaintiff's presentation that allegedly led University representatives to interrupt his performance, conduct an investigation into plaintiff's actions, and ultimately terminate his employment. (Cmplt. ¶¶ 20-21, 35) (alleging that his "nude dance" and the "sexual content" of his presentation were cited in his termination letter). The *Crimson*'s statement that Clopper performed "nude" (Ex. 1) was indisputably true, as was its statement that his presentation "contain[ed] nudity" (Ex. 2). Moreover, to the extent that it might under other circumstances be deemed defamatory to say that a presenter performed "nude," in this case plaintiff's actions could not have harmed his reputation to a greater degree than plaintiff's own pre-event publicity that previewed the nude performance.

      Whether a statement is capable of defamatory meaning is a question of law for the Court, and therefore determinable on a motion to dismiss. *Amrak Prod'ns, Inc. v. Morton,* 410 F.3d 69, 72 (1st Cir. 2005) (affirming Rule 12(b)(6) dismissal). It is to be determined with reference to the context in which the statement was made. *Id.* at 73. In particular, the meaning of an allegedly defamatory headline must be interpreted "in light of … the entire text of the article," *id.*, citing *Foley v. Lowell Sun Pub. Co.,* 404 Mass. 9, 11 (1989) (affirming dismissal of defamation claim where text of article accompanying the contested headline made clear that plaintiff had been arrested, not convicted, for assault); *see also Lemelson v. Bloomberg L.P.*, 253 F. Supp. 3d 333, 339 (D. Mass. 2017). Here, *The Crimson*'s articles fully explained what was meant by the word "nude" in the headline: that Clopper "stripped to the nude" during the performance (Ex. 1, ¶ 1) and that it "concluded in full nudity" (*id.*, ¶ 12), as Clopper himself acknowledged: "In terms of

7

the nudity, that was about the last 20 seconds and that was meant as the punchline of a recurring trope throughout. …I think there's nothing intrinsically wrong about … nudity…." (Ex. 1, ¶ 15.)

Clopper nevertheless protests that to call his presentation a "nude … rant" (*see* Ex. 1) is "a patent falsehood," because "[h]e said no words during his brief nude dance," and therefore could not be said to have been nude simultaneous with his "ranting." (Cmplt. ¶ 101(c).) He is parsing too finely. Even if the headline could somehow be considered misleading by juxtaposing "nude" with "rant," and even if any such impression were not offset by the text of the articles themselves, still there would be no falsehood for purposes of this motion to dismiss. Defamation law "overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 516 (1991); *see also Veilleux v. Nat'l Broad. Co.,* 206 F.3d 92, 133 (1st Cir. 2000) (acknowledging that "substantial truth" is sufficient to counter an allegation of defamatory falsehood).

### 2. "Rant"

Merriam-Webster defines "rant" to mean "a bombastic extravagant speech" (https://www.merriam-webster.com/dictionary/rant); an Urban Dictionary contributor says a speaker "rants" when he "talk[s] for a long time in a passionate manner" (https://www.urbandictionary.com/define.php?term=Rant). Nowhere in Plaintiff's Complaint does he dispute that he spoke, alone on stage, for some two hours and twenty minutes, and both his Complaint and the writings on his website, https://www.clopper.com/, make it evident that he proudly is passionate about the subject matter of circumcision. In any event, the First Circuit has recognized that statements are not punishable as defamation unless they are capable of being proven true or false, and "rhetorical hyperbole" or statements using words "in a loose, figurative sense" are also shielded from liability. *Pan Am Sys., Inc. v. Atlantic Northeast Rails & Ports, Inc.*

804 F.3d 59, 65 (1st Cir. 2015). Describing plaintiff's lengthy one-person show as a "rant" clearly falls in both categories.[8]

### 3. "Anti-Semitic"

Whether a statement is a fact or opinion is a matter of law for the court to decide. *See Piccone*, 785 F.3d 766 (1st Cir. 2015); *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st Cir. 2000). Opinions, such as theories and subjective views, are constitutionally protected unless they imply the existence of false and defamatory facts. *See Phantom Touring,* 953 F.2d at 730*; Piccone,* 785 F.3d at 771. This principle finds its rationale in the U.S. Supreme Court's observation in the seminal case of *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339-40 (1974): "Under the First Amendment there is no such thing as a false idea.  However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."

"Most courts that have considered whether allegations of racism, ethnic hatred or bigotry are defamatory have concluded for a variety of reasons that they are not. The most important reason is the chilling effect such a holding would cast over a person's freedom of expression." *Ward v. Zelikovsky*, 136 N.J. 516, 533, 643 A.2d 972, 982 (1994).

Statements in a newspaper that someone has anti-Semitic views is not actionable if the facts on which the statement is based are disclosed. *Nat'l Ass'n of Gov't Employees/Int'l Bhd. of Police Officers v. BUCI Television, Inc*., 118 F. Supp. 2d 126, 130 (D. Mass. 2000). Similarly,

---

[8] Plaintiff seems to concede as much in his presentation: He describes himself as "sputtering in rage." *See* Ex. 6, 125:01–125:47 ("I do not enjoy sputtering in rage as you have seen and you have felt but that rage that rage is embedded in my being in my fucking core perhaps I should be up here preaching forgiveness but I cannot find it the Jews in my case my own fucking father raped me he gave his rage to me let's not allow them to rape the next generation of children whether Jew or Gentile all children deserve protection.").

9

accusations of discriminatory beliefs based on disclosed facts are not actionable. *See Nat'l Ass'n of Gov't Emp., Inc. v. Cent. Broad. Corp.*, 379 Mass. 220, 226–27 (1979) (associating someone with "communism" is protected because it was based on disclosed non-defamatory facts and was too vague to be cognizable as the subject of a defamation action); *Stevens v. Tillman*, 855 F.2d 394, 402 (7th Cir. 1988) (accusations of racism are only actionable if the statements imply the existence of undisclosed, defamatory facts); *Williams v. Kanemaru*, 130 Haw. 304, 309 P.3d 972 (Haw. Ct. App. 2013) (accusation of racism based on disclosed facts not actionable as defamation); *Weidlich v. Rung*, No. M2017-00045-COA-R3-CV, 2017 Tenn. App. LEXIS 714, *17 (Tenn. App. Oct. 26, 2017) (accusing someone of being a "white supremacist" was protected as an opinion based upon disclosed facts and did not imply the existence of unstated defamatory facts).

As those cases and others make clear, an opinion can be defamatory only if it falsely implies the existence of undisclosed defamatory facts. Put another way, "A speaker can immunize his statement from defamation liability by fully disclosing the non-defamatory facts on which his opinion in based." *Piccone*, 785 F. 3d at 771. *See also McKee v. Cosby*, 874 F.3d 54, 63 (1st Cir. 2017) (statement did not give rise to a libel claim because the speaker disclosed non-defamatory facts underlying the assertions; thus, readers could draw conclusions from the information provided); Restatement (Second) of Torts § 566 (an opinion is punishable "only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion").

When viewed with this legal backdrop in mind, it is clear that the statement that Clopper made anti-Semitic statements during his play and engaged in a "nude, anti-Semitic rant" are, if not provably true, at the very least subjective opinions based on disclosed non-defamatory facts. The *Crimson* articles note that the newspaper obtained videos showing Clopper, during his

10

presentation, "pacing around the Sanders stage" and "offering denunciations of circumcision." (*See* Bertsche Aff., Ex. 1.) The articles offer other uncontested (and incontestable; see Ex. 6) statements supportive of the adjective "anti-Semitic." The Crimson noted, for example, that in his presentation Clopper said that Jews "are an unmasked genital mutilation cult" who had "raped" him; that Judaism had a "demonstrably evil influence" on the United States; that he vowed to "expend every breath in my body" to "tear this covenant to pieces"; that his play marked his "official declaration of war on our fucking covenant" and contained his promise that he would recruit an "army from our generation to wage it"; and that he will "force" Jewish individuals to "comply" with his demand that they stop circumcising their children. All of those statements are literally and contextually accurate excerpts from Clopper's presentation. (*See* Transcript at Bertsche Aff., Ex. 6.)[9]

Because the use of the word "anti-Semitic" to describe Clopper's presentation is not provably false, and because it is based on accurate facts contained in the *Crimson* articles themselves, it is language protected by the First Amendment, and the plaintiff's libel claim must be dismissed.

### B. The Complaint Does Not Plausibly Allege, As it Must, That *The Crimson* Acted With Reckless Disregard for the Truth.

Even if Clopper could somehow establish that *The Crimson*'s statements amounted to a provably false assertion of fact, still his libel claim must be dismissed, because he cannot produce clear and convincing evidence that *The Crimson* published the statements with actual

---

[9] Clopper made many other comments during his presentation that could reasonably be perceived as anti-Semitic. *See, e.g.,* Ex. 6, 117:41–117:58 ("[W]e cannot and will not tolerate Judaism in its current form[.] [W]ere you [*sic*] done tolerating cults that ritually mutilate their children's genitals."); Ex. 6, 122:59–123:19 ("[I]f you are an American man if you take your penis in your hand you will see a scar where you've been raped of essential elements of your humanity because of the demonstrable evil influence Judaism has on this country.").

11

malice—that is, with knowledge that they were false or with reckless disregard of whether they were false or not. *Sindi*, 896 F.3d at 14, citing *Gertz,* 418 U.S. at 342; *see also Alharbi v. Beck*, 62 F. Supp. 3d 202, 206 (D. Mass. 2014). He faces this "heavy burden," *id.*, because he is, by his own admission, a limited-purpose public figure for purposes of defamation law. Since the public-figure determination is a question of law for the court, *Pendleton v. City of Haverhill*, 156 F.3d 57, 68 (1st Cir. 1998), it is an entirely appropriate basis upon which this Court may dismiss Count VII for failure to state a claim upon which relief can be granted.

A limited-purpose public figure is one who "voluntarily injects himself" into a particular public controversy and thereby becomes a public figure for a limited range of issues. *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 13 (1st Cir. 2011). Clopper fits precisely into this category. His Complaint admits that "after studying the practice for years, Clopper became one of a large and increasing number of people, including Jews, adamantly opposed to non-consensual circumcision or genital cutting." (Cmplt. ¶ 8.) "It is Clopper's mission in life to help end what he considers to be a harmful and unlawful traditional practice that harms babies and mutilates their genitals for life." (*Id*.) He has lectured on the topic of circumcision, including at Cornell University, and then turned his lecture into the play that is at the heart of this lawsuit. (Cmplt., ¶¶ 9, 11.) He promoted the play extensively across Harvard's campus (Cmplt. ¶ 15), going so far as to hire actors "to wear seven-foot inflatable penis costumes in Harvard Yard and hold picket signs of these same posters." (*Id*.) He recorded online videos of himself taking group portraits with "dozens of citizens around Cambridge" while promoting the play, *id.,* and his performance attracted an audience consisting of "hundreds of individuals from the Harvard community and beyond." (Cmplt. ¶ 19.) Clopper also posted the play online, where "thousands of YouTube viewers" added a "like" rating to his play. (*Id.*)

Clopper, therefore, is a limited-purpose public figure because he "thrust" himself in the "forefront" of the public issue of circumcision, seeking to "influence its outcome" by holding himself out as an authority on the subject, speaking at length about it in front of large crowds, and sharing his views on it through online public forums. *See McKee*, 874 F.3d at 62 (quoting *Gertz*, 418 U.S. at 345).

As a public figure, Clopper faces a particularly onerous burden when pleading a defamation claim. To survive a motion to dismiss, a public figure must allege "well-pled facts"—not merely legal "buzzwords"—that "plausibly support" an inference that a defendant published the statements with actual malice. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012). As the federal district court for the Southern District of New York has noted, Rule 12(b)(6) should play a "particularly important role in testing the plausibility of a plaintiff's defamation claim" because of the "difficulty of proving actual malice . . . as well as the fact that actual malice must be proven by clear and convincing evidence in order for a plaintiff to succeed." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 278 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015).

Clopper's only, weak, attempt to plead actual malice in the Complaint comes in his assertion that the videos seen by *The Crimson* do not support the characterization of his presentation as a "nude, anti-Semitic rant." That question, however, is one for this Court to make, based on the facts, not on unsupported conclusions or "information and belief" allegations. Clopper does not contest the authenticity or veracity of the videos. Rather, Clopper disagrees with *The Crimson*'s interpretation of his comments as seen on the videos. This does not constitute actual malice. *See Nat'l Ass'n of Gov't Employees/Int'l Bhd. of Police Officers v. BUCI Television, Inc.*, 118 F. Supp. 2d 126, 131 (D. Mass. 2000) (the defendant's "rational

interpretation" of a plaintiff's "ambiguous comments" "does not create a jury question of actual malice.").

**II.     Count II Fails to State a Claim Against *The Crimson* Under the Massachusetts Civil Rights Act, Because the Crimson Did Not Engage in Coercive Conduct and Did Not Interfere With a Recognized Constitutional Right.**

To establish a claim under the Massachusetts Civil Rights Act ("MCRA"), M.G.L. 12 § 11(I), a plaintiff must prove: (1) that the defendant engaged in threats, intimidation, or coercion, and that (2) the defendant's activities interfered with, or were an attempt to interfere with (3) the plaintiff's exercise or enjoyment of some constitutional or statutory right. *Currier v. Nat'l Bd. of Med. Examiners*, 462 Mass. 1, 12 (2012). Clopper complains that *The Crimson* violated the MCRA by interfering with his constitutional right to free speech by "threats, intimidation, or coercion." (Cmplt. ¶ 67.) He also claims that—in the absence of "threats, intimidation, or coercion"—*The Crimson* is liable under the MCRA because it "acquiesced to pressure from third parties" to interfere with his rights. (Cmplt. ¶ 72.)

Although he cites the elements of the cause of action (Cmplt., ¶¶ 67, 72), Clopper fails to state a viable claim because he cannot establish that *The Crimson* interfered with his recognized constitutional rights. Quite to the contrary, a finding that *The Crimson* is liable under the MCRA would violate the newspaper's own free speech rights. Clopper also fails to identify threatening, intimidating, or coercive conduct in which *The Crimson* allegedly engaged.

**A.   *The Crimson* Did Not Interfere With A Recognized Constitutional Right.**

A threshold requirement of the MCRA is that the plaintiff interfered with a right "secured by" statute or by the Constitution of the United States or Massachusetts. *Roman v. Trustees of Tufts Coll.,* 461 Mass. 707 (2012). Clopper alleges that *The Crimson* interfered with his constitutional right to free speech in seven ways (Cmplt. ¶¶ 66, 67(b)), but none of the instances

to which he points can support the weight he puts on them. None, even if true, would constitute interference with a recognized constitutional right.

Clopper asserts first that he has a constitutional "right to be free from defamation," allegedly infringed by *The Crimson*'s coverage of the aftermath of his performance. (Cmplt. ¶ 67(b)(vi).) Specifically, he alleges that *The Crimson* interfered with his free speech rights by (1) "claiming that he did not have the right to say what he said during the Play" and (2) "claiming that he did not have the right to express himself by dancing nude." (Cmplt. ¶ 67(b)(i), (ii).) Of course, the *Crimson* articles make no such claims; they merely report on his activities and the University's response to them (and, in one case, the *Crimson* editors' assessment of them). (*See* Bertsche Aff., Exs. 1-3.) In any event, these claims fail because there is no such thing as a constitutional or statutory "right to be free from defamation," as Clopper characterizes it. (*See* Cmplt. ¶ 72.) *Pendleton v. City of Haverhill*, 156 F.3d 57, 62–63 (1st Cir. 1998) (an interest in reputation is not a "liberty" or "property" interest protected by the constitution).

Clopper also purports to have a constitutional right to publish a rebuttal in *The Crimson*, a private, non-governmental entity—a "right" that he says was violated when *the Crimson* denied his and his attorney's demand that they be permitted to commandeer the newspaper's editorial columns for their own. (Cmplt. ¶ 67(b)(iii), (iv), (v)). The U.S. Supreme Court has definitively ruled that there is no such right. *See Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (compelling a private newspaper to print candidates' rebuttals is an impermissible burden on "editorial control and judgment"); *Redgrave v. Bos. Symphony Orchestra, Inc.*, 855 F.2d 888, 906 (1st Cir. 1988) ("We have no reason to think that the Massachusetts Legislature enacted the MCRA in an attempt to have its courts, at the insistence of private plaintiffs, oversee the editorial

15

judgments of newspapers."). Clopper's claims that *The Crimson* violated his right to free speech by infringing his right to privacy and acquiescing to pressure from third parties also fail.[10]

Most fundamentally, as the First Circuit has recognized, to impose MCRA liability on *The Crimson* would have the unconstitutional effect of infringing on the newspaper's own rights under the First Amendment and Article XVI of the Massachusetts Declaration of Rights. *Redgrave v. Bos. Symphony Orchestra, Inc.*, 855 F.2d 888 (1st Cir. 1988) (en banc), *cert. denied*, 488 U.S. 1043 (1989). In *Redgrave*, the First Circuit held that a state constitutional defense may bar MCRA liability. *Id.* at 904, 910 (constitutional protections apply when the expression of one private person threatens to interfere with the expression of another). *The Crimson*'s right to be free from compelled speech includes the "editorial freedom" to choose what it does or does not print. *Id.* at 904 (the freedom for newspapers to "pick and choose among ideas, to winnow, to criticize, to investigate, to elaborate, to protest, to support, to boycott, and even to reject is essential if 'free speech' is to prove meaningful"); *see also Tornillo*, 418 U.S. at 241. The MCRA cannot constitutionally be enforced in such a way as to deprive *The Crimson* of its own free speech rights. *Id.* at 904 (expressing "grave concerns" about the state entering the marketplace of ideas in order to restrict speech that may have the effect of "coercing" other speech).

### B. *The Crimson* Did Not Engage In Threatening, Intimidating, Or Coercive Conduct.

Clopper's MCRA claim also fails because he pleads no facts to suggest, let alone prove, that *The Crimson* interfered with his rights by "threats, intimidation or coercion." Gen. Laws c.

---

[10] Both of these claims must be dismissed because Clopper presents no facts supporting an allegation that his privacy was infringed, nor any facts—other that unsupported "information and belief" speculation—that *The Crimson* acquiesced to third-party pressure. (Cmplt. ¶ 67(b)(vi), (vii).)

12, § 11(I). He does not allege any "actual or potential physical confrontation accompanied by a threat of harm," which is a required element of a MCRA claim. *See Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 475 (1994).[11]

### III. Count IX Fails to State a Claim Against *The Crimson* For Tortious Interference Because *The Crimson*'s Statements Were True And Not Made With Improper Means Or Motive.

In Count IX, Clopper alleges that *The Crimson* interfered with his employment contract by making false accusations against him with the improper motive of assisting Harvard, which resulted in his termination. (Cmplt. ¶ 116.) This claim fails because, as discussed above, Clopper cannot prove that any of *The Crimson*'s statements are false. (See I.A, above.)

The claim also fails because Clopper does not adequately plead that *The Crimson* acted with improper means or motive. *See The Hertz Corp. v. Enter. Rent-A-Car Co.*, 557 F. Supp. 2d 185, 196 (D. Mass. 2008) (improper conduct may include ulterior motives (*e.g.*, wishing to do injury) or wrongful means (*e.g.* deceit or economic concern)); *see also Dulgarian v. Stone*, 420 Mass. 843, 851 (1995). In *Dulgarian*, the Supreme Judicial Court dismissed an intentional interference claim against a television station because there was no indication that it acted improperly or was motivated by any purpose other than reporting on a newsworthy topic. *Id.* at 852. The claim against *The Crimson* should be dismissed under the same principle.

---

[11] Even in the absence of "threats, intimidation or coercion," Clopper's MCRA claim fails because Clopper does not present facts showing how Harvard or any third party pressured *The Crimson*. (*See* Cmplt. ¶¶ 68, 72; *see also* n.10, above.)

### IV. Count X Fails to State a Claim for Conspiracy Because *The Crimson* Engaged in No Underlying Tortious Conduct.

In Count X, Clopper claims that *The Crimson*, together with Harvard, Michael Xie, Lucy Wang, and "other still unnamed individuals" conspired to defame him.[12] (Cmplt. § 121.) This claims fails because it is premised upon the same facts as Clopper's failed defamation claim. As explained above, *The Crimson* made no false, defamatory statement of fact, and in any event Clopper failed to plead facts that would support a plausible finding of actual malice. Clopper's claim of "conspiracy to defame" must be dismissed. *See Paquette v. Nashoba Reg'l Sch. Dist.*, No. CV 05-40099-FDS, 2006 WL 8458640, at *9 (D. Mass. Mar. 30, 2006) (a party cannot be liable for conspiracy to defame if the party did not commit defamation).

THE HARVARD CRIMSON, INC.

By its attorneys,

*/s/ Robert A. Bertsche*_____
Robert A. Bertsche (BBO #554333)
*rbertsche@princelobel.com*
Michael J. Lambert (BBO #704134)
*mlambert@princelobel.com*
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA  02110
Dated:  October 5, 2020         (617) 456-8018

**CERTIFICATE OF SERVICE**

I hereby certify that this document has been filed on October 5, 2020, through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and by email to Andrew DeLaney, 6 South Street, Morristown, NJ 07690 (andrewdelaney21@gmail.com).

*/s/ Robert A. Bertsche*__
Robert A. Bertsche

---

[12] Plaintiff erroneously cited M.G.L. 274 § 7, the criminal conspiracy statute. (Cmplt. § 121.) The Crimson has construed this, instead, as a claim for civil conspiracy.