**Exhibit A**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ERIC CLOPPER,<br>Plaintiff<br><br>v.<br><br>HARVARD UNIVERSITY; PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION); THE HARVARD CRIMSON; AND JOHN DOES 1-10,<br><br>Defendants | Case No.: 1:20-cv-11363-RGS |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT PRESIDENT AND FELLOWS OF HARVARD COLLEGE'S**

**MOTION TO DISMISS**

/s/ Michael Vigorito _____          Dated: October 19, 2020
Michael Vigorito, Esq. (BBO#: 696328)
VIGORITO WOOLF PC
100 State Street, Floor 9
Boston, MA 02109
(617) 410-6750
mvigorito@vigoritowoolf.com

**Table of Contents**

Table of Contents…………………………………………………...……………………………………i

Legal Standard…………………………………………………...……………………………………1

The Complaint contains viable claims that Harvard violated the Plaintiff's right to free speech (Counts I and II) ……………………………………………………………..……………………………..1

    A.  Clopper's play taken as a whole was not obscenity and therefore it is protected free speech...2

    B.  Cambridge's blanket law against nudity is unconstitutional and cannot be validly invoked to restrict Clopper's constitutional right to free expression………………...…………………5

    C.  The Complaint also contains a viable claim for violating the MCRA (Count II)………...…..6

The Complaint contains viable contract claims (Counts III-VI) as Harvard breached numerous promises to the Plaintiff that he reasonably relied upon………………………………………...…………………7

    A.  Harvard encouraged free speech, repeatedly promised to protect it, and the Plaintiff relied on the promises………………………………………………………………...…………9

    B.  Harvard promised the Plaintiff that he could perform nude with sexual content and at Harvard's Sander's Theatre (Count III) without fear of termination (Count IV)…………...…9

    C.  The Complaint states a viable claim of breach of the covenant of good faith and fair dealing (Count V)………………………………………………………………………….…….12

    D.  The Complaint states a plausible claim of Promissory Estoppel (Count VI)………,………..13

The Plaintiff's Complaint contains plausible allegations that Harvard defamed him (Count VIII)………16

    A.  Harvard defamed Clopper by influencing the Harvard Crimson……………………………16

    B.  Harvard acted with actual malice………………………………………………………18

The Complaint contains plausible allegations of tortious conversion (Count VIII) and conspiracy to tortuously interfere with Clopper's employment contract by defaming him (Count X)…………………19

Conclusion. ………………………………………………………………………………20

Certificate of Service…………………………………………………………………………...20

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO HARVARD'S MOTION TO DISMISS AND IN SUPPORT OF ITS MOTION TO VACATE DISMISSAL OF THE CASE**

In evaluating Harvard's Rule 12(b)(6) motion to dismiss the claims against it, the Court must (1) accept the Complaint's factual allegations as true; (2) construe them in the light most favorable to the plaintiff; and (3) determine whether the facts allow a reasonable inference that the defendant is liable for the misconduct alleged." *Ruivo v. Wells Fargo Bank, N.A.*, 766 F.3d 87, 90 (1st Cir. 2014); *Handal v. State St. Bank & Tr. Co.*, 941 F. Supp. 2d 167, 172 (D. Mass. 2013) ("[T]he court accepts as true all well pleaded facts and draws all reasonable inferences in favor of the plaintiff."). "To survive a motion to dismiss, the complaint must allege `a plausible entitlement to relief.'" *O'Connor v. Jordan Hospital*, No. 10–11416–MBB, 2012 D. Mass. WL 1802308, at 3 ; *accord*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)*.* "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Stevenson v. Amazon. com, Inc.*, No. 15-13505-FDS, 2016 D. Mass., WL 2851316, at 3. Allegations may be direct or inferential. *Id*. Stated differently, when plaintiff asserts facts, whether directly or by inference, that can be construed as making a claim against Harvard even plausible, the Court should not dismiss the claim.

## I.  THE COMPLAINT CONTAINS VIABLE CLAIMS THAT HARVARD VIOLATED THE PLAINTIFF'S RIGHT TO FREE SPEECH (COUNTS I AND II)

Harvard's violations of the Massachusetts Civil Rights Act insofar as they relate to the violations of Clopper's Constitutional rights ensure that this claim must be allowed. In order to prove a claim under the Massachusetts Civil Rights Act, M.G.L. Ch. 12, a party does not need to show that it was a government actor that deprived the plaintiff of a constitutional right, only that

1

a constitutional right has indeed been violated. *Sena v. Commonwealth*, 629 N.E.2d. 986, 993

(Mass. 1994). Third, Harvard relies heavily on the assertion that nudity was prohibited in the

play under the laws of the City of Cambridge, a state actor. As discussed below, nude dancing is

constitutionally protected so the prohibition is unconstitutional and invalid. Thus, even though

Harvard is not a state actor, Clopper had a right to constitutionally protected free speech at

Harvard.

### A. CLOPPER'S PLAY TAKEN AS A WHOLE WAS NOT OBSCENITY AND THEREFORE IT IS PROTECTED FREE SPEECH

Harvard materially misrepresents the nature, substance, and character of Clopper's play

and of the applicable law in an attempt to support its bold claim that "without question"

Clopper's play is obscene, MTD at 11, and not entitled to First Amendment protection. An

accurate portrayal of Clopper's performance as a whole and of the law as to what constitutes

obscenity leads to the conclusion that the play was not obscene and that it is entitled to

constitutional protection.

For a performance to be deemed obscene and outside the bounds of First Amendment

protection, all three of the following conditions must be met: 1) It must depict or describe, in a

patently offensive way, sexual conduct specifically defined by applicable state law; 2) The entire

performance, <u>taken as a whole</u>, must appeal to the prurient interests (as defined by contemporary

community standards); and 3) <u>Taken as a whole</u>, the performance must lack serious literary,

artistic, political, or scientific value. *Miller v. California*, 413 U.S. 15, 24-25 (1973). In applying

this test, the court has ruled that nudity alone does not place otherwise protected material outside

the mantle of First Amendment protection. *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 66

(1981). As such, nude dancing has been held to be expressive conduct that falls within the

perimeter of the First Amendment's protections. *Barnes v. Glen Theatre*, 501 U.S. 560 (1991);

*Cabaret Entertainments, Inc. v. Alcoholic Beverages Control Commission*, 393 Mass. 13 (1985). Furthermore, even "hardcore sexual activity" (whether it be in the form of "masturbation," "lewd exhibition of the genitals," or "ultimate sex acts") only constitutes obscenity when such activity is unalloyed with some constitutionally recognized form of expression. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 293 (2000); *see also* James Weinstein, "Democracy, Sex and the First Amendment," 31 N.Y.U. REV. OF L. & SOCIAL CHANGE 865, 870 n. 19 (2007). Massachusetts courts have ruled that free speech protections for expressive conduct (including adult entertainment) go even further than the First Amendment does. *Showtime Entertainment, LLC v. Town of Mendon*, 769 F.3d. 61, 79-80 (Mass. 2014).

Here, Clopper's performance was not obscenity. Quite to the contrary, the performance was a highly regarded 2+ hour long presentation built on a lecture at Cornell that incorporated scholarly analysis, raw passion, humor, less than four minutes of a dance involving nudity for comic relief, and after Harvard stopped the play, a physical demonstration. As a whole, the performance conveyed its ultimate point: which is that circumcision, a sacred religious ritual that was introduced to the United States in an attempt to prevent masturbation and hence to suppress sexuality, is a harmful practice that causes deleterious effects (physical and otherwise) to boys and men which should be stopped. The audience gave the performance a standing ovation, and to date it has garnered over 187,000 views on Youtube, with a ratio of 6,900 "likes" to 232 "dislikes." We ask the Court to also consider the entirety of the play, including the clothes parts, which is a professional production available for viewing online.[1]

Harvard nonetheless attempts to portray the performance as obscenity by grossly mischaracterizing it as being, in large part, nothing more than a debased public "live sex show"

---

[1] https://www.youtube.com/watch?v=FCuy163srRc/ Note: YouTube has restricted access to viewing Clopper's play, and it requires sign-in with a Google account to view it.

devoid of any other purpose,[2] when the play was an educational tour de force, and nudity in any

form constituted less than 3% of the entire performance. Moreover, the acts that Harvard claims

are prima facie evidence of the performance as a whole being obscene (exposure of Clopper's

penis, and simulated sex acts and masturbation shown in the background as a series of slide, after

Harvard had ended the show, and after most of the audience had left), are in fact educational in

demonstrating several of the overall points that Clopper was trying to make: that circumcision

has a deleterious effect on the physical functioning of the male genitalia, and that (in a tongue in

cheek way) there is a bizarre interplay between the state of sexual affairs in America and

circumcision. Harvard's argument fails because: 1) The presentation taken as a whole contained

so much educational value that the performance cannot possibly be deemed obscene; 2) the

nudity and sexual acts at the end of the show did not meet the definition of obscenity; and 3)

even if individual acts within the performance constituted obscenity, which they do not, they

cannot be treated as a standalone unit for the purpose of rendering the performance as a whole

outside the bounds of First Amendment protection.

Furthermore, the performance did not take place in public, but rather was limited to a

relatively small theatre where the only participants, most from the Harvard community, were

those who had paid money and voluntarily chosen to attend, knowing from the advertisements –

which showed Clopper in the nude pointing to his genitals, and actors wearing inflatable penises

– that the play would contain nudity and sexual content. As such, for Harvard to claim that

Clopper exposed himself publicly, suggesting through innuendo that Clopper and his

performance were on par with some perverted street flasher, is specious, if not patently absurd.

In fact, the only case law Harvard cites in support of its argument that lewd public displays (a

---

[2] Harvard excerpts Clopper's the most slapstick portion of Clopper's nude dance in furtherance of this mischaracterization.

4

mischaracterization that it attributes to Clopper's performance) are illegal and outside the bounds

of First Amendment protection involves a man who exposed himself on a subway platform, *see*

*Commonwealth v. Maguire*, 476 Mass. 156 (2017), and even in that case, the court reversed the

man's conviction for lewd conduct. This merely underscores how little legal merit there is to

Harvard's suggestion that Clopper's performance falls outside the bounds of First Amendment

protection.

### B. CAMBRIDGE'S BLANKET LAW AGAINST NUDITY IS UNCONSTITUTIONAL AND CANNOT BE VALIDLY INVOKED TO RESTRICT CLOPPER'S CONSTITUTIONAL RIGHT TO FREE EXPRESSION

Cambridge's blanket prohibition on nudity is unconstitutional and thus Harvard's reliance

on it is void ab initio. Bans on public displays of nudity are unconstitutional unless the bans are

narrowly applied only to displays of nudity done on an unsuspecting or unwilling audience.

*Commonwealth v. Ora*, 451 Mass. 125 (2008); *Revere v. Aucella*, 369 Mass. 138 (1975).

Here, Cambridge's blanket prohibition against nudity runs afoul of the constitution for

overbreadth and lack of any kind of tailoring. Furthermore, as applied to the specific case of

Clopper's performance, no constitutionally sound law could reasonably be applied to restrict

Clopper's performance since it was show to a sophisticated, intelligent audience that willingly

went to a performance that advertised as being for a mature audience, and where the audience

could reasonably expect to hear and see nudity and sexual content as part of the performance. To

the extent that Harvard argues that even if the law is unconstitutional, it is absolved of

responsibility since they are merely "complying" with Cambridge's law, such an argument is

untenable. MTD at 10. The logic behind such an argument is such that wanton violations of the

constitution (racial discrimination, violations of civil rights) would go unsanctioned so long as

the perpetrator happened to live in a local jurisdiction where it could hide behind

unconstitutional local laws. The Court cannot sanction such a result by granting merit to such an argument on the part of Harvard.

### C.  THE COMPLAINT ALSO CONTAINS A VIABLE CLAIM FOR VIOLATING THE MCRA (COUNT II)

To establish a claim under the act, "a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." *Currier v. Nat'l Bd. of Med. Exam'rs*, 965 N.E.2d 829, 837-38 (Mass. 2012). We have shown that the first two prongs were satisfied, leaving the third prong. The Court ruled, "nor does [the Complaint] plausibly suggest that Harvard used threats, intimidation, or coercion to achieve any alleged interference with his rights, as required by the Massachusetts Civil Rights Act, M.G.L. ch. 12, ss. 11H, 11I." We respectfully disagree.

First, the complaint alleges that Harvard interfered with Clopper by threats and intimidation in many ways, Cplt. Para. 67(a), and Clopper can confirm he found the interference threatening and intimidating. These included threatening him shortly before he performed the play not to perform nude in it; telling him one day before the play to stop putting up posters advertising his play; by Harvard theatre manager Maureen Lane physically and threateningly blocking him from returning to the stage to make concluding remarks; and by threatening to terminate him for expressing his sincerely help opinion; and by banning him from campus and hence from graduate school.

Second, "Threatening, intimidating, and coercive actions *directed at third parties* should be included in considering any conduct that forms the basis of a claim under the MRCA." *Haufler v. Zotos*, 845 N.E.2d 322, 334 (Mass. 2006). During the investigation, Harvard threatened, bullied, isolated, and threatened his mentor Thomas Hammond. In addition, knowing

that Clopper was loyal to Hammond, and to deter Clopper from exercising his right to file this lawsuit, Harvard threatened to fire Hammond. The threat drove Hammond to suicide. Yet, though afraid, held his ground and he did not apologize. He said, "You know what? I stand proudly next to Clopper." *Cptl.* 43–50, 73–76.

## II. THE COMPLAINT CONTAINS VIABLE CONTRACT CLAIMS (COUNTS III – VI) AS HARVARD BREACHED NUMEROUS PROMISES TO THE PLAINTIFF THAT HE REASONABLY RELIED UPON

The Court dismissed most of Clopper's contract claims citing *Jackson v. Action for Bos. Cmty. Dev., Inc.*, 403 Mass. 8, 9 (1988) for the proposition that contracts of employment are usually terminable at will. That is only the starting point, however, for the analysis of a contract claim in the context of at will employment. The *Jackson* case continues, "Of course, there are certain restrictions on an employer's ability to discharge an employee at will." (1) Manifestly, for example, an employer cannot breach an *express promise not to terminate an employee* for engaging in certain conduct. (2) It cannot breach a *contract implied in fact, which is to be determined by whether a reasonably jury could conclude that an implied contract in fact existed.*. *Jackson* at 9. (3) An employer cannot violate *the duty of good faith and fair dealing implied by law* in every contract in Massachusetts. *Id.* (4) It cannot discharge an employee *in violation of public policy*. *Id.* (5) It cannot *discriminate in employment*. *Id.* (6) Even in the absence of a formal contract, "[w]hen a promise is enforceable in whole or in part by virtue of reliance, it is a 'contract,' and it is enforceable pursuant to a 'traditional contract theory' antedating the modern doctrine of consideration." *Loranger Const. Corp. v. E. F. Hauserman Co.*, 376 Mass. 757 (explaining how reliance can constitute an actionable promise under the promissory estoppel doctrine in the absence of a formal contract). (7) provisions of a contract that contain unconstitutional provisions (here, Cambridge law's blanket bar on nudity) are unenforceable. As

discussed below, all of these exceptions to the general rule that employees can be terminated at will apply here.

The *Jackson* court also began with the view that a court should consider all surrounding circumstances, which this Court has not yet done. Citing precedent dating back to 1897, *Carnig v. Carr*, 167 Mass. 544, 547, the *Jackson* court stated, "in determining a contract's terms 'it is necessary to consider the circumstances surrounding the making of the contract, its subject, the situation and relation of the parties, and the sense in which, taking these things into account, the words would be commonly understood.'" *Id.* at 13.

The essence of the Plaintiff's contract claims is that Harvard promised him, expressly and impliedly in fact and law, by words and conduct, that he could do every single thing that he did without fear of having his employment terminated.[3] Plaintiff asserts that he relied upon Harvard's various promises.[4][5][6][7][8] At the pleadings stage, the Court must accept his assertions as true. Harvard nonetheless terminated Plaintiff for having done what it promised him he could do without losing his job. *Cplt.* ¶ 35. Indeed, the Plaintiff's boss Thomas Hammond -- at the expense of his job, his home, and his life -- repeatedly told Harvard administrators that he had approved everything that Plaintiff did; and that the accusations of misconduct by the Plaintiff, which Harvard reiterated in its termination letter, were untrue; and Hammond refused to fire him.

---

[3] A subset of express, written promises, verbatim or close to it, by authorized agents of Harvard:

[4] We don't intend to censor things…" Clopper's Sanders Theatre Contract, Benjamin Janey, April 25, 2018.

[5] "Provocative plays are welcome at Harvard." "Your play is conservative in comparison." Clopper's Dean, Robert Doyle, April 30, 2018.

[6] "You [Clopper] were just following my instructions." Clopper's boss, Thomas Hammond. June 7, 2018.

[7] "the way to approach it (no matter who you are talking to) as your speech -- as rousing as it may be – is a form of political activism. As such, no matter what you [sic] employment position is at Harvard, it is protected speech … This seems to be a simple case of employment policy and I am sure HR will stand by you." Clopper's supporting faculty member, Michael Bronski. November 2, 2017

[8] Email from Hammond to Clopper on 6/7/2018 stated: "The issue is that you had the right to perform as an individual and we (Harvard) supported that right."

*Cplt.* 46 ¶. In light of Harvard's *many, express written and other promises*, a reasonable jury could conclude that an implied in fact contract existed between Clopper and Harvard that Clopper could perform his provocative play without censorship or retaliation. The only way to prevent an obvious injustice is to allow Plaintiff's breach of promise and contract claims to proceed. They have been pled with considerable and certainly sufficient detail in the Complaint, which Fed. R. Civ. P. 8(a) states must be short.

**A.  Harvard Encouraged Free Speech, Repeatedly Promised to Protect It, and the Plaintiff Relied on the Promises**.

Harvard's free-speech guidelines, which have not changed since 1990, promise that, "[s]peech is privileged in the University community"; that, "[w]e do not permit the censorship of noxious ideas"; and free speech disputes will be resolved "consistent with established First Amendment standards"; and that there is a presumption in favor of free speech. Furthermore, "[hard] choices about appropriate time, place, and manner should have a presumption favoring free speech." Harvard must be judged by its own standards, and the standards that Clopper was relying on when he gave his presentation.

Here, Harvard cannot meet its burden of rebutting the presumption that the Plaintiff engaged in free speech at an appropriate time and place. Professor Bronski told the Plaintiff that he could rely upon Harvard's free speech policy without fear of losing his job, and so did the Plaintiff's own manager Thomas Hammond.

**B.  Harvard Promised the Plaintiff that He Could Perform Nude With Sexual Content and at Harvard's Sander's Theatre (Count III) Without Fear of Termination (Count IV)**.

This Court ruled on Defendant's then unopposed motion to dismiss, "Plaintiff does not identify any provision in the Sanders Theatre contract entitling him to perform nude. Indeed, he

appears to concede that the Sanders Theatre contract contains a provision expressly prohibiting nudity in performances." We respectfully disagree for the following reasons.

"Conditions and clauses of a contract may be waived, either expressly or by words and conduct" *Owen v. Kessler*, 56 Mass. App. Ct. 466, 470 (2002). As shown above, Harvard promised to protect the Plaintiff's right to assert his First Amendment rights, see Part I, which included performing nude with sexual content. In addition, Harvard expressly and impliedly promised through words and conduct that he *could* perform nude and include sexual content at Harvard's Sanders Theatre, and the Plaintiff relied upon those promises. *Cplt.* ¶ 17.

Harvard itself advertised an adult-only play with a nude Clopper on the ads and collected ticket sales without complaint for approximately six weeks, until just before the show. *Cplt.* ¶ 18; *Owen¸* 56 Mass App. Ct. at 470 ("a waiver [can be] established by the acceptance of payments and continued dealings between the parties."). In addition, the Plaintiff advertised the show with inflatable penises in Harvard Yard, so Harvard was on notice that there might be a discussion of and depiction of an erect penis in the Clopper's show about penises. *Cplt.* ¶ 15.

Harvard itself suggested and booked Sanders Theatre for the play, and then Harvard advertised and profited off of advertising Clopper's "adult-only," play about "sex," "circumcision," and an "explicit" "love "story" up until the eve of the play. *Id.* Thus, Harvard was at least on constructive notice that nudity and sexuality would be included in the play, if not express notice. *The document the Plaintiff signed to book the theatre did not prohibit nudity*. Dkt. No. 30-1 Ex. D. Harvard did not provide Clopper with the external document ("Sanders Theater Producer's Handbook") referenced to in Provision 18 of the contract that prohibited nudity, nor did Harvard provide Clopper with any other document outside the four walls of the contract. *Id.* Clopper read the contract carefully and, noting that there was no prohibition on nudity, he "took

it." *Cplt.* 18. If Harvard did not want Plaintiff performing nude there, it had a duty to inform him that nudity was not permitted. Instead Harvard and their various agents promised Clopper that he would "not be censored," and that his "play was conservative in comparison" to other programs on campus.[9]  *Nudity in the play was integral part of the bargain that the Plaintiff made with Harvard when booking the theatre.* Clopper reasonably and massively relied on the written, oral, and "by conduct" representations by Harvard representatives by investing $40,000—his life's savings and all the donor support he could muster—into putting on the play as he did, which included exercising his Harvard promised First Amendment right to nude, expressive dance. *Cplt.* 78. The Plaintiff states that had he been informed in time that nudity was not permitted, he would have chosen another venue. *Cptl.* 78.

Moreover, Harvard cannot blame Clopper for not knowing that nudity was prohibited. Harvard likely did not realize *itself* that the license for Sanders Theatre did not allow nudity until after tickets had been sold and three days before the play was about to be performed. *Cplt.* ¶ 18. That was Harvard's mistake. By that time, it was too late and it would have been unconscionable to change the venue or cancel the show. As a matter of law, "if the court finds the contract or any clause of the contract to have been made unconscionable, it may so limit the application of the unconscionable clause as to avoid any unconscionable result." M.G.L.A. 106 § 2-302.

For a contract or a provision to be unconscionable, it must be both procedurally and substantively unconscionable. *Machado v. System4 LLC*, 471 Mass. 204, 218 (2015) (explaining that "no meaningful choice" and unfair surprise" meet the procedural prong, and "oppressive terms" meet the substantive prong). The procedural prong is met because Clopper had "no meaningful choice." Clopper could sign the Sanders boilerplate contract or nothing. *Cplt.* ¶ 18.

---

[9] *See supra* note 4.

Furthermore, there was an "unfair surprise" since Harvard informed Clopper of the "no-nudity" provision contained in an external document never provided to Clopper three days prior to the show after they waived their condition to enforce this Unconstitutional and inconsistent restriction on Clopper's right to free expression. *Id.* The substantive prong is met because it was "oppressive" to demand Clopper change or cancel his show after investing $40,000 into it – an enormous sum of money for Clopper. *Id.* Indeed, the contract allowed Harvard to cancel the show at any time and for any reason, and Harvard would not be liable for any resulting damages to Clopper for cancelling his play at the last minute. Dkt. No. 30-1 Ex. D, Provision 15.

Unconscionable or not, Clopper's boss also instructed him to dance nude and show the final scene. *Cplt.* ¶ 17. There was thus an enforceable contract that the Plaintiff could perform nude with sexual content at Harvard's theatre; the Plaintiff relied upon that promise; and Harvard breached the promise. Thus, Harvard did not have the right, as claimed in its termination letter, to terminate Clopper for his performance at Sanders Theatre.

### C. The Complaint States a Viable Claim of Breach of the Covenant of Good Faith and Fair Dealing (Count V).

It is well established under Massachusetts law, that every employment contract contains an implied covenant of good faith and fair dealing. *Fortune v. Nat'l Cash Register Co.*, 373 Mass. 96, 103 (1977). "A breach occurs when one party violates the reasonable expectations of the other." *Chokel v. Genzyme Corp.*, 449 Mass. 272, 276 (2007). Harvard tries to narrow the covenant so restrictively as to preclude Clopper's claim under it. MTD at 19 ("The covenant, however, does not supply terms that the parties were free to negotiate but did not." *Chokel*, 449 Mass. at 276 (citing *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 388 (2004)). However, *Uno* concerned a real estate transaction between two sophisticated business entities. Clopper had no bargaining power with his employment contract with Harvard.

Furthermore, his contract—or at least his reasonable understanding—included Clopper's right to engage in protected speech per First Amendment standards outside of work without retaliation.

Thus, this is not a "tag-along" claim, MTD at 19; there are ample facts that support it. Among the subset of "reasonable expectations" that Clopper had and Harvard violated were, without limitation, that: (1) Harvard would not terminate him for activities outside work; (2) Harvard would honor it many promises to respect Clopper's right to express himself consistent with First Amendment standards without retaliation; (3) if Harvard were to "investigate" him, it would tell him what for, it would conduct the investigation expeditiously, and it would not procure a stolen video of him masturbating and share it with his friends and colleagues during said "investigation," (4) it would not terminate him for following his boss's orders; (5) it would not conspire to defame him with the student press, as explained further in Part III below; (v) and it would not have threatened Hammond to prevent Clopper from filing this action before the Court.

### D. The Complaint States a Plausible Claim of Promissory Estoppel (Count VI).

We have shown that the Plaintiff has pled a plausible claims for breach of contract. Even had the formal elements of a contract—offer, acceptance, and consideration—been technically absent, however, Clopper would still be entitled to recovery under the equitable doctrine of promissory estoppel. It provides for enforcement of a promise that a defendant made [here, Harvard] with the intent to induce reliance by a plaintiff [here, Clopper], where the plaintiff relied on that promise to his detriment. *See Nardone v. LVI Servs., Inc.*, 94 Mass. App. Ct. 326, 330 (2018).

In dismissing the Plaintiff's promissory estoppel claim, the Court reasoned that the Plaintiff "does not sufficiently plead the elements of promissory estoppel. He does not allege, for

example, that Harvard (or any authorized or apparent agent of Harvard) made a clear or definite

promise that he could perform nude." We respectfully suggest that the Complaint does so allege.

It alleges that Harvard's Free Speech Guidelines promised that "speech consistent with First

Amendment standards" would be protected, which has included nude expressive dance for the

last 42 years. *Com. v. Sees*, 374 Mass. 532, 537 (1978); that Harvard through its conduct

impliedly and expressly promised that he could perform nude at Sanders Theatre, *Cplt.* ¶ 17; *see

also supra* note 4; that Professor Bronski suggested that he perform an edgy play, approved the

advertisements showing the Plaintiff in the nude, and told him that he had the right to perform

his play without fear of retaliation; that his boss approved every word and action in the play –

indeed his boss instructed him to perform nude and the final scene with sexual content was his

boss's idea – and told him that he could perform the play at Harvard's Sanders theatre the way he

did without fear of retaliation. *Id.*

It cannot be stressed enough that the Plaintiff, an idealistic 25 year old at the time the

play was performed, "massively relied" (his own words) upon these promises in performing his

play. He trusted that promises by the university, a Harvard professor, his dean, and his boss

meant something. In reliance, Clopper invested all the money he had and his reputation in

performing the play. He believed Harvard's promises that he could put on his controversial play

in the pursuit of "discovering and disseminating [important] ideas," and that if anyone found his

message "noxious," Harvard meant what it said when it wrote, "We do not permit censorship of

noxious ideas. We are committed to maintaining a climate in which reason and speech provide

the correct response to a disagreeable idea."

The Court's order of dismissal then states, "And even if plaintiff had made such an

allegation [of allowing a brief nude dance that constituted less than 3% of the play], the

14

Complaint does not establish *that reliance on such a promise would have been reasonable* under these circumstances, where the Sanders Theatre contract contained an express prohibition to the contrary." We respectfully suggest that this line of reasoning fails.

As discussed above, the extra-contractual provision may have been waived or unconscionable. Furthermore, "apparent or ostensible authority results from conduct by the principal which causes a third person reasonably to believe that a particular person … has authority to enter into negotiations or to make representations as his agent." *Hudson v. Mass. Prop. Ins. Underwriting Assn.*, 386 Mass. 450, 457 (1982).

A jury could find that it was reasonable for the 25-year-old Clopper to rely on the promises and assurances of the senior faculty member Bronski, long-time director Hammond, the long-time Dean Doyle, and other Harvard agents that he could "dance nude," "perform a rousing performance without retaliation," put on a "provocative play" that "was conservative in comparison," and that he "**would not be censored**." *See supra* note 4. Plaintiff contends that the totality of these assurances constitute actionable and binding promises from legitimate principals of Harvard. To add to the gravity of this reliance, Clopper revered and trusted Hammond, and Hammond went to his grave defending Clopper's right to perform the play as and where he did.

To rule that Clopper's reliance was unreasonable would lead to the untenable conclusion that Harvard's guidelines promising to protect free speech mean nothing, and that promises senior faculty members and even one's boss that Harvard will honor that policy mean nothing. It would follow that it is unreasonable to trust promises by Harvard. If Harvard does not like someone's message, it can feel free to retaliate against the person in any way it likes with impunity in the ways complained of in the Complaint, including blackballing him from attending its graduate school at a deep discount. The Plaintiff already has good evidence of that and other

retaliation – the claims are not speculative –- and at the pleading stage, the Court must accept the

claims as true.

## III. THE PLAINTIFF'S COMPLAINT CONTAINS PLAUSIBLE ALLEGATIONS THAT HARVARD DEFAMED HIM (COUNT VII)

Clopper's Complaint properly lays out a cause of action for defamation against Harvard

since it acted in concert with the Harvard Crimson to publish defamatory statements about his

performance. Under Massachusetts law, a plaintiff alleging libelous defamation must establish

six elements: that the defendant: 1) Published a written statement, 2) of and concerning the

plaintiff, that was both 3) false, and 4) defamatory, that 5) the defendant was at fault, and 6)

causing damage to the plaintiff. *Corellas v. Viveiros*, 410 Mass. 314, 319 (1991).

### A.  HARVARD DEFAMED CLOPPER BY INFLUENCING THE HARVARD CRIMSON

By working in concert with the Harvard Crimson to label Clopper's performance as a

"nude, anti-semitic rant," Harvard engaged in defamation against Clopper since the allegation is

objectively false and falls outside the protection sometimes given to mere expressions of opinion.

Under Massachusetts law, expressions of opinion that are not based on assumed or known facts

and that therefore imply that there are undisclosed facts on which opinion is based are open to

defamation actions. *Nat'l Assoc. of Gov't Emps. v. Cent. Broad Corp.*, 379 Mass. 220, 227

(1979). Here, when Harvard administrators encouraged the Harvard Crimson to publish an article

bearing the headline that Clopper's presentation was a "nude, anti-semitic rant," Harvard became

responsible for the dissemination of two categorical, defamatory falsehoods. The first is that the

presentation, nor any part of it, could not in any conceivable way be accurately described as a

"nude, anti-semitic rant." During the short portion of the performance where Clopper is nude, no

words were spoken. As such, it is a factual impossibility for the characterization of the

16

performance as a "nude, anti-semitic rant" to be accurate. In describing it as such, Harvard therefore portrays Clopper's presentation as something it was not. It gives off the inflammatory impression that Clopper's entire performance was a nude rant excoriating Jewish people, rather than what it actually was: by and large a clothed and passionate presentation against circumcision, with some small degree of nudity at the end of the performance. While the Harvard seems to make little note of this and while the court may initially see this as a distinction without a difference, there is a key distinction between being portrayed as a naked madman intent on doing nothing more than frothing venom against the Jewish people (how Harvard characterizes Clopper), and someone who incorporates nudity, passion and edgy material as a way of adding color to a performance presenting a legitimate point of view: opposition to circumcision.

The second categorical falsehood is that the performance was an anti-Semitic rant. Under the definition adopted by the State Department, anti-Semitism is defined as the following: "A certain perception of Jews, which may be expressed as hatred of Jews. Rhetorical and physical manifestations of anti-Semitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities." There is nothing in this working definition that brings criticism of Jewish practices, no matter how excoriating that criticism may be, within its ambit. Instead, the working definition is limited to attacking the Jewish people, their property, and their institutions. Here, Clopper concededly launches a vigorous verbal attack against circumcision, and the role that it plays in the Jewish religion. His attack on it, however, no matter how vigorous and vituperative it might be, never veers into the kind of broadside attack on the Jewish people as a whole that constitutes the definition of anti-Semitism. In fact, even the most inflammatory points of Clopper's performance that Harvard is able to point to, insofar as they allegedly show anti-Semitism on the part of Clopper, are limited

17

in their scope to excoriating their role in the practice of circumcision and excoriating the practice of circumcision itself, not their very existence as a people.

Harvard's argument that, notwithstanding the latter point, labelling Clopper's performance anti-Semitic is the expression of opinion protected from a defamation lawsuit, is without merit. Based on the clearly defined working definition of anti-Semitism, it cannot be a matter of mere opinion. Given that Clopper only made statements critical of circumcision and did not delve into the kind of attacks on the Jewish people that are required under the definition, the imputation of anti-Semitism onto his performance suggests that there is some underlying, invidious actual anti-Semitism Clopper engaged in beyond his passionate excoriation of the practice of circumcision and Jewish involvement in it. For the foregoing reasons, Harvard cannot claim that labelling Clopper's performance anti-Semitic is mere opinion.

### B.  HARVARD ACTED WITH ACTUAL MALICE

The Court's dismissal of the defamation count states that plaintiff acted as a limited-purpose public figure with respect to his performance and has not adequately alleged actual malice on the part of Harvard. In Paragraph 104 of the defamation count (Count VII) of the Complaint against The Crimson and Harvard, however, the Plaintiff alleged, "the Crimson displayed actual malice in their actions towards Clopper." Paragraph 100 avers that Harvard senior administrators encouraged the Crimson to publish those claims, and it is therefore that Harvard, as well as the Crimson, displayed actual malice. The complaint could be amended but it seems unnecessary.

Harvard knew that the portrayal of Clopper's performance that it helped facilitate in the Harvard Crimson was a false and defamatory one, and therefore it easily meets the actual malice standard required of a defamation claim, even if Clopper is a limited purpose public figure. To

survive a Rule 12(b)(6) motion to dismiss, a claim pleading malice need only plead with generality, rather than specificity. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012). Actual malice requires that the defendant acted with actual knowledge of the falsity of the statement or with reckless disregard for the truth. *St. Amant v. Thompson*, 390 U.S. 727, 728 (1968). Here, it represents a logical impossibility for Harvard not to have known that the portrayal of Clopper's performance that it helped facilitate in the Harvard Crimson was in fact a false one. It makes reference to the performance, and had access to videos of the performance, thereby proving that it knew the contents of the performance and chose to help have a patently false representation of it published in the Crimson anyway.

## IV. THE COMPLAINT CONTAINS PLAUSIBLE ALLEGATIONS OF TORTIOUS CONVERSION (COUNT VIII) AND CONSPIRACY TO TORTIOUSLY INTERFERE WITH CLOPPER'S  EMPLOYMENT CONTRACT BY DEFAMING HIM (COUNT X)

The Court dismissed the claim (Count VIII), stating that plaintiff fails to allege the existence of any personal, tangible property over which Harvard exerted dominion. However, in Paragraph 113, the Plaintiff alleged that his Play, which is intellectual property.

The Court dismissed Plaintiff's conspiracy claim (Count X) stating, "he fails to establish the existence of an underlying tort or plead any facts supporting his conclusory allegation of any common plan or scheme." Notwithstanding Harvard's attempt to intone that Massachusetts has never recognized the tort of civil conspiracy, however, Massachusetts courts actually do recognize such a tort, which requires a common design or agreement, which need not be express, between two or more persons to do a wrongful act, with a tortious act in furtherance of such an agreement. *Kurker v. Hill*, 44 Mass. App. Ct. 184, 189-90 (1988).

The Complaint alleges that Harvard and the Harvard Crimson engaged in a common plan to defame Clopper when Harvard administrators encouraged the Harvard Crimson to publish

defamatory articles about Clopper and instructed reporters what to say. Hammond confirmed this, writing to Clopper on June 7, 2018 that, "the Crimson and Harvard are sharing information," engaging in "collusion," and that "the Crimson's independence is a claim of convenience when Harvard doesn't wish to be held responsible for libelous stories."

## CONCLUSION

For the foregoing reasons, Plaintiff prays that the Court grant its motion to vacate the judgment and allow the Plaintiff's claims to proceed.


/s/ Michael Vigorito_____                Dated: October 19, 2020
Michael Vigorito, Esq. (BBO#: 696328)
VIGORITO WOOLF PC
100 State Street, Floor 9
Boston, MA 02109
(617) 410-6750
mvigorito@vigoritowoolf.com


## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 19, 2020.


/s/ Michael Vigorito  _____