DocuSign Envelope ID: 815BB3DE-758E-4AEE-B75A-63E42C16CD8E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ERIC CLOPPER

*Plaintiff,*

v.

HARVARD UNIVERSITY; PRESIDENT
AND FELLOWS OF HARVARD
COLLEGE (HARVARD CORPORATION);
THE HARVARD CRIMSON; and JOHN
DOES 1-10,

*Defendants.*

Civil Action No. 20-cv-11363-RGS

## PLAINTIFF'S OPPOSITION TO THE HARVARD CRIMSON'S MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

STANDARD OF REVIEW ..................................................................................................... 1

INITIAL REQUEST THAT THE COURT VIEW THE PLAY .................................................. 1

ARGUMENT .......................................................................................................................... 2

I.    THE COMPLAINT STATES A PLAUSIBLE DEFAMATION CLAIM (COUNT VII)
AGAINST THE CRIMSON ................................................................................................... 2

   A.   Applicable Law ........................................................................................................ 3

   B.   The Crimson Published False Statements About the Plaintiff ................................... 4

     i.    Falsity #1: Clopper Abused Harvard's Resources to Make his Play ............... 4

     ii.   Falsity #2: Clopper is Anti-Semitic ................................................................. 5

     iii.  Falsity #3: Clopper Went on a "Nude, Anti-Semitic Rant" in Sanders Theatre ............. 5

   C.   The Crimson Acted with Malice Towards Clopper .................................................. 9

   D.   Clopper Suffered Damages from The Crimson's Libel. .......................................... 11

II.    THE COMPLAINT STATES A PLAUSIBLE CLAIM UNDER THE
MASSACHUSETTS CIVIL RIGHTS ACT (MCRA) (COUNT II) .......................................... 11

III.   THE COMPLAINT STATES A PLAUSIBLE CLAIM FOR TORTIOUS
INTERFERENCE WITH EMPLOYMENT CONTRACT (COUNT IX) .................................. 14

A PLEA FOR FAIRNESS .................................................................................................... 17

CONCLUSION .................................................................................................................... 18

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ayyadurai v. Floor64, Inc.,*
  270 F. Supp. 3d 343 (D. Mass. 2017) .................................................................. 3

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................ 1

*Carvalho v. Town of Westport*,
  140 F. Supp 2d 95 (D. Mass. 2001) .................................................................. 14

*Currier v. Nat'l Bd. of Med. Exam'r,*
  965 N.E.2d 829 (Mass. 2012) ........................................................................... 12

*Dulgarian v. Stone*,
  420 Mass. 851 (1995)......................................................................................... 15

*Eyal v. Helen Broadcasting Corp.*,
  583 N.E.2d 228 (Mass. 1991) ............................................................................. 3

*Handal v. State St. Bank & Tr. Co.*,
  941 F. Supp. 2d 167 (D. Mass. 2013) .................................................................. 1

*Jackson v. Action for Bos. Cmty. Dev., Inc.*,
  403 Mass. 8 (1988)............................................................................................. 12

*Kurker v. Hill*,
  44 Mass. App. Ct. 184 (1998) ..................................................................... 14, 16

*McNamee v. Jenkins*,
  52 Mass. App. Ct. 503 (2001) ............................................................................. 9

*Nat'l Ass'n of Gov't Emps. v. Cent. Broad.*,
  379 Mass. 220 (1979)........................................................................................... 6

*Nelson v. Nason,*
  343 Mass. 220 (1961)......................................................................................... 16

*O'Connor v. Jordan Hospital*,
  No. 10–11416–MBB, 2012 D. Mass. WL 1802308 .............................................. 1

DocuSign Envelope ID: 815BB3DE-758E-4AEE-B75A-63E42C16CD8E

*Pan Am Sys., Inc. v. Atlantic Northeast Rails & Ports, Inc.,*
    804 F.3d 59 (1st Cir. 2015) ........................................................................... 3

*Pathe Computer Control Sys. Corp. v. Kinmont Indus., Inc.,*
    955 F.2d 94 (1st Cir.1992) ........................................................................... 16

*Piccone v. Bartels*,
    785 F.3d 766 (1st Cir. 2015) ......................................................................... 3

*Poland v. Post Publishing Co.*,
    330 Mass. 701 (1953) ..................................................................................... 3

*Redgrave v. Bos. Symphony Orchestra*, Inc.,
    502 N.E.2d 1375 (Mass. 1978) .................................................................... 13

*Ruivo v. Wells Fargo Bank, N.A.*,
    766 F.3d 87 (1st Cir. 2014) ........................................................................... 1

*Schatz v. Republican State Leadership Comm.*,
    669 F.3d 50 (1st Cir. 2012) ......................................................................... 10

*Scholz v. Delp*,
473 Mass 242 (2015) ........................................................................................ 3

*Sena v. Commonwealth*,
    629 N.E.2d 986 (Mass. 1994) ...................................................................... 12

*Stanton v. Metro*,
    438 F.3d 119 (1st Cir. 2006) ............................................................... 3, 6, 7, 8

*Stevenson v. Amazon. com, Inc.*,
    No. 15-13505-FDS, 2016 D. Mass., WL 2851316 ...................................... 1

## Other Authorities

Jasper G. Goodman, *Harvard, The Crimson Move to Dismiss Lawsuit Filed by Former
    University Employee Eric Clopper*, The Harvard Crimson (Oct. 7, 2020)
        https://www.thecrimson.com/article/2020/10/7/harvard-motion-to-dismiss-clopper-lawsuit/... 9

## Treatises

*Restatement (Second) of Torts* (1977) ......................................................... 6, 16

## STANDARD OF REVIEW

In evaluating The Crimson's Rule 12(b)(6) motion to dismiss the claims against it, the Court must (1) accept the Complaint's factual allegations as true; (2) construe them in the light most favorable to the plaintiff; and (3) determine whether the facts allow a reasonable inference that the defendant is liable for the misconduct alleged." *Ruivo v. Wells Fargo Bank, N.A.*, 766 F.3d 87, 90 (1st Cir. 2014); *Handal v. State St. Bank & Tr. Co.*, 941 F. Supp. 2d 167, 172 (D. Mass. 2013) ("[T]he court accepts as true all well pleaded facts and draws all reasonable inferences in favor of the plaintiff."). "To survive a motion to dismiss, the complaint must allege 'a plausible entitlement to relief.'" *O'Connor v. Jordan Hospital*, No. 10–11416–MBB, 2012 D. Mass. WL 1802308, at 3; *accord*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Stevenson v. Amazon. com, Inc.*, No. 15-13505-FDS, 2016 D. Mass., WL 2851316, at 3. Allegations may be direct or inferential. *Id*. Stated differently, when the plaintiff asserts facts, whether directly or by inference, that can be construed as making a claim against The Crimson even plausible, the Court should not dismiss the claim.

## INITIAL REQUEST THAT THE COURT VIEW THE PLAY

The Plaintiff's causes of action against the Crimson and the Crimson's Motion to Dismiss concern a play that the plaintiff Eric Clopper performed at Harvard's Sanders Theatre on May 1, 2018. So far, however, the court has likely seen only a few minutes of a misappropriated slideshow that played in the background *after the show's conclusion* that almost no audience members saw and that was not representative of the play's contents. That portion of the play is not at issue here. It is important and in the interests of justice that the Court view the rest of the

play, which is at issue here because that is what The Crimson wrote about. The bulk of Clopper's performance was an erudite 130-minute long clothed PowerPoint presentation with oration, based on a lecture at Cornell, which took up 97.3% of the play, is available to the public on various streaming websites. The brief nude dance that the 25-year-old Plaintiff included at the behest of his Harvard boss included no oration. The nude dance was 3 minutes and 46 seconds long, representing 2.7% of the play. The entire play, including the brief nude dance, is attached in Sealed Exhibit A.[1] Clopper has received many thousands of messages from viewers around the world as to how his play has changed their lives, and he has raised tens of thousands of dollars to pursue this litigation because of his play. Plaintiff respectfully requests the Court view his play to make an informed decision on the merits of his case.

## ARGUMENT

### I.    THE COMPLAINT STATES A PLAUSIBLE DEFAMATION CLAIM (COUNT VII) AGAINST THE CRIMSON

The Crimson knowingly (that is, with malice) published objectively false and defamatory statements about Clopper and his performance in Sanders Theatre. Cplt. ¶ 104. Clopper did not go on a "nude, anti-Semitic rant," as The Crimson falsely claims, and that is a provable fact. The Crimson's publications about Clopper greatly damaged his reputation and led to Harvard terminating his promising career there. Thus, Count VII of defamation and libel against The Crimson should proceed to discovery and trial.

---

[1] All timestamps refer to Sealed Exhibit A. The clothed portion of the play runs from the start to 2 hr 10 min 10 sec. The nude dance runs from 2 hr 11 min 5 sec to 2 hr 14 min 51 sec. Harvard's Maureen Lane intercepted Clopper following his nude dance and ended his play. Cplt. ¶ 21. Once Lane stopped admonishing Clopper, Clopper stayed in Sanders Theatre to meet the remaining attendees and take pictures with them. While Clopper spoke with his fans, Harvard (or Baystate at the request of Harvard) made an unauthorized screen capture of the slideshow that played in the background. Cplt. ¶ 32. Clopper's Harvard boss conceived, filmed, video edited, and insisted that Clopper include the slideshow after the nude dance, and the 25-year-old Plaintiff conceded to his boss's demands. Cplt. ¶ 17. The video shows that few attendees saw the slideshow and none were offended by it.

## A. Applicable Law

To succeed on a defamation claim under Massachusetts law, a plaintiff must show that the defendant was at fault for (1) the publication of a (2) false statement (3) of and concerning the plaintiff which was (4) capable of damaging his or her reputation in the community and which (5) either caused economic loss or is actionable without proof of economic loss. *Stanton v. Metro*, 438 F.3d 119, 124 (1st Cir. 2006). The level of fault required varies between negligence (for statements concerning private persons) and actual malice (for statements concerning public officials and public figures)." *Scholz v. Delp*, 473 Mass 242, 249 n.8 (2015). "Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn, or ridicule, or tend to impair his standing in the community." *See Eyal v. Helen Broadcasting Corp.*, 583 N.E.2d 228, 232 (Mass. 1991).

Regarding element (2), to succeed on a defamation claim, a plaintiff must show that the defendant published a "false statement at its core." *Piccone v. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015). Generalities are not enough; the defamatory statement must be capable of being proven true or false. *Pan Am Sys., Inc. v. Atlantic Northeast Rails & Ports, Inc.,* 804 F.3d 59, 65 (1st Cir. 2015). And, if the plaintiff made comments of "public concern" — as in this case where the plaintiff questioned America's widespread practice of cutting the genitals of healthy baby boys — then the plaintiff must not only allege that the statements are false, but he must also provide "factual underpinning" to support his claim. *Ayyadurai v. Floor64, Inc.,* 270 F. Supp. 3d 343, 355 (D. Mass. 2017). In addition, "A defendant in an action for libel is liable for what is insinuated as well as for what is explicitly stated." *Poland v. Post Publishing Co.*, 330 Mass. 701, 704 (1953).

3

It is undisputed that The Crimson published five articles about Clopper and his play. Cplt. ¶ 99. Therefore, elements (1) and (3) are met, leaving elements (2), (4), and (5).

## B. The Crimson Published False Statements About the Plaintiff

The five Crimson articles, independently and taken together, all state and insinuate that Clopper acted improperly at Harvard in numerous ways. The Crimson portrayed him as a bad person, as an employee who flouts rules about work, and as a racist who goes on "naked rants." More particularly, the false claims are that: (1) Clopper improperly worked on the play during work hours, Cplt. ¶105; that (2) Clopper is anti-Semitic; and moreover, that (3) Clopper engaged in a "nude, anti-Semitic rant" in Harvard's Sanders Theatre. Cplt. ¶ 101(c).

At the outset, we observe that not only does the Plaintiff allege that these claims are false, but also, as detailed below, Clopper's own boss and superior at Harvard Thomas Hammond verified Clopper's defenses to any alleged improprieties. At enormous personal cost to himself, Hammond went to his grave telling Harvard that the claims were false and that Clopper had done nothing wrong. Cplt. ¶¶ 29, 41, 46–50. In addition, the Crimson admitted that it had only published one side of the story; that is, Harvard's side. Cplt. ¶ 25. Despite admitting that, it refused to publish Clopper's rebuttal, the other side of the story. Cplt. ¶ 67(b). The Crimson has thus itself admitted that it failed to uphold basic journalistic standards, and as The Complaint and this Opposition alleges, its reporting transgressed into libelous defamation with malice.

### i.  Falsity #1: Clopper Abused Harvard's Resources to Make his Play

The claim that Clopper improperly worked on the play during work hours is false. As Hammond told Harvard during its inquisition of Clopper, it had been Hammond's policy for 14 years that employees could work occasionally on personal projects in the Language Resource Center when it did not interfere with their work or the center's operations; Hammond told

Clopper that he could do any and all of the work on the play that he did; Hammond himself encouraged Clopper to work on the play at Harvard when not performing departmental duties on Harvard's time; and Clopper was using vacation time anyway. Cplt. ¶¶ 29, 36.

### ii. Falsity #2: Clopper is Anti-Semitic

It is a terrible thing to accuse a person, here Clopper, of being an anti-Semite, a hater of Jews. Anti-Semitism bring to mind vile conduct such as drawing swastikas on synagogues or burning them, and chanting "Jews will not replace us" or attacking them. The accusation that Clopper is an anti-Semite is not only false but also preposterous. As the Complaint states as its first fact, "Clopper is Jewish." Cplt. ¶ 7. Clopper is anti-circumcision, not anti-Semitic, and he has many Jewish friends who are also opponents of circumcision. Cplt. ¶ 101(a). As mentioned, at the Motion to Dismiss stage his disavowal must be accepted as true.

### iii. Falsity #3: Clopper Went on a "Nude, Anti-Semitic Rant" in Sanders Theatre

The claim that Clopper engaged in a "nude, anti-Semitic rant" in Sanders Theatre is demonstrably false. The phrase communicates and insinuates that Clopper performed nude throughout the play, whereas he only performed nude for 3.75 minutes or 2.7% of the play. When he did perform his nude dance, he did not speak, and hence it is logically impossible for him to have engaged in a "nude, anti-Semitic rant" as the Crimson reported; thus the claim is false. The vast majority of the play consisted of a scholarly PowerPoint presentation based on a lecture, which was the opposite of a rant, and thus the claim that the play was a "rant" was false. The phrase "nude, anti-Semitic rant" falsely communicates that Clopper was virtually deranged in spewing anti-Semitic hate while nude, which held him up to contempt in the Harvard community and cost him his career there.

As the *Restatement (Second) of Torts* § 563, comment d (1977) notes, and as the First Circuit endorses, "*the public frequently reads only the headline of the articles or reads the article itself so hastily or imperfectly as not to realize its full significance.*" *Stanton*, 438 F.3d at 126 (emphasis added). The "reasonable reader" may not even read to the second sentence, and thus the initial impression is most important. *Id.* Thus, the majority of the public is going to "[read] only the headline" and "reasonably interpret" the objectively false and intentionally defamatory message that Clopper engaged in a naked, anti-Semitic rant in Sanders Theatre.

The Crimson asserts as a defense in its Motion to Dismiss that if its headline is "not provably true, [it is] at the very least subjective opinions based on disclosed non-defamatory facts." Mem. Law. Supp. To Dismiss ("MTD") at 10, Dkt. No. 36. This Court held in dismissing Plaintiff's defamation claims against Harvard in relevant part that, "these statements either accurately relay facts (plaintiff *did* perform nude without permission) or express unactionable opinions." Dkt. No. 37. However, for the reasons discussed above, and as evidenced by Sealed Exhibit A, the headline *is* "provably false."[2] Furthermore, expressions of opinions not based on facts are open to defamation actions. *See Nat'l Ass'n of Gov't Emps. v. Cent. Broad.*, 379 Mass. 220, 227 (1979). Thus, even if The Crimson's gross mischaracterization of Clopper's anti-circumcision play as an "anti-Semitic rant" constitutes an "unactionable opinion," it is an indisputable fact that Plaintiff did not criticize circumcision (or say anything critical at all) while naked. Thus, The Crimson's "nude, anti-Semitic rant" "opinion" of Clopper's play gives rise to an actionable defamation claim because it is based on the defamatory falsity that Clopper engaged in any form of "nude ranting."

---

[2] Clopper alleges that he has pled enough facts in the form of video evidence that *proves* that he did not engage in a "nude, anti-Semitic rant." The burden should now shift to defendant to direct the Court to a timestamp in Sealed Exhibit A where Clopper engaged in any conduct that could conceivably be construed as a "nude, anti-Semitic rant." Otherwise, Plaintiff's defamation claims should proceed against The Crimson.

DocuSign Envelope ID: 815BB3DE-758E-4AEE-B75A-63E42C16CD8F

The Crimson responds that Clopper "is parsing too finely" and that "[e]ven if the headline could somehow be misleading by juxtaposing 'nude' with 'rant' … there would be no falsehood for purposes of this motion to dismiss." MTD at 8. To support such a bold assertion, The Crimson cites the rule that, "Defamation law 'overlooks minor inaccuracies and concentrates upon substantial truth.'" *Id.* (citing *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 516 (1991)). But the "substantial truth" of the matter is that Clopper delivered an impassioned, erudite, and well-received refutation of a long-standing religious ritual, which has received critical acclaim a great many times online and in person. As Clopper's letter to The Crimson's editor in response to its articles, which The Crimson refused to publish, reads, in part:

> If I can be forgiven for a lack of modesty, I might also point out that the Crimson's article failed to mention that my performance received a sustained standing ovation – hardly what one would expect for an "employee's nude, anti-Semitic rant."[3]

The Crimson appears to suggest that "nude" and "rant" are so far separated in the headline that they did not communicate to their readers that Clopper went on a "nude rant." MTD at 8. However, The Crimson's admittedly "misleading" juxtaposition of "nude" and "rant" is connected by a single word, the horrific qualifier "anti-Semitic." The question is whether a "reasonable interpretation of the juxtaposition [of the article's contents]" is defamatory. *Stanton*, 438 F.3d at 131 (holding that placing a picture of a teenage girl next to a suggestive headline met the burden of a defamatory insinuation at the motion-to-dismiss stage). If merely placing a picture adjacent to a suggestive headline is a close enough juxtaposition to constitute libel, then surely the juxtaposing phrase, "Nude, Anti-Semitic Rant" as a headline "reasonably communicates" one image, i.e. Clopper naked ranting with hatred about his own Jewish people.

---

[3] Clopper sent his "Letter to the Editor" on May 3, 2018, the day following the "Nude, Anti-Semitic Rant" article was published. The Crimson never responded to Clopper, and instead published four more attack articles about him.

As Harvard's own Professor of Media & Activism Michael Bronski commented, "the title [headline] implies you are nude though [sic] the entire show, which is not true -- *and gives the casual reader a TOTALLY inappropriate and inflammatory description of the event.*" Cplt. ¶ 101(c) (emphasis added).

The Crimson then tries to escape liability for defamation by asserting that the contents of the article provide context to its headline, MTD at 7, citing the rule that "headlines be interpreted in light of the entire context of the publication." *Id.* (citing *Amrak Productions, Inc. v. Morton*, 410 F.3d 69, 73 (1st Cir. 2005)). However, the "context" of The Crimson's headline only compounds rather than clarifies the article's inaccuracies. The hundreds of members of the Harvard community who saw the play, unlike the Crimson's reporters who did not, posted laudatory comments about the play on the Crimson's public messaging board, and they intensely criticized the Crimson's "coverage" and narrative that Clopper's two hour long tour de force about Jewish circumcision constituted a nude anti-Semitic rant. The Crimson's follow-up article to its "Nude, Anti-Semitic Rant" "review" of Clopper's play provides additional context and insight to The Crimson's true motives. Two days following the "Nude, Anti-Semitic Rant" article, The Crimson falsely claims that Clopper, "Planned [his] Show Containing Anti-Semitism, Nudity in Harvard Workplace During Work Hours," and suggests that Harvard should terminate him on those grounds, which further implies malice (discussed in the next section). Cplt. ¶ 99. As discussed, Clopper had his boss's permission and was on vacation when preparing his play. Cplt. ¶¶ 29, 37.

"In assessing whether a statement can bear a defamatory construction, '[m]eaning is to be derived as well from the expression used as from the whole scope and the apparent object of the writer.'" *Stanton*, 438 F.3d at 129 (citing Robert D. Sack, *Sack on Defamation: Libel, Slander,*

DocuSign Envelope ID: 815BB3DE-758E-4AEE-B75A-63E42C16CD8F

*and Related Problems* § 2.4.2, at 2–19 (2004)). By intentionally leading with the objectively false and defamatory headline of "nude, anti-Semitic rant," it is clear that The Crimson set out to attack Clopper, discredit his well-received anti-circumcision message, and end his Harvard career, instead of reporting the news and "fulfill[ing] its mission of upholding the highest standards of journalistic ethics" as its president claims The Crimson does in its October 7, 2020 article covering news of this lawsuit. Jasper G. Goodman, *Harvard, The Crimson Move to Dismiss Lawsuit Filed by Former University Employee Eric Clopper*, https://www.thecrimson.com/article/2020/10/7/harvard-motion-to-dismiss-clopper-lawsuit/. As the next section shows, The Crimson made these false and defamatory statements with actual malice.

### C. The Crimson Acted with Malice Towards Clopper

The Court ruled that plaintiff's defamation claim against Harvard failed in part because, "plaintiff acted as a limited-purpose public figure with respect to his performance and has not adequately alleged actual malice on the part of Harvard." Dkt. No. 37. Plaintiff concedes that he acted as a public figure in the public controversy about circumcision. However, Clopper *did* plead actual malice against both Harvard and the Crimson, Cplt. ¶¶ 104–105, and with considerable specificity, as shown below.

"[A]ctual malice means that the 'defamatory falsehood was published with knowledge that it was [i] false or [ii] reckless disregard of whether it was false.'" *McNamee v. Jenkins*, 52 Mass. App. Ct. 503, 506 (2001). The Crimson had a video of Clopper's play; as discussed, the video shows that the play was not a "Nude, Anti-Semitic Rant." Therefore, The Crimson had actual knowledge that its statement was false, and thus the requirement of malice is met.

DocuSign Envelope ID: 815BB3DE-758E-4AEE-B75A-63E42C16CD8F

The Crimson also acted with reckless disregard for the truth. Michael Xie and Lucy Wang—the reporters of the "Nude, Anti-Semitic Rant" article—*did not see Clopper's show.* Their only source was a "Benjamin" from Harvard's Hillel – the university's Jewish student group, as Clopper's boss Hammond emailed Clopper in a June 5, 2018 email.

> The fact that HR knows about 'Benjamin' [the Harvard Hillel student who wrote the defamatory article and then had Michael Xie and Lucy Wang affix their names to it] suggests that the Crimson and Harvard are sharing information. This collusion could be important for [your attorneys] to know about. May for example be used as evidence that the Crimson's independence is a claim of convenience when Harvard doesn't wish to be held responsible for libelous stories.[4]

The fact that Harvard and The Crimson shared information about sources, combined with the fact that they both claim to be independent, reinforces the conclusion that both had ill will and malicious intent in their "coverage" of Clopper's play.

Malice may be "alleged generally" as long as the plaintiff "lay[s] out enough facts from which malice might be reasonably inferred." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012) and as stated, the standard is that all inferences favorable to the plaintiff must be made at the Motion to Dismiss stage. A reasonable jury could find that the totality of the facts — which include: The Crimson (i) calling Clopper's play a "nude, anti-Semitic rant" in the headline despite having a video showing that that statement was verifiably false; (ii) uncritically accepting an invidious hit piece against Clopper from a likely biased source ("Benjamin" from Harvard's Hillel community) without disclosing the source; (iii) Crimson reporters affixing their names to the article despite never having seen the play; (iv) publishing five attack articles against Clopper; (v) refusing to publish Clopper's letter to the editor; (vi)

---

[4] Email from Hammond to Clopper on June 7, 2018 at 8:20 am.

keeping objectively false articles and headlines up online, "nude, anti-Semitic rant," to this day; (vii) conspiring with Harvard as evidence shows while constantly posturing that both parties are independent; and (viii) requesting an interview from Clopper because it is "really interested in achieving balance and bringing your perspective to our coverage" on January 26, 2020, and February 13, 2020, on the eve of what The Crimson likely perceived to be an actionable defamation lawsuit against them from Clopper — all create a reasonable inference of actual malice, especially at the motion to dismiss stage.

### D.  Clopper Suffered Damages from The Crimson's Libel.

There was no reason for Harvard to instigate an "investigation" against Clopper following his standing-ovation play. Indeed, Harvard never gave Clopper a reason why it was investigating him, and the scope of the investigation continued to increase with time. Cplt. ¶¶ 27, 30. At the time of Clopper's play, he was a star employee. Cplt ¶¶ 38–41. His boss Hammond and Dean Kirwan had already agreed to promote him to "Associate Director of Harvard's Language Center" in the near future. Yet, Dean Kirwan received complaints *throughout the night* about The Crimson's libelous "Nude, Anti-Semitic Rant" headline about his play. Cplt. ¶ 103. Indeed, Dean Kirwan herself said in a May 15, 2018 staff meeting that *this "investigation" started because of the complaints* inspired by The Crimson's coverage.[5] The Complaint further pleads a plausible nexus between The Crimson's coverage and Clopper's ultimate termination of his career and plausible graduate school aspirations at Harvard University. Cplt. ¶¶ 106, 107.

### II.    THE COMPLAINT STATES A PLAUSIBLE CLAIM UNDER THE MASSACHUSETTS CIVIL RIGHTS ACT (MCRA) (COUNT II)

---

[5] Hammond emailed Clopper on May 15, 2018 at 10:21 am his recollection of Dean Kirwan's public comments to FAS staff earlier that morning about Clopper's play and The Crimson's coverage about it. Hammond's email recounting Kirwan's comments reads, in part, "There were complaints, many complaints from a variety of sources. As a result, this matter is under review."

To establish a claim under the act, "a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." *Currier v. Nat'l Bd. of Med. Exam'r,* 965 N.E.2d 829, 837–38 (Mass. 2012). Unlike its federal counterpart, 42 U.S.C. § 1983, the Massachusetts Civil Rights Act does not require a party to show that a government actor deprived the plaintiff of a constitutional right. *Sena v. Commonwealth*, 629 N.E.2d 986, 993 (Mass. 1994).

**Element (1) is met here** as Clopper had the constitutional right to engage in protected speech under First Amendment standards as an individual on his own time, and in the manner he did in his play. We have shown that Clopper's anti-circumcision play, performed before a sophisticated Harvard audience expecting nudity, *taken as a whole*, was not obscene, and thus it was protected speech. *See* Ex. A of Dkt. No. 44 at Part I.A.

**Element (2) is met here as well**. Granted, the plaintiff was an employee at will, but as the Complaint alleges, Harvard in its Free Speech Guidelines encouraged free speech consistent with First Amendment standards, and promised not to retaliate against the plaintiff for engaging in it. Cplt. ¶ 83. Professor Bronski and Thomas Hammond also told the plaintiff that Harvard would not retaliate against him for performing his play. *Id.* Hammond's boss told him that his job was safe. *Id.* A jury could well conclude that the many express, implied, written, and oral promises made by Harvard and several of its agents materially altered his employment contract with Harvard to encompass protection for performing the play as he did. *See* Ex. A of Dkt. No. 44 at Part II; *see also Jackson v. Action for Bos. Cmty. Dev., Inc.*, 403 Mass. 8, 9 (1988) ("A contract implied in fact may be found to exist from the conduct and relations of the parties."). He also relied upon those promises and is convinced that his reliance was reasonable.

The Crimson attempted to and did interfere with Clopper's employment contract—*which encompassed Harvard upholding his First Amendment rights*—to perform his play without retaliation. But for The Crimson's defamation campaign against Clopper, Harvard would not have instigated its 69-day "investigation" against him, which concluded with his eventual termination.

**Element (3) is met**. Importantly, Clopper need not prove that The Crimson itself interfered with his rights by "threats, intimidation, or coercion" if the defendants acquiesced to pressure from third parties who did wish to interfere with such rights. *See Redgrave v. Bos. Symphony Orchestra, Inc.*, 502 N.E.2d 1375, 1379–80 (Mass. 1978). Contrary to The Crimson's assertion that "[Clopper] pleads no facts to suggest … that The Crimson interfered with his rights by [this element]," MTD at 16, Clopper has pled facts in the Complaint, and reiterates them here, demonstrating a plausible inference that The Crimson was acting at the behest of a third party. Because The Crimson did not even see Clopper's play, *it must have been informed by a third-party what to write about the play*, as discussed in more detail in Part IV, *infra*. The Crimson told Clopper that it was just reporting the "one-sided" account of "*where Harvard is standing regarding your performance*." Cplt. ¶ 25 (emphasis added). Furthermore, as stated, Harvard informed Hammond that The Crimson received its [defamatory] headline and articles from a "Benjamin" from Harvard's Hillel. *See* Part I.C, *supra*. The Crimson's "coverage" of Clopper's play therefore interfered with Clopper's implied in fact contract that Harvard would not terminate him for performing his play.

The Crimson next tries to deny Clopper relief under the MCRA by inventing the legal rule that an "'actual or potential physical confrontation accompanied by a threat of harm,' … is a required element of the MCRA claim." MTD at 17 (citing *Planned Parenthood League of*

13

*Massachusetts, Inc. v. Blake,* 417 Mass. 467, 475 (1994). However, as the 2001 case *Carvalho* explains, the SJC only "suggests" that a "potential physical confrontation" is required, and that a "loss of a contract right" may invoke MCRA liability. *Carvalho v. Town of Westport*, 140 F. Supp 2d 95, 101 (D. Mass. 2001) (citing *Willitts v. Roman Catholic Archbishop*, 411 Mass. 202, 210 (1991)). In any event, the SJC is "conflicted" about whether the exception of tortious interference with contractual relations due to acquiescence to third parties has been overruled. *Id.* Thus, *Carvalho* ultimately holds that, "[adverse employment action] in retaliation for [plaintiff's] public statements are—at the motion to dismiss stage—sufficient to state a claim under [the MRCA.]" *Carvalho*, 140 F.Supp.2d at 102. Where here the plaintiff has alleged adverse employment action in retaliation for The Crimson's libelous coverage of his public statements, he has thus stated a sufficient claim for relief under the MRCA at the motion to dismiss stage.

## III.   THE COMPLAINT STATES A PLAUSIBLE CLAIM FOR TORTIOUS INTERFERENCE WITH EMPLOYMENT CONTRACT (COUNT IX)

"In order to make out a claim for interference with advantageous business relations, the plaintiff must prove that (1) he had a business relationship for economic benefit with a third party, (2) the defendants knew of the relationship, (3) the defendants interfered with the relationship through improper motive or means, and (4) the plaintiff's loss of advantage resulted directly from the defendants' conduct." *Kurker v. Hill*, 44 Mass. App. Ct. 184, 191 (1998).

**Elements (1) and (2) are met.** Clopper was employed by Harvard and thus had a contractual relationship with it and The Crimson knew of said contract, as evidenced by its numerous references to his employment there and its erroneous assertions that he abused Harvard's resources to produce his play. Cplt. ¶ 99.

**Element (3) is met.** "'[I]mproper means' may consist of a violation of a statute or common law precept." *Kurker*, 44 Mass. App. Ct. at 191 (citing *United Truck Leasing Corp. v.*

14

DocuSign Envelope ID: 815BB3DE-758E-4AEE-B75A-63E42C16CD8F

*Geltman*, 406 Mass. 811, 817 (1990)). Thus, if Plaintiff's defamation claims proceed, as the plaintiff argues they should, then defamation is per se an "improper means" of interfering with his employment at Harvard. It is especially plausible that The Crimson's coverage interfered with Clopper's employment because Clopper had an otherwise stellar career at Harvard, Cplt. ¶¶ 38–41, until after the Crimson published its "nude, anti-Semitic rant" article about him, which instigated his investigation, his termination, and his being blackballed from graduate school at Harvard.

The Crimson points to *Dulgarian v. Stone*, 420 Mass. 851 (1995) to try to deny Plaintiff relief under this count. MTD at 17. However, in *Dulgarian*, a news station *accurately reported* on conflicts of interests between body-repair shops and drive-in appraisal services with the intent to inform the public of this potential deceptive conduct. *Id.* In this case, by contrast, The Crimson *intentionally misrepresented* Clopper's play as a "nude, anti-Semitic rant" and admitted that its coverage was one-sided, thereby actionably holding him up to contempt and scorn in the Harvard community – a community where he had worked for the past seven years; a place Clopper had called home and where he expected to do graduate work, whereas now he has since been ostracized on campus as a persona non grata.

**Element (4) is met.** Finally, as pled in the Complaint, Harvard's administration, Dean Kirwan, and others received numerous complaints because of the Crimson's "coverage," as The Crimson should have expected. Cplt. ¶¶ 42, 103, 117. Without the Crimson's articles, Clopper's standing-ovation performance would have gone unnoticed on campus until he released his well-received play online. However, because of The Crimson's misrepresentation of Clopper's play as a "nude anti-Semitic rant," Harvard instituted its investigation against Clopper *expressly because of the complaints that Harvard received as a result of* the Crimson's false, defamatory, and

15

malicious coverage of his play. *Id.* Thus, if Plaintiff's defamation claim against the Crimson

proceeds, so too must the tortious interference with advantageous business relations claim

(Count IX) because then all four elements of this tort would be met.

## IV. THE COMPLAINT STATES A PLAUSIBLE CLAIM FOR CONSPIRACY TO DEFAME (COUNT X)

As to this final count against The Crimson, Massachusetts courts recognize the tort of

civil conspiracy, which requires a common design or agreement, which need not be express,

between two or more persons to do a wrongful act, with a tortious act in furtherance of such an

agreement. *Kurker*, 184 Mass. App. Ct. at 188– 90. "For harm resulting to a third person from

the tortious conduct of another, one is subject to liability if he … (b) knows that the other's

conduct constitutes a breach of duty and gives substantial assistance or encouragement to the

other so to conduct himself." *Restatement (Second) of Torts* § 876(b), (1977). Massachusetts

courts have recognized this tort liability. *See, e.g., Nelson v. Nason,* 343 Mass. 220, 222

(1961) (recovery allowed under concerted action theory of § 876(b) where the defendant's

deliberate conduct caused another to engage in tortious activity); *see also Pathe Computer*

*Control Sys. Corp. v. Kinmont Indus., Inc.,* 955 F.2d 94, 98 (1st Cir.1992) ("[in] the tort field, the

doctrine appears to be reserved for application to facts which manifest a common plan to commit

a tortious act where the participants know of the plan and its purpose and take affirmative steps

to encourage the achievement of the result.") (citing *Stock v. Fife,* 13 Mass.App.Ct. 75, 430

N.E.2d 845, 849 n. 10 (1982)).

Here, if Plaintiff's defamation claim (Count VII) proceeds for the reasons above, then

Plaintiff contends so too must his conspiracy claim (Count X) proceed. By the Crimson's own

admission, its reporters did not see Clopper's show. Cplt. ¶ 25. Ipso facto, if its May 2, 2018

coverage of Clopper's May 1, 2018 play was libelous, then *The Crimson must have received its*

*defamatory information from a third party*; that is, a third party who "provided substantial assistance or encouragement" to defame Clopper and then convince Michael Xie and Lucy Wang to affix their names to the articles.

Plaintiff respectfully disagrees with the court that he failed to plead "any facts supporting his conclusory allegation of any common plan or scheme." Dkt. No. 37. Harvard told Hammond that a third party wrote the hit piece against Clopper in a June 5, 2018 meeting and then got Xie and Wang to publish it under their names. Hammond then relayed this information to Clopper in a June 7, 2018 email as pled above. *See* Part I.C, *supra*.

Thus, plaintiff's conspiracy to defame implicates both a "Benjamin" as a to-be-named defendant, and perhaps even Harvard University. Regardless, Plaintiff's conspiracy to defame against The Crimson should be allowed to proceed.

## A PLEA FOR FAIRNESS

The plaintiff and four attorneys (one who drafted demand letters, two who made an appearance, and one attorney retained to appear at trial) have spent more than 1,000 hours curating and reviewing the facts, interviewing friendly witnesses, doing legal research, writing demand letters, and drafting the complaint. We believe that Harvard retaliated against the plaintiff in violation of Harvard policy and promises by his superiors on whom he reasonably relied, that Harvard and The Crimson defamed him, and that he has meritorious claims against them both. We further believe that the plaintiff has pled all counts in the Complaint as thoroughly as needed and as allowed, insofar as a complaint can only contain a short statement of the facts. We respectfully disagree with the court's dismissal of all claims as to Harvard and its reasoning, and believe that the dismissal is appealable (except as to Count I as we grant that the argument that Harvard is not a state actor is correct).

Speaking openly, the plaintiff and his two attorneys of record were also surprised that the Court dismissed the case at the outset of the litigation, and *with prejudice*, without leave to amend (which we do not believe was needed), only one day after the deadline to file an opposition to Harvard's Motion to Dismiss, and after having seen only seen a 5-minute misappropriated slideshow that rolled in the background after the play had ended and after most of the of the audience had left so almost no one saw it. We were also surprised that the Court did not allow the Plaintiff to file its opposition a few days late, or allow the plaintiff's attorney Michael Vigorito to file an affidavit under seal explaining that that he had all the symptoms of COVID 19 including brain fog, compounded by an illness of a personal nature. Thus, the court ruled that he had not shown excusable neglect without reading his reasons. Let us agree to disagree about the dismissal of the claims against Harvard. We are simply asking that the Court decide the instant claims against The Crimson fairly on the merits after viewing the rest of the play.

## CONCLUSION

The Court now has *the full video record* of what transpired in Sanders Theatre. It can see that the play was an erudite and entertaining performance about a controversial topic. The Crimson's articles depiction of the play as a "nude, anti-Semitic rant" improperly prepared during work hours is false. The Crimson even admitted that its articles were one-sided; their articles constituted a series of premeditated, defamatory attacks on his reputation and his career. Moreover, evidence shows that The Crimson colluded with agents of Harvard and others to defame his reputation and call for his dismissal, which led alumni to pressure Harvard to do the same, and Harvard did terminate him and bar him from graduate school. Moreover, The Crimson has refused to take down the defamatory articles, and they are very likely to preclude him from

obtaining job and other opportunities in the future that he would otherwise obtain. Therefore, the

plaintiff should be allowed to conduct discovery and proceed to trial on all of the counts against

The Crimson, and its motion to dismiss should be denied.

Respectfully submitted,
**Eric Clopper**

By his attorney,

Andrew DeLaney, ESQ.


## CERTIFICATE OF SERVICE


I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on November 3,

2020.

Andrew DeLaney, ESQ.